# EXHIBIT A

HP Tuners, LLC Operating Agreement dated March 25, 2004, including the Amendment to HP Tuners, LLC Operating Agreement

# HP Tuners LLC

## Operating Agreement

A.  THIS OPERATING AGREEMENT (the "Agreement") of HP Tuners LLC (the "Company") is entered into as of March 25, 2004 by and between each of the persons named in Exhibit A hereto. Such persons are referred to individually as a "Member" and collectively as the "Members".

B.  The Members have formed a limited liability company under the laws of the state of Nevada (Chapter 86 of the Nevada Revised Statutes, hereinafter the "Nevada Limited Liability Company Act").  The articles of organization of the Company filed with the Nevada Secretary of State on December 31, 2003 ("Filing Date"). This Agreement shall be effective as of the Filing Date.

C.  The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the laws of the state of Nevada ("Nevada Limited Liability Company Act").

"Agreement" means this operating agreement

"Capital Contribution" means the amount of cash, property or services contributed to the Company, or the cash value of property contributed or services rendered, or the amount of a promissory note or other binding obligation to contribute cash or property or to perform services.

"Company" means HP Tuners LLC, a Nevada limited liability company.

"Filing Date" means the date of filing of the Articles of Organization of HP Tuners, LLC
with the Nevada Secretary of State.  Such date is December 31, 2003.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

# HP Tuners LLC

## Operating Agreement

A. THIS OPERATING AGREEMENT (the "Agreement") of **HP Tuners LLC** (the "Company") is entered into as of March __, 2004 by and between each of the persons named in **Exhibit A** hereto. Such persons are referred to individually as a "Member" and collectively as the "Members".

B. The Members have formed a limited liability company under the laws of the state of Nevada (Chapter 86 of the Nevada Revised Statutes, hereinafter the "Nevada Limited Liability Company Act"). The articles of organization of the Company filed with the Nevada Secretary of State on December 31, 2003 ("Filing Date"). This Agreement shall be effective as of the Filing Date.

C. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

### ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the laws of the state of Nevada ("Nevada Limited Liability Company Act").

"Agreement" means this operating agreement

"Capital Contribution" means the amount of cash, property or services contributed to the Company, or the cash value of property contributed or services rendered, or the amount of a promissory note or other binding obligation to contribute cash or property or to perform services.

"Company" means HP Tuners LLC, a Nevada limited liability company.

"Filing Date" means the date of filing of the Articles of Organization of HP Tuners, LLC with the Nevada Secretary of State. Such date is December 31, 2003.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest" means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Regulations" shall mean the regulations promulgated by the Department of the Treasury pursuant to the Internal Revenue Code.

"Technology" means the intellectual property contributed by each member and described on Exhibit A.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

## ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 **Initial Capital Contributions and Membership Interests**. The Capital Contributions of the initial Members, as well as the Membership Interests of each Member, are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 **Subsequent Contributions**. No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 **Capital Accounts**. Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 **Interest**. No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 **Limited Liability**. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocations**. The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 **Distributions.** The Company shall have the right to make distributions of cash and property (excluding Technology) to the Members pro rata based on the relative Membership Interests. The timing and amount of distributions shall be determined by the Members in accordance with Nevada law.

3.3 **Limitations on Distributions**. The Company shall not make any distributions if, after giving effect to the distribution either (a) the Company would not be able to pay its debts as they become due in the usual course of business or (b) the total assets of the Company would be less than the sum of its total liability.

## ARTICLE 4: TECHNOLOGY

4.1 **Intellectual Property**. In exchange for his membership interests, each member has contributed and assigned to the Company the intellectual property described on Exhibit A ("Technology"). Each member hereby agrees to assist the Company in any reasonable manner to obtain for the Company's benefit legal protection for the Technology and will execute, when requested, any lawful documents deemed necessary by the Company to carry out the purposes of the Technology assignment. Each member will further assist the Company in every way to enforce its rights in the Technology, testifying in any suit or proceeding involving any of the Technology or by executing any documents deemed necessary by the Company.

4.2 **Additional Technology**. Each Member also grants the Company all of his rights, titles and interest in and to improvements, enhancements, derivative works to the Technology.

4.3 **Return of Technology**. If a member withdraws from the Company prior to January 1, 2005, such withdrawing member will have the right to demand the Company return his original Technology described on Exhibit A. The Company will promptly transfer and assign such Technology back to the Member upon his withdrawal. In exchange for the return of the Technology, the Member will return his Units to the Company and will no longer be entitled to any ownership interest in the Company. The Company shall, however, have the right to keep all additional Technology described in Section 4.2.

## ARTICLE 5: MANAGEMENT

5.1 **Management**. The business of the Company shall be managed by the Members. In the event of a dispute between Members, final determination shall be made by a vote of the majority of the Members (unless a greater percentage is required in this Agreement or under Nevada law). Only the President shall have the ability the bind the Company in any matters relating to the ordinary course of business.

5.2 **Banking**. Subject to full member approval, the President is authorized to set up one or more bank accounts and is authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the

name of the Company.  Notwithstanding the foregoing, the President may not write any checks in an amount exceeding $10,000 per check nor more than $30,000 per month without the consent of a majority of the members.

5.3 **Officers.**  The Members are authorized to appoint one or more officers from time to time.  The officers shall hold office until their successors are chosen and qualified.  Subject to any employment agreement entered into between the officer and the Company, an officer shall serve at the pleasure of the Members.  The current officers of the Company are listed on Exhibit B.

## ARTICLE 6: ACCOUNTS AND ACCOUNTING

6.1 **Accounts**.  Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member.  The costs of such inspection and copying shall be borne by the Member.

6.2 **Records**.  At all times during the term of existence of the Company, and beyond that term if the Members deems it necessary, the Members shall keep or cause to be kept the following:

(a)  A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member;

(b)  A copy of the articles of organization and any amendments;

(c)  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent taxable years; and

(d)  An original executed copy or counterparts of this agreement and any amendments.

6.3 **Income Tax Returns**.  Within 45 days after the end of each taxable year, the Company shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.4 **Tax Matters Member**.  Ken Cannata shall act as tax matters member of the Company to represent the Company (at the Company's expense) in connection with all

-4-

examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

6.5 **Accounting Method**. The records of the Company shall be maintained based on a cash method of accounting.

## ARTICLE 7: MEMBERSHIP--MEETINGS VOTING

7.1 **Members and Voting Rights**. Members shall have the right and power to vote on all matters with respect to which this agreement or Nevada law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under Nevada law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

7.2 **Meetings**. Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by Nevada law, including by conference telephone or similar communications equipment. In addition, any action which could be taken at a meeting can be approved without a meeting and without notice if consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action.

## ARTICLE8 : WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

8.1 **Withdrawal**. A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 8.2 below. A Member which withdraws pursuant to this Section 8.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account. If such withdrawal is prior to January 1, 2005, then the provisions of Article 4, Section 4.3 shall apply.

8.2 **Restrictions on Transfer**. A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless Members holding a majority of the Membership Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

## ARTICLE 9: DISSOLUTION AND WINDING UP

9.1 **Dissolution**.  The Company shall be dissolved upon the first to occur of the following events:

> (a) The unanimous written agreement of the Members to dissolve the Company.

> (b) Upon entry of a decree of judicial dissolution pursuant to Section 86.495 of the Nevada Limited Liability Ac

9.2 **No automatic dissolution upon certain events.**  Neither the death, incapacity, disassociation, bankruptcy or withdrawal of a Member shall automatically cause dissolution of the Company.

9.3 **Liquidation**.  Upon dissolution of the Company, the assets of the Company shall be liquidated and the proceeds thereof shall be paid in accordance with Section 1.704-1(b)(2)(iv) of the Regulations and in the following order:

> (a) To the Company's creditors in the order of priority required by law;

> (b) To a reasonable reserve for reasonably foreseeable contingent liabilities to be distributed when and as the Managers agree; and

> (c) Thereafter to the Member in accordance with its positive Capital Account.

## ARTICLE 10: INDEMNIFICATION

10.1 **Indemnification**.  The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to

be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 **Expenses.** Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

## ARTICLE 11: GENERAL PROVISIONS

11.1 **Entire Agreement; Amendment.** This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

11.2 **Governing Law; Severability.** This agreement shall be construed and enforced in accordance with the internal laws of the State of Nevada. If any provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this agreement shall remain in effect.

11.3 **Benefit.** This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.4 **Number and Gender.** Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include

the male and female as well as a trust, firm, company, or corporat on, all as the context and meaning of this agreement may require.

11.5 **No Third Party Beneficiary**. This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

11.6 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

11.7 **Principal Office**. The principal offices of the Company shall be located at 22583 Pamplico Drive, Saugus, California, 91350.

**IN WITNESS WHEREOF**, the parties have executed or caused to be executed this Operating Agreement as of the date below.

Dated: March 25 2004

_Keith Prociuk_
Keith Prociuk

_Ken Cannata_
Ken Cannata

_Chris Flstri_          26/03/2004.

-9-

EXHIBIT A

## MEMBERS

The following persons are the initial Members of the Company, and their initial capital contributions and ownership is set forth below.

| Name | Capital Contribution (Property) | Percentage Interest |
|------|-------------------------------|---------------------|
| Keith Prociuk | See Attachment A | 33.3 |
| Ken Cannata | See Attachment A | 33.3 |
| Chris Piastri | See Attachment A | 33.3 |

ATTACHMENT A

| Name | Description of Technology |
|---|---|
| Keith Prociuk | Keith Prociuk has developed the following items:<br><br>VCM Suite Software which includes;<br><br>Definition Editor 1.1.0<br>- Used to create definition file maps for PCM Binary images. Definition files are used in VCM Editor.<br><br>VCM Flash 1.1.0<br>- Reads and Writes to the PCM. Supports recovery features, partial and full writes.<br><br>VCM Editor 1.1.0<br>- Edits PCM files read with VCM Flash and uses maps created with Definition Editor. Includes table editor with graphical displays and copy/paste features.<br><br>VCM Scanner 1.1.0<br>- Scans PCM data and reports and clears diagnostic trouble code information. Log file save capability and logging is functional. |
| Ken Cannata | Kenneth Cannata has developed a simple pass through device and associated firmware for the translation of the RS232 protocol to the SAE VPWM/PWM protocols. This encompasses the use of a Motorola HC08 MCU and a Delphi DLC controller.<br><br>Submitted hardware version is 1.0<br>Submitted firmware version is 2.3.5<br><br>The firmware version 2.3.5 which incorporates the use of a non or minimal data caching technique between the HC08 MCU and DLC controller in order to decrease the data transfer time latency in either data direction.<br><br>The firmware also includes various error handling routines to improve data robustness |

| | |
|---|---|
| | such as message retry for VPW bus related errors. |
| | The firmware 2.3 5 also includes the automatic detection of the Begin High Speed "$A1" and Return to Normal "$20" commands by monitoring the received messages for a non pass through initiated command on the J1850 bus for the purpose of setting the configuration registers of the DLC controller. |
| | The firmware 2.3.5, hardware 1.0 also includes a dynamic bus load changing feature. |
| Chris Piastri | Chris Piastri has developed the following items: |
| | PCM unlocking algorithm used to unlock the device to enable reprogramming.<br>- Support for V8 LS1 engines and V6 L67 engines is submitted |
| | Bootloader routines to enable reading and writing of the PCM flash memory. The 1024k write bootloader included support for both Intel and AMD flash technologies. Also the LS1 bootloaders incorporate intelligent information responses, 4x mode switching, checksum verification and error reporting. The following versions are submitted:<br>- LS1 V8 512k/1024k Read Bootloader version 0.5<br>- LS1 V8 512k Write Bootloader version 0.16<br>- LS1 V8 1024k Write Bootloader version 0.17<br>- L67 V6 Read Bootloader version 0.3<br>L67 V6 Write Bootloader version 0.17 |

EXHIBIT B

## OFFICERS

The following person(s) are elected as officers of the Company:

President, CFO and Secretary – Ken Cannata
Assistant Secretary – Tomer Tal

EXHIBIT C

## NEW MEMBER'S CONSENT

The undersigned agrees to be bound as a Member by the terms of the Operating Agreement of HP Tuners LLC as if the undersigned was a signatory thereof.

_____

(signature)

Name:_____

Date: _____

AMENDMENT TO HP TUNERS, LLC OPERATING AGREEMENT

This Amendment to the Operating Agreement of HP Tuners, LLC is effective this 17th day of September, 2004. All members agree to amend section 5.2 to read as follows"

5.2 **Banking**. Subject to full member approval, the President is authorized to set up one or more bank accounts and is authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company. .

12/10/04

Keith Prociuk


Ken Cannata

10/12/04

Chris Piastri