# EXHIBIT B

Membership Interest Purchase Agreement dated October 20, 2016, and
Ancillary Documents

Execution Version

MEMBERSHIP INTEREST PURCHASE AGREEMENT

by and between

*KEN CANNATA*

and

*HP TUNERS LLC*

Dated as of October 20, 2016

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS AND RULES OF CONSTRUCTION ................................ 1
    1.1  Defined Terms.................................................................................... 1
    1.2  Cross Reference to Additional Terms .............................................. 3

SECTION 2.  PURCHASE AND SALE ............................................................................ 5

SECTION 3.  PURCHASE PRICE AND CLOSING ........................................................ 5
    3.1  Purchase Price. ................................................................................... 5
    3.2  Closing ................................................................................................ 5
    3.3  Conditions of Obligations of the Company ...................................... 5
    3.4  Conditions of Obligations of Seller ................................................. 6
    3.5  Seller Closing Deliverables............................................................... 6
    3.6  The Company Closing Deliverables ................................................. 6

SECTION 4.  REPRESENTATIONS AND WARRANTIES OF SELLER........................ 7
    4.1  Title and Right to Assign .................................................................. 7
    4.2  Authority ............................................................................................ 7
    4.3  Execution, Delivery and Enforceability............................................ 7
    4.4  No Conflicts ....................................................................................... 7
    4.5  Consents, Approvals, etc.................................................................... 8
    4.6  Compliance with Law ........................................................................ 8
    4.7  No Litigation or Proceedings ............................................................ 8
    4.8  No Bankruptcy, etc. of Seller; Solvency........................................... 8
    4.9  Excluded Information, Etc. ................................................................ 8

SECTION 5.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY.................. 9
    5.1  Organization....................................................................................... 9
    5.2  Authority ............................................................................................ 9
    5.3  Consents, Approvals, etc.................................................................. 10
    5.4  No Conflicts ..................................................................................... 10
    5.5  Execution, Delivery and Enforceability.......................................... 10
    5.6  No Litigation or Proceedings .......................................................... 10
    5.7  Compliance with Law ...................................................................... 10
    5.8  No Bankruptcy, etc. of the Company; Solvency.............................. 10

SECTION 6.  CERTAIN COVENANTS ......................................................................... 11
    6.1  Cooperation Regarding Certain Matters ......................................... 11
    6.2  Further Assurances........................................................................... 12
    6.3  Confidentiality ................................................................................. 12
    6.4  Non-Competition and Non-Solicitation .......................................... 12
    6.5  Non-Disparagement ......................................................................... 13

SECTION 7.  RELEASE AND TERMINATION............................................................ 13
    7.1  Releases............................................................................................ 13

7.2     Termination ........................................................................................ 14

SECTION 8.   SURVIVAL and Indemnification ................................................................ 14
8.1     Survival ............................................................................................. 14
8.2     Mutual Indemnifications ................................................................... 14
8.3     Specific Indemnification by Seller.................................................... 15
8.4     Effect of Investigation ...................................................................... 15
8.5     Escrow Amount.................................................................................. 15

SECTION 9.   Bankruptcy Provisions ............................................................................. 16
9.1     Bankruptcy Representations and Warranties .................................... 16
9.2     Payment of Purchase Price................................................................ 16
9.3     Bankruptcy Claims............................................................................ 17

SECTION 10. MISCELLANEOUS ................................................................................... 17
10.1    Notices .............................................................................................. 17
10.2    Assignment........................................................................................ 18
10.3    Successors and Assigns; Third Party Beneficiaries ......................... 18
10.4    Amendment and Waiver .................................................................... 18
10.5    Joint Drafting .................................................................................... 19
10.6    Counterparts; Signatures ................................................................... 19
10.7    [Reserved] ......................................................................................... 19
10.8    [Reserved] ......................................................................................... 19
10.9    WAIVER OF JURY TRIAL............................................................. 19
10.10   Specific Performance ........................................................................ 19
10.11   Severability ....................................................................................... 20
10.12   Expenses............................................................................................ 20
10.13   Entire Agreement .............................................................................. 20

EXHIBITS:

A    –    Assignment
B    –    Closing Date Payment Wire Transfer Account

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made as of October 20, 2016 (the "Effective Date"), by and between KEN CANNATA, an individual ("Seller"), and HP TUNERS LLC, a Nevada limited liability company (the "Company").

## RECITALS

Seller wishes to sell, assign, and transfer to the Company, and the Company wishes to purchase and acquire, the Purchased Interest (as hereinafter defined), which constitutes and embodies all rights and interests of Seller in or with respect to the Company and the Company's assets at the price and on the terms hereinafter set forth.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises of the parties herein contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION 1. DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Defined Terms. The following capitalized terms have the meanings ascribed to them in this Section 1.1:

"Affiliate" means, with reference to a specified person: (a) a person who, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the specified person or (b) any person who is an officer, director, general partner, or trustee of, or serves in a similar capacity with respect to, the specified person or of which the specified person is an officer, director, general partner, or trustee, or serves in a similar capacity.

"Ancillary Agreements" means the agreements, instruments and certificates contemplated to be delivered by the Company and/or Seller pursuant to this Agreement.

"Business" means the business undertaken, and contemplated to be undertaken, by the Company as of the Effective Date.

"Business Day" means a day (other than Saturday or Sunday) on which banks are generally open for the ordinary conduct of business in New York, New York.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company's Knowledge" means, with respect to a particular fact or subject matter set forth in the representations and warranties of the Company, the actual knowledge of any senior executive officer of the Company concerning the existence of such fact or other subject matter of the Company and the imputation of knowledge of that fact or subject matter that any such senior executive officer of the Company could reasonably be expected to discover or otherwise become

aware in the course of conducting a reasonable investigation concerning the existence of such fact or other subject matter.

"Control" (including the terms "Controlling," "Controlled by," and "under common Control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting shares or interests, by contract, or otherwise.

"Encumbrance" means any security interest, pledge, mortgage, lien (including tax liens), charge, encumbrance, adverse claim, preferential arrangement, option, right of first of refusal, purchase right or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (in each case, other than pursuant to this Agreement), regardless of whether or not notice of such Encumbrance has been provided, recorded in any public record, or otherwise perfected.

"Governmental Authority" means any nation or government, any state, province, city, municipal entity, or other political subdivision thereof, and any governmental, executive, legislative, judicial (including a court), administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau, or similar body, whether federal, state, provincial, territorial, local, or foreign.

"Governmental Order" means, unless otherwise indicated, any order, writ, judgment, injunction, decree, stipulation, determination or administrative ruling or award entered by or with or issued by any Governmental Authority.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases that are owned or used by the Company in the conduct of the Business.

"Law" means, unless otherwise indicated, any national, federal, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Litigation" means any claim, action, suit, complaint, dispute, demand, litigation, judicial proceeding, administrative proceeding, or arbitration proceeding.

"Material Adverse Change" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, is materially adverse to the business operations, assets, condition (financial or otherwise), results of operations or prospects of the Company.

"Proprietary Information" means and includes all confidential and proprietary information of the Company; provided, however, Proprietary Information shall not include such information that (i) is or becomes generally available to, and known by, the public (other than as

2

a result of a breach of this Agreement by Seller); (ii) becomes available to Seller on a non-confidential basis from a source other than the Company, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal, or fiduciary obligation of confidentiality with respect to such information; (iii) was known or developed by Seller prior to becoming an owner of the Company and which does not now constitute Intellectual Property of the Company; or (iv) is independently developed by Seller after the date hereof without violating any of Seller's obligations under this Agreement for his own existing business operations.

"Purchase Price" means an amount equal to $6,460,000.00.

"Purchased Interest" means all of Seller's (i) rights, title and interests in and to any equity securities and other securities of the Company; (ii) rights and interests as a member of the Company, including any and all rights with respect to the Company or its respective assets, gains, profits, cash flow, distributions and business; and (iii) rights to vote on or have any voice in the affairs of the Company or with respect to any other matter affecting the Company under the governance documents of the Company, the laws of the state of formation of the Company or otherwise.

"Representative" means, with respect to any person, any director, officer, principal, attorney, employee, agent, financial advisor, consultant, accountant, or any other person acting in a representative capacity for such person.

"Seller's Knowledge" means, with respect to a particular fact or subject matter set forth in the representations and warranties of Seller, the actual knowledge concerning the existence of such fact or other subject matter of Seller and the imputation of knowledge of that fact or subject matter that Seller could reasonably be expected to discover or otherwise become aware in the course of conducting a reasonable investigation concerning the existence of such fact or other subject matter.

"Taxes" means any federal, state, or local taxes, including all income, gross receipts, unemployment compensation, payroll, social security, workers' compensation, estimated, transfer, excise, privilege, property, ad valorem, franchise, license, sales, use and any other tax or similar governmental charge or imposition under the applicable Laws of the United States, or any state or municipal or political subdivision thereof, together with any interest and penalties, additions to tax or additional amounts imposed with respect thereto.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with respect to Taxes, including any schedule or attachment thereto and any amendment thereof.

      1.2   Cross Reference to Additional Terms. The following terms are defined elsewhere in this Agreement:

"Agreement" ..................................................................... Preamble

"Assignment" ............................................................... Section 3.5(b)

"Closing".......................................................................... Section 3.2

"Closing Date" ................................................................. Section 3.2

"Closing Date Payment" .............................................Section 3.1(a)

"Company"........................................................................ Preamble

"Company Released Claims".......................................Section 7.1(b)

"Company Releasors" .................................................Section 7.1(b)

"Damages" ........................................................................ Section 8.2

"Deferred Purchase Price" ............................................. Section 3.1

"Effective Date"................................................................ Preamble

"Escrow Agent" ...........................................................Section 3.5(d)

"Escrow Agreement" ...................................................Section 3.5(d)

"Escrow Amount" .......................................................... Section 8.5

"Escrow Period"............................................................... Section 8.5

"Excluded Information"...............................................Section 4.9(b)

"Indemnified Party" ...................................................... Section 8.2

"Non-Competition Period" ..........................................Section 6.4(a)

"Non-Solicitation Period".............................................Section 6.4(b)

"Restricted Parties" .....................................................Section 6.4(a)

"Section 1542" ............................................................Section 7.1(a)

"Seller Released Claims"..............................................Section 7.1(a)

"Seller Releasors" .......................................................Section 7.1(a)

"Tax Damages" ............................................................... Section 8.3

"Tax Liability" ................................................................. Section 8.3

4

**SECTION 2.   PURCHASE AND SALE**

On the terms and subject to the conditions set forth in this Agreement, at the Closing and with effect as of the Closing Date, the Seller shall sell, assign and transfer to the Company, and the Company shall purchase and acquire from the Seller, for the Purchase Price, all rights, title, and interests in and to the Purchased Interest, free and clear of all Encumbrances.

**SECTION 3.   PURCHASE PRICE AND CLOSING**

3.1    <u>Purchase Price</u>.

(a)    The total purchase price payable by the Company for the Purchased Interest shall equal the Purchase Price. On the Closing Date, the Company shall pay (i) to Seller a portion of the Purchase Price in cash equal to $3,160,000 (the "<u>Closing Date Payment</u>") and (ii) to the Escrow Agent a portion of the Purchase Price equal to the Escrow Amount *plus* $3,160,000, which is the deferred portion of the Purchase Price that was not paid on the Closing Date (the "<u>Deferred Purchase Price</u>").

3.2    <u>Closing</u>.   The consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place as of the Effective Date, or at such other place or on such other date as Seller and the Company may mutually agree in writing (the date on which the Closing occurs is the "<u>Closing Date</u>"). The Closing shall be consummated at the offices of Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-4231. Subject to the satisfaction of the conditions and the deliveries to be made by Seller and the Company pursuant to <u>Section 3.3</u>, <u>Section 3.4</u>, <u>Section 3.5</u>, and <u>Section 3.6</u>, respectively, it is the intention of Seller and the Company that, without any further action by the parties (other than such actions to be taken pursuant this Agreement and the Ancillary Agreements), all right, title and interest in and to the Purchased Interest shall transfer to the Company on the Closing Date.

3.3    <u>Conditions of Obligations of the Company</u>. The obligations of the Company to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by the Company (in its sole discretion) in writing:

(a)    the representations and warranties of Seller set forth in <u>Section 4</u> shall have been true and correct on the date hereof and shall be true and correct as of the Closing Date;

(b)    Seller shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with thereby at or before the Closing; and

(c)    Seller shall have delivered to the Company those items required to be delivered by Seller pursuant to <u>Section 3.5</u>.

3.4    <u>Conditions of Obligations of Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction

5

on or prior to the Closing Date of each of the following conditions, any of which may be waived by Seller (in his sole discretion) in writing:

(a)      the representations and warranties of the Company set forth in Section 5 shall have been true and correct in all material respects on the date hereof and shall be true and correct in all material respects as of the Closing Date;

(b)      the Company shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with by the Company at or before the Closing; and

(c)      the Company shall have delivered to the Seller Parties those items required to be delivered by the Company pursuant to Section 3.6.

3.5      Seller Closing Deliverables.  At the Closing, and with effect as of the Closing Date, Seller shall deliver to the Company the following, all of which shall be dated as of the Closing Date (unless otherwise specified):

(a)      a certificate, dated as of the Closing Date, certifying the fulfillment of the conditions set forth in Section 3.3(a) and Section 3.3(b);

(b)      an Assignment of Membership Interests in respect of the Company in substantially the form attached hereto as Exhibit A duly executed by Seller as of the Closing Date (the "Assignment");

(c)      a duly executed certificate reasonably acceptable to the Company and in accordance with Treasury Regulation 1.1445-2(b) affirming that Seller is not a foreign person for U.S. federal income tax purposes; and

(d)      a counterpart to an Escrow Agreement, in a form reasonably acceptable to the Company (the "Escrow Agreement"), duly executed by Seller and Huntington Bancshares Incorporated (or one of its Affiliates), as the escrow agent (the "Escrow Agent") (provided that if such counterpart is not delivered on the date of this Agreement, the transaction hereunder shall be consummated on the date hereof (i.e., the Effective Date), and such counterpart shall be promptly delivered by Seller after the Closing Date).

3.6      The Company Closing Deliverables.  At the Closing, and with effect as of the Closing Date, the Company shall deliver to Seller the following, all of which shall be dated as of the Closing Date (unless otherwise specified):

(a)      a certificate, dated as of the Closing Date and executed by a duly authorized officer of the Company, certifying the fulfilment of the conditions set forth in Section 3.4(a) and Section 3.4(b).

(b)      the Closing Date Payment, paid by wire transfer of immediately available funds to the account set forth on Exhibit B; and

6

(c)     a counterpart to the Escrow Agreement duly executed by the Company (provided that if such counterpart is not delivered on the date of this Agreement, the transaction hereunder shall be consummated on the date hereof (i.e., the Effective Date), and such counterpart shall be promptly delivered by the Company after the Closing Date).

## SECTION 4.   REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to the Company as follows:

4.1     Title and Right to Assign. Seller is the sole record and beneficial owner of, and has good and marketable title to, the Purchased Interest, free and clear of all Encumbrances. Other than the Purchased Interest, Seller and his respective Affiliates do not own any interests, other securities or any securities convertible, exercisable or exchangeable for any units, membership interests, capital stock, share capital or other securities of the Company, or any rights or options to subscribe for or to purchase any units, membership interests, capital stock, share capital or other securities of the Company or any unit appreciation or similar rights, phantom unit or stock or similar plans or similar rights of the Company. Other than the governance documents of the Company, this Agreement and the Ancillary Agreements, Seller is not a party to any agreement or contract relating to the Purchased Interest. At the Closing, Seller shall deliver to the Company (and the Company shall acquire and own) good, valid and marketable title to, and all beneficial and economic interest in, the Purchased Interest, free and clear of all Encumbrances.

4.2     Authority. Seller has full legal right, capacity, power, and authority to enter into and perform the terms of this Agreement and each Ancillary Agreement to which he is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance by Seller of this Agreement and each Ancillary Agreement to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby by Seller have been duly authorized by all required action on the part of Seller.

4.3     Execution, Delivery and Enforceability. This Agreement and each Ancillary Agreement to which Seller is or will be a party has been duly executed and delivered by Seller, and this Agreement and each Ancillary Agreement to which Seller is or will be a party constitutes or will constitute a valid and binding agreement and obligation of Seller in accordance with its terms, except to the extent: (i) that such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, preference, equitable subordination, marshaling, or other similar Laws of general application now or hereafter in effect relating to creditors' rights generally, and (ii) that the remedies of specific performance, injunction, and other forms of equitable relief are subject to certain tests of equity jurisdiction, equitable defenses, and the discretion of the court before which any proceeding therefor may be brought.

4.4     No Conflicts. The execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements to which Seller is a party does not and will not violate, conflict with, result in the breach of, or accelerate the performance required by Seller of (i) the articles of organization, operating agreement or other organizational document of the Company,

7

(ii) any contract to which Seller is a party or by which Seller is bound, or (iii) any Law or Governmental Order to which Seller or his assets are subject, or constitute a default thereunder.

4.5     Consents, Approvals, etc. No consent of, notice to, approval of, or authorization of or declaration or filing with any person, including any Governmental Authority, is required in connection with the execution and delivery of this Agreement or any Ancillary Agreement by Seller, the consummation by Seller of the transactions contemplated hereby, or the performance of and compliance with the terms and conditions hereof by Seller.

4.6     Compliance with Law. Seller is not in violation of any Law or Governmental Order applicable to him or any of his properties or assets that could adversely affect the consummation of the transactions contemplated by this Agreement or by any Ancillary Agreement.

4.7     No Litigation or Proceedings. No Litigation or other proceeding, at law, in equity, or otherwise, is pending, or, to Seller's Knowledge, threatened, against Seller with respect to any matter whatsoever that could affect the consummation of the transactions contemplated hereby or by any Ancillary Agreement, and, to Seller's Knowledge, there is no basis for any such proceeding. There is no investigation by any Governmental Authority pending, or, to Seller's Knowledge, threatened, that relates to or involves the transactions contemplated by this Agreement or by any Ancillary Agreement, nor, to Seller's Knowledge, is there any basis for any such investigation.

4.8     No Bankruptcy, etc. of Seller; Solvency. Neither Seller nor any other person has filed or, to Seller's Knowledge, threatened to file against Seller any proceeding seeking to adjudicate Seller insolvent, or seeking the liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of Seller or of his respective debts under any Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or similar official for him or any part of his property, nor has Seller made any assignment of any property for the benefit of any creditors, nor is there currently existing or, to Seller's Knowledge, threatened, any tax or creditor's Encumbrance or any other execution, levy, attachment or other process of Law upon the property of Seller, nor is there outstanding any legal process against Seller or his property that enjoins or could enjoin Seller from consummating the transactions contemplated by this Agreement or by any Ancillary Agreement. Seller is solvent and able to pay his debts and fulfill his obligations as they come due.

4.9     Excluded Information, Etc.

(a)     Seller is not relying on the Company or any of its subsidiaries or Affiliates for investment, legal or tax advice, and Seller has consulted with his own counsel, accountants and advisors regarding the various legal, tax and economic considerations relating to the sale of the Purchased Interest and the transactions contemplated by this Agreement and by the Ancillary Agreements.

(b)     Seller has adequate information concerning the Purchased Interest and the Company to make an informed decision regarding the transactions contemplated hereby

and by the Ancillary Agreements, and Seller has had the opportunity to access all information that he has deemed necessary or advisable in connection herewith and therewith and he has independently, and without reliance upon the Company or any of its Affiliates for information or advice (other than Seller's reliance on the representations and warranties of the Company expressly set forth in Section 5), made his own analysis and decision to enter into this Agreement and the Ancillary Agreements and sell the Purchased Interest and engage in the transactions contemplated by this Agreement and enter into and consummate each of the Ancillary Agreements and the transactions contemplated thereby. Seller acknowledges and agrees that the Company and its Affiliates may possess information regarding the Purchased Interest, the Company and its respective Affiliates, and the transactions contemplated hereby and the Ancillary Agreements, that has not been provided to Seller and that is not publicly available ("Excluded Information"). Excluded Information may be material to the Purchased Interest, the Company and its respective Affiliates, the transactions contemplated by this Agreement and by the Ancillary Agreements, and to Seller's decision to enter into this Agreement and the Ancillary Agreements and to sell the Purchased Interest and engage in the transactions contemplated by the Ancillary Agreements. Seller acknowledges and agrees that he has determined to enter into this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby, notwithstanding his lack of knowledge of Excluded Information, whether or not material. Seller agrees none of the Company or its subsidiaries or Affiliates shall have any liability to him with respect to the non-disclosure of Excluded Information, waives and releases any claims that he might have against the Company or any of its subsidiaries or Affiliates arising out of or relating to any matters contemplated by this Section 4.9(b), including the nondisclosure of Excluded Information.

(c)     Seller acknowledges and agrees that neither the Company nor any of its Affiliates has made any representation or warranty, express or implied, written or oral, relating to the transactions contemplated by this Agreement or by the Ancillary Agreements, except for those representations and warranties of the Company expressly set forth in Section 5.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Seller as follows:

5.1     Organization. The Company is a limited liability company duly organized and validly existing and in good standing under the laws of the State of Nevada and has all requisite power and authority to carry on its business.

5.2     Authority. The Company has full legal right, capacity, power, and authority to enter into and perform the terms of this Agreement and each Ancillary Agreement to which the Company is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which the Company is a party, and the consummation of the transactions contemplated hereby and thereby by the Company, have been duly authorized by all required action on the part of the Company.

5.3     Consents, Approvals, etc. No consent of, notice to, approval of, or authorization of or declaration or filing with any person, including any Governmental Authority,

is required in connection with the execution and delivery of this Agreement or any Ancillary Agreement by the Company, the consummation by the Company of the transactions contemplated hereby, or the performance of and compliance with the terms and conditions hereof by the Company.

        5.4     No Conflicts. The execution, delivery and performance by the Company of this Agreement and the Ancillary Agreements to which the Company is a party does not and will not violate, conflict with, result in the breach of, or accelerate the performance required by the Company of (i) the articles of organization, operating agreement or other organizational document of the Company, (ii) any contract to which the Company is a party or by which the Company is bound, or (iii) any Law or Governmental Order to which the Company or its assets are subject, or constitute a default thereunder.

        5.5     Execution, Delivery and Enforceability. This Agreement and each Ancillary Agreement to which the Company is a party has been duly executed and delivered by the Company, and this Agreement and each Ancillary Agreement to which the Company is a party constitutes a valid and binding agreement and obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent: (i) that such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, preference, equitable subordination, marshaling, or other similar Laws of general application now or hereafter in effect relating to creditors' rights generally and (ii) that the remedies of specific performance, injunction, and other forms of equitable relief are subject to certain tests of equity jurisdiction, equitable defenses, and the discretion of the court before which any proceeding therefor may be brought.

        5.6     No Litigation or Proceedings. Other than the Tax Liability described in Section 8.3 of this Agreement, no Litigation or other proceeding, at law, in equity, or otherwise, is pending, or, to the Company's Knowledge, threatened, against the Company with respect to any matter whatsoever that could affect the consummation of the transactions contemplated hereby or by any Ancillary Agreement, and, to the Company's Knowledge, there is no basis for any such proceeding. There is no investigation by any Governmental Authority pending, or, to the Company's Knowledge, threatened, that relates to or involves the transactions contemplated by this Agreement or by any Ancillary Agreement, nor, to the Company's Knowledge, is there any basis for any such investigation.

        5.7     Compliance with Law. The Company is not in violation of any Law or Governmental Order applicable to it or any of its properties or assets that could adversely affect the consummation by the Company of the transactions contemplated by this Agreement or any Ancillary Agreement.

        5.8     No Bankruptcy, etc. of the Company; Solvency. Neither the Company nor any other person has filed or, to the Company's Knowledge, threatened to file against the Company, any proceeding seeking to adjudicate the Company insolvent, or seeking the liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of the Company or of its respective debts under any Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or similar official for it or any part of its property, nor has the

Company made any assignment of any property for the benefit of any creditors, nor is there currently existing or, to the Company's Knowledge, threatened, any tax or creditor's Encumbrance or any other execution, levy, attachment or other process of Law upon the property of the Company, nor is there outstanding any legal process against the Company or its respective property that enjoins or could enjoin the Company from consummating the transactions contemplated by this Agreement or by any Ancillary Agreement. The Company is, and after the consummation of the transaction described in the Agreement and the payment of the Purchase Price by the Company, will continue to be solvent and able to pay its debts and fulfill its obligations as they come due.

## SECTION 6.   CERTAIN COVENANTS

    6.1    <u>Cooperation Regarding Certain Matters</u>.

        (a)    All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest with respect thereto) incurred by Seller in connection with this Agreement or any Ancillary Agreement, shall be paid by Seller when due, and Seller will file all necessary Tax Returns and other documentation with respect to such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, the Company will join in the execution of any such Tax Returns and documentation.

        (b)    After the Closing, upon reasonable written notice, Seller shall furnish or cause to be furnished to the Company as promptly as practicable such information in Seller's possession and such assistance relating to the Company (including access to books, records and personnel) as is reasonably requested for the filing of all Tax Returns (including any extensions thereof), the making of any election related to Taxes, the preparation for any audit or tax contest, and the prosecution or defense of any action related to any Tax or Tax Return. Seller agrees to retain all books and records in his possession with respect to Tax matters and pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Company, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Governmental Authority.

        (c)    At or prior to the Closing, Seller shall deliver to the Company each of the following: (i) any and all firmware and software source code in Seller's possession relating to the MPVI, (ii) any and all designs and schematics in Seller's possession relating to the MPVI, (iii) any and all hardware programming devices and programming devise software purchased by or otherwise belonging to the Company; (iv) any and all hardware design, layout and schematic creation software and license information of the Company, or that was purchased by the Company, in Seller's possession; (v) all Company phones, laptops or other personal devices and any other Company computer hardware, monitors and other peripherals (it being agreed that Seller may expunge from any such devices and equipment all information stored on such devices and equipment). Additionally, at or prior to the Closing, Seller shall destroy any and all copies of Proprietary Information (whether written or electronic) and destroy any and all documents or other media that contain or reflect any Intellectual Property or Proprietary Information (or, if such other media is an electronic device or hard drive that Seller is not

11

required to deliver to the Company, Seller shall permanently expunge from such device or hard drive all information containing or reflecting any Intellectual Property or Proprietary Information, such expungement to the reasonable satisfaction of the Company's outside counsel).

6.2   Further Assurances. The Company (subject to its rights set forth herein), Seller and their respective Affiliates shall take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements in accordance with their respective terms. Each party hereto agrees to, and each party hereto shall cause its/his respective Affiliates to, from time to time, upon the request of another party, execute, acknowledge and deliver, or shall cause to be executed, acknowledged and delivered, to the requesting party all such further transfers, assignments, deeds, powers, and assurances of title, and additional instruments, and do or cause to be done all acts or things, as often as may be reasonable, proper, or necessary to (i) sell, transfer, and assign the Purchased Interest, (ii) to transfer any other rights, interest or title Seller may have in the Company or any assets of the Company, (iii) to carry out the intent of this Agreement and the Ancillary Agreements and to vest in the Company or its designees the entire right, title, and interest of Seller in the Purchased Interest.

6.3   Confidentiality. From and after the date hereof, Seller shall, and shall cause his Affiliates and his Representatives to, keep confidential and not disclose, or otherwise use in any manner, any information that any of them have relating to: (i) this Agreement; (ii) the Ancillary Agreements; (iii) the transactions contemplated by this Agreement or the Ancillary Agreements (including details relating to the Purchase Price); or (iv) the Proprietary Information; provided, however, the foregoing shall not prevent Seller from making any disclosure of the foregoing to the extent such disclosure is required by Law.

6.4   Non-Competition and Non-Solicitation.

(a)   Seller, for himself, and on behalf of each of his Affiliates, (collectively, the "Restricted Parties," and each individually, a "Restricted Party"), acknowledges that he is familiar with the Intellectual Property and Proprietary Information of the Company. Seller, for himself and on behalf of each of the other Restricted Parties, acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly compete with the Company or provide services to any person competing with the Company or engaging in the Business, and that such direct or indirect competition by any Restricted Party would harm the Company. In connection therewith, and in further consideration for Purchaser's payment of the Purchase Price under this Agreement (in respect of which payment the Restricted Parties derive a substantial and direct benefit), and in order to protect the value of the Company, Seller agrees not to, and Seller shall cause the other Restricted Parties not to, during the period commencing on the Closing Date and ending at the conclusion of eighteen (18) months from the Closing Date (the "Non-Competition Period"), directly or indirectly, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, or lend such Restricted Party's credit to any business or person that, directly or indirectly, owns or operates any business that competes with the Business anywhere in the world; provided, however, that a Restricted Party may purchase or

12

otherwise acquire up to (but no more than) two percent (2%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended. Restricted Party agrees that this covenant is reasonable with respect to its duration, geographical area, and scope.

(b)   During the period commencing on the Closing Date and ending on the third (3rd) anniversary of the Closing Date (the "Non-Solicitation Period"), Seller shall not, and shall cause each of its Affiliates to not, directly or indirectly, either individually or acting in concert with another person or persons, solicit for employment or retention, or hire, employ, retain or engage (as a consultant or otherwise) any person who is an employee of, or engaged as a consultant by, the Company (or any of their respective Affiliates), or influence or attempt to influence any such employee or consultant to terminate his or her employment or engagement with the Company during the Non-Solicitation Period.

6.5   Non-Disparagement. From and after the date hereof, Seller shall not make, and shall cause his respective Affiliates not to make, any negative, derogatory or disparaging statements or communications regarding the Company, any Affiliate of the Company, or the Business. From and after the date hereof, the Company shall not make, and it shall cause its Affiliates not to make, any negative, derogatory or disparaging statements or communications regarding Seller. For the avoidance of doubt, this Section 6.5 shall not restrict the making of claims, or bringing of enforcement actions, relating to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby.

## SECTION 7.   RELEASE AND TERMINATION

7.1   Releases.

(a)   Seller Release. From and after the Closing, Seller shall release and forever discharge, and shall cause each of his Affiliates, successors, and assigns (collectively with Seller, the "Seller Releasors") to release and forever discharge the Company and its respective officers, directors, managers, employees, shareholders, members, Affiliates, successors, and assigns from any and all claims, obligations, liabilities, and causes of action of any kind (whether at law or in equity and including claims in tort or for breach of contract or breach of warranty), known or unknown, fixed or contingent, that any of the Seller Releasors previously had or may have had, now has or may have, or may in the future have that in any way arises out of or relates to (i) the Company or its respective operations or management, (ii) the formation documents, operating agreement, limited liability company agreement or similar agreement or other governance documents applicable to the Company, or (iii) the Purchased Interest (collectively, the "Seller Released Claims"); provided, however, the Seller Released Claims shall exclude claims arising out of fraud or willful misrepresentation, or claims arising as a result of any breach of this Agreement. Seller hereby represents and warrants to the Company that none of the Seller Released Claims have been assigned or otherwise transferred to any third party.

(b)   Company Release. From and after the Closing, the Company shall release and forever discharge, and shall cause each of its Affiliates, successors, and assigns

13

(collectively with the Company, the "Company Releasors") to release and forever discharge Seller and its Affiliates, agents, representatives, successors, and assigns from any and all claims, obligations, liabilities, and causes of action of any kind (whether at law or in equity and including claims in tort or for breach of contract or breach of warranty), known or unknown, fixed or contingent, that any of the Company Releasors previously had or may have had, now has or may have, or may in the future have that in any way arises out of or relates to (i) the formation documents, operating agreement, limited liability company agreement or similar agreement or other governance documents of the Company applicable to the Seller or (ii) the Purchased Interest (collectively, the "Company Released Claims"); provided, however, the Company Released Claims shall exclude claims arising out of fraud or willful misrepresentation, or claims arising as a result of any breach of this Agreement. The Company hereby represents and warrants to Seller that none of the Company Released Claims have been assigned or otherwise transferred to any third party.

(c)     Each party hereto has read Section 1542 of the Civil Code of the State of California ("Section 1542"), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each party hereto understands and agrees that such party is aware that Section 1542 gives such party the right not to release existing claims of which such party is not now aware unless such party voluntarily chooses to waive this right. Being aware of this right, each of Seller and the Company nevertheless hereby voluntarily waives the rights described in Section 1542, and elects to assume all risks for claims that now exist in the Company' or Seller's favor, respectively, known or unknown, arising from the subject matter of this Agreement.

7.2     Termination.  Seller hereby agrees to the termination of any of Seller's rights under any and all agreements, arrangements and understandings between Seller and the Company and/or any other members of the Company in respect of the Purchased Interest, including, without limitation, the Buy Sell Agreement dated March 2008 among the Company, Seller and the other parties thereto, as amended by the First Amendment to Buy Sell Agreement dated July 20, 2015.

## SECTION 8. SURVIVAL AND INDEMNIFICATION

8.1     Survival. Each party's respective representations, warranties, covenants and agreements contained in this Agreement shall survive the Closing.

8.2     Mutual Indemnifications. Each of Seller and the Company shall indemnify the other and its/his respective Affiliates, successors, assigns, owners, controlling persons, directors, officers and employees (each, an "Indemnified Party"), against, and hold each Indemnified Party harmless from, any and all claims, losses, liabilities, damages, judgments, assessments, fines, costs, expenses or deficiencies, including reasonable attorneys' fees and

disbursements, as well as the reasonable fees of experts and consultants incurred by a party entitled to indemnification under this Agreement (collectively, "Damages") arising out of, resulting from or based upon:

(a)     any inaccuracy in or any breach of any representation or warranty of the other party contained in this Agreement or in any Ancillary Agreement;

(b)     any breach of any covenant by, or agreement of, the other party contained in this Agreement or in any Ancillary Agreement;

The indemnification obligations in this Section 8.2 shall survive the date of this Agreement, and claims for indemnification under this Section 8.2 may be made at any time.

8.3     Specific Indemnification by Seller. Seller shall indemnify the Company and its Affiliates, and their respective successors, assigns, owners, controlling persons, directors, officers and employees (each, an "Indemnified Party"), against, and hold each Indemnified Party harmless from any and all liabilities, damages, judgments, assessments, fines, costs, expenses or deficiencies, including reasonable attorneys' fees and disbursements, as well as the reasonable fees of experts and consultants incurred by a party entitled to indemnification under this Agreement, actually incurred by the Company, arising out of, resulting from or based upon any failure of the Company to file Tax Returns or pay Taxes when due prior to the Effective Date (collectively, the "Tax Liability"), provided that Seller shall not be liable for more than one-third of the Tax Liability, and that the aggregate amount for which Seller will be liable pursuant to this Section 8.3 shall under no circumstances exceed the Escrow Amount (Seller's allocable portion of the Tax Liability, the "Tax Damages"), and provided further that the Company shall promptly provide Seller with evidence of its payment of such Tax Liability.   The indemnification obligations under this Section 8.3 shall be satisfied exclusively from the Escrow Amount. The indemnification obligations of Seller in this Section 8.3 shall survive the date of this Agreement.

8.4     Effect of Investigation. Notwithstanding anything contained herein to the contrary, the right to indemnification, payment of Damages, Tax Damages, or other remedy based on the representations, warranties, covenants and obligations set forth in this Agreement will not be affected by (i) any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy or inaccuracy of or compliance or failure to comply with, any such representation, warranty, covenant or obligation.

8.5     Escrow Amount; Payment of Remaining Portion of Purchase Price.

(a)     The Company shall deduct $140,000 (the "Escrow Amount") from the Closing Date Payment made by the Company on the Closing Date, and the Escrow Amount shall be held in escrow by the Escrow Agent on behalf of the parties hereto until the date on which any and all outstanding claims arising from the Tax Liability are resolved (the "Escrow Period"). The Company agrees to utilize its reasonable efforts to resolve the Tax Liability as quickly as is practicable under the circumstances. The Company agrees to provide prompt written notice to Seller of any interim or final resolution of the Tax Liability. Within ten (10) Business Days of the final resolution regarding the Tax Liability, the Company shall provide

15

written notice to the Escrow Agent, with a copy to Seller, advising as to the resolution of the Tax Liability, and making any applicable claim for indemnifiable Tax Damages under this Agreement. Within ten (10) Business Days of such notice, the Company and Seller shall provide joint written instructions to the Escrow Agent instructing the Escrow Agent to pay to the Company any indemnifiable Tax Damages under this Agreement, and to release to Seller the remaining portion of the Escrow Amount promptly thereafter. Upon the Escrow Agent's payment to the Company of the indemnifiable Tax Damages under this Agreement, the portion of the Escrow Amount equal to such indemnifiable Tax Damages will no longer be due and payable to Seller, except to the extent such amount is later determined to not constitute indemnifiable Tax Damages owed to the Company. The Company and Seller shall use good faith efforts to ensure the prompt release of any remaining portion of the Escrow Amount to Seller. At the conclusion of six months following the Closing Date, the Company shall provide written notice to Seller as to the status of the Company's efforts to resolve the Tax Liability. For the avoidance of doubt, the Company's and Seller's respective rights under this Section 8.5 are in addition to any other rights it may have under this Agreement or at law.

(b)     On the Closing Date, the Deferred Purchase Price will be paid by the Company to the Escrow Agent, and the Deferred Purchase Price will be held by the Escrow Agent on behalf of Seller. Unless instructed earlier by Seller, promptly following January 1, 2017, Seller shall deliver written instructions to the Escrow Agent instructing the Escrow Agent to pay to Seller the Deferred Purchase Price.

### SECTION 9.   BANKRUPTCY PROVISIONS

9.1     Bankruptcy Representations and Warranties.   The Company hereby represents, warrants and agrees that, in consideration of the recitals and mutual covenants contained herein and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the Company has no current intent (i) to file any voluntary petition under any Chapter of the Bankruptcy Code, or in any manner to seek relief, protection, reorganization, liquidation, dissolution or similar relief for debts under any other local, state, federal or other insolvency laws or laws providing for relief of debtors in equity, or directly or indirectly to cause any party who holds any interest in the Company to file any such petition to seek any such relief, either at the present time, or at any time hereafter, or (ii) directly or indirectly to cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against the Company or directly or indirectly to cause the Company to become the subject of any proceedings pursuant to any other state, federal or other insolvency laws or laws providing for the relief of debtors, either at the present time, or at any time hereafter.

9.2     Payment of Purchase Price.   The Company hereby stipulates and agrees that in the event it shall (a) file with any bankruptcy court of competent jurisdiction, or be the subject of, any petition under Title 11 of the Bankruptcy Code, as amended, (b) be the subject of any order for relief issued under the Bankruptcy Code, as amended, (c) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or bankruptcy, insolvency, or other relief for debtors, (d) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (e) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition,

16

readjustment, liquidation, dissolution or bankruptcy, insolvency or relief for debtors, then the Company hereby irrevocably acknowledges and agrees that the payment of the Purchase Price is intended as a contemporaneous exchange for new value given to the Company, and that the payment of the Purchase Price is in fact a substantially contemporaneous exchange.  The Company hereby further agrees and acknowledges that it is receiving valuable consideration under this Agreement, that Seller would be prejudiced if this acknowledgement were not enforced in such bankruptcy proceeding, that the other creditors of the Company, if any, will not be prejudiced by enforcement of this acknowledgement, and that but for the Company's acknowledgement and agreement herein, Seller would not have entered into this Agreement.

        9.3    <u>Bankruptcy Claims</u>.  If any claim is ever made by the Company, or any other individual or entity, including, without limitation, any trustee appointed in any case commenced by or against any of the foregoing under the Bankruptcy Code, upon, in connection with or relating to this Agreement or the transactions contemplated hereby (including, but not limited to, any claim for avoidance of any obligation or transfer, or for repayment or recovery of any portion of the Purchase Price paid to Seller in connection with this Agreement, because of any assertion that any such obligation or transfer constituted a preferential transfer or fraudulent conveyance, or for any other reason whatsoever in connection with a bankruptcy, insolvency or other proceeding) (a "Bankruptcy Claim"), then, at Seller's option, before or after any such a Bankruptcy Claim has been resolved, settled or determined, Seller may choose to treat the transaction which is the subject of the Bankruptcy Claim as not having occurred and to revive in full any and all interests of Seller in the Company, and any and all claims that Seller had against the Company prior to this Agreement.  The revival set forth in this Section 9.3 shall be in addition to all of Seller's other rights and remedies.

**SECTION 10. MISCELLANEOUS**

        10.1    <u>Notices</u>.  All notices, consents, and other communications required or permitted under this Agreement shall be in writing and shall be effective:  (i) upon receipt when delivered by hand; (ii) five (5) Business Days after mailing to the addressee by U.S. registered or certified mail, return receipt requested; (iii) one (1) Business Day after being sent to the addressee by overnight or next-day commercial courier or delivery service; or (iv) the next Business Day after sending by email (<u>provided</u> that receipt of such email is specifically confirmed by the recipient), in the case of (ii), (iii) and (iv) addressed to the party as follows:

        If to Seller:

            Ken Cannata
            ███████████
            Reno NV 89511
            Email: ███████████

        With a copy (which shall not constitute legal notice) to:

            Kolesar & Leatham
            400 S. Rampart Blvd., Suite 400

17

Las Vegas, NV 89145
Attention:  Shlomo S. Sherman, Esq.; Joseph J. Mugan, Esq.
Email:  ssherman@klnevada.com; jmugan@klnevada.com

If to the Company:

HP Tuners LLC
701 Dartmouth Lane
Buffalo Grove, IL 60089
Attention: ▮▮▮▮▮▮▮▮▮
Email: ▮▮▮▮▮▮▮▮▮▮▮

With a copy (which shall not constitute legal notice) to:

Kaye Scholer LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602-4231
Attention:  Sheldon Solow, Esq.
Email:  Sheldon.Solow@kayescholer.com

A party may, by notice given in accordance with this Section 10.1, designate another address or person for receipt of notices hereunder.

10.2    Assignment. No party hereto may assign this Agreement or any of its/his rights hereunder, or delegate performance of any of its/his obligations, to any other person without the prior written consent of the other parties.

10.3    Successors and Assigns; Third Party Beneficiaries. Subject to the restrictions on assignment herein contained, this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties. This Agreement is not intended to create, and shall not be deemed to create, enforceable legal rights in any person other than the parties hereto, as a third party beneficiary or under any other legal theory, except that (a) each Indemnified Party is an intended third party beneficiary of Section 8.2 (entitled to enforce same as if an actual party hereto) and (b) each applicable released party under Section 7 is an intended third party beneficiary of Section 7 (entitled to enforce same as if an actual party hereto).

10.4    Amendment and Waiver.

(a)    No failure or delay on the part of either party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(b)    Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to

18

any departure by any party from the terms of any provision of this Agreement shall be effective (i) only if it is made or given in writing and signed by the party against whom it is sought to be enforced, and (ii) only in the specific instance and for the specific purpose for which made or given.

10.5    Joint Drafting. The parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements. In the event an ambiguity or question of intent or interpretation arises, this Agreement and each Ancillary Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement or the Ancillary Agreements.

10.6    Counterparts; Signatures. This Agreement may be executed in any number of counterparts, and by the parties in separate counterparts, each of which when so executed shall be deemed an original and all of which taken together shall constitute one and the same agreement. A counterpart signature page to this Agreement transmitted by fax or other electronic means shall have the same effect as an original.

10.7    [Reserved].

10.8    [Reserved].

10.9    WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.10    Specific Performance. The parties hereby acknowledge and agree that the failure by the parties to perform their agreements and covenants under this Agreement will cause irreparable injury to the other parties for which monetary damages, even if available, will not be an adequate remedy. Accordingly, each party hereby consents to the granting of equitable relief (including specific performance and injunctive relief) by the courts specified in Section 10.8 to enforce the other parties' obligations hereunder. The parties further agree to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such equitable relief and that this Section 10.10 is without prejudice to any other rights or remedies that the parties may have for any failure to perform this Agreement.

10.11    Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and

19

enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby in such jurisdiction, and such provision or obligation shall not in any way be affected or impaired thereby in any other jurisdiction.

      10.12  <u>Expenses</u>. Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party hereto incurring such costs and expenses.

      10.13  <u>Entire Agreement</u>. This Agreement, together with the Exhibits hereto (which are an integral part of and by this reference are hereby incorporated into this Agreement), is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties, or undertakings other than those set forth or referred to herein or therein. This Agreement, together with the Exhibits hereto, supersedes all prior agreements and understandings between the parties with respect to such subject matter.

[<em>Balance of this page intentionally blank</em>]

IN WITNESS WHEREOF, the undersigned have executed this Membership Interest Purchase Agreement as of the Effective Date.

**THE COMPANY**

HP TUNERS LLC

By: _____
Name: Keith Prociuk
Title: CEO

**SELLER**

_____
Name: Ken Cannata

IN WITNESS WHEREOF, the undersigned have executed this Membership Interest Purchase Agreement as of the Effective Date.

**THE COMPANY**

HP TUNERS LLC

By: _____
      Name:
      Title:

**SELLER**

Name:  Ken Cannata

**EXHBIT A**

(see attached)

# ASSIGNMENT

This Assignment (this "Assignment") is made as of October __, 2016 by and between KEN CANNATA, an individual ("Assignor"), and HP TUNERS LLC, a Nevada limited liability company (the "Company").

## RECITALS

WHEREAS, this Assignment is being delivered in connection with the Membership Interest Purchase Agreement, dated as of October __, 2016 (the "Agreement"), by and between the Company and Assignor;

WHEREAS, Assignor is a member of the Company, and, as of the date hereof, Assignor is the record owner of 1,000 Common Units of the Company, representing 33.33% of the outstanding units of the Company (the "Common Units"); and

WHEREAS, pursuant to the Agreement, in exchange for the consideration set forth in the Agreement, Assignor has agreed to sell, assign and transfer to the Company, free and clear of all Encumbrances, and the Company has agreed to purchase and acquire from Assignor, free and clear of all Encumbrances, the Common Units.

## AGREEMENTS

In consideration of the above recitals and of the mutual agreements and covenants contained in this Assignment and the Agreement (and the consideration payable thereunder), the parties to this Assignment, intending to be legally bound hereby, agree as follows:

1.     Assignment. Assignor hereby sells, assigns and transfers the Common Units to the Company, free and clear of all Encumbrances, and Assignor acknowledges payment, in accordance with the Agreement, of the consideration due and payable with respect to such sale, assignment and transfer of the Common Units. Assignor confirms and agrees that the payment of the applicable consideration with respect to the Common Units constitutes full satisfaction of all obligations of the Company in respect of the obligation to pay such consideration.

2.     Acknowledgment; Release. Assignor hereby acknowledges and agrees that: (i) the sale, transfer and assignment of the Common Units is effective immediately upon the execution and delivery of this Assignment between Assignor and the Company; and (ii) following the effectiveness of this Assignment, (a) Assignor shall no longer have any rights or interests whatsoever with respect to the Common Units, (b) Assignor expressly disclaims any rights or interests with respect to the Common Units, including, without limitation, rights or interests in the allocation of profits and losses of the Company, distributions by the Company, any right to direct or control the Company or its business and affairs, or any other rights and privileges in or with respect to the Company under law or contract with respect to the Common Units and (c) Assignor releases, and shall cause each of his Affiliates, directors, officers, employees, representatives and agents to release, the Company and each of their respective Affiliates, directors, officers, employees, representatives and agents from any and all claims, demands, actions, proceedings, debts, liabilities, rights, obligations, duties, contracts, agreements and/or expenses (whether known or unknown, contingent or actual) relating to or arising from the

Common Units and/or any other matter relating to the Company arising contemporaneously or prior to the Closing. The foregoing shall not, and is in no way intended to, limit or amend the Agreement.

     3.    <u>Defined Terms</u>. Capitalized terms not otherwise defined herein shall have the respective meanings given to them in the Agreement.

     4.    <u>Other Documents</u>.  Assignor hereby agrees to execute and deliver such other documents and instruments as may be necessary to accomplish the assignment and assumption contemplated by this Assignment as reasonably requested by the Company.

     5.    <u>Governing Law</u>.  This Assignment shall be governed, construed and enforced in accordance with the laws of the State of Illinois (without regard to the choice of law provisions thereof).

     6.    <u>Counterparts</u>.  This Assignment may be signed in two or more counterparts with the same effect as if the signature on each counterpart were upon the same instrument.

     7.    <u>Binding Effect</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

*[Balance of this page intentionally blank]*

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first written above.

ASSIGNOR

_____
Name:   Ken Cannata

THE COMPANY

HP TUNERS LLC

By:   _____
       Name:
       Title:

3

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first written above.

ASSIGNOR

_____

Name:  Ken Cannata


THE COMPANY

HP TUNERS LLC


By: _____
        Name:  Keith Prociuk
        Title:   CEO

# EXHIBIT B

## CLOSING DATE PAYMENT WIRE TRANSFER ACCOUNT

**Execution Version**

MEMBERSHIP INTEREST PURCHASE AGREEMENT

by and between

*KEN CANNATA*

and

*PPC HOLDINGS, LLC*

Dated as of October   , 2016

## TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS AND RULES OF CONSTRUCTION ............................................. 1
    1.1   Defined Terms.......................................................................................... 1
    1.2   Cross Reference to Additional Terms...................................................... 3

SECTION 2.  PURCHASE AND SALE ......................................................................................... 4

SECTION 3.  PURCHASE PRICE AND CLOSING ...................................................................... 4
    3.1   Purchase Price. ........................................................................................ 4
    3.2   Closing .................................................................................................... 4
    3.3   Conditions of Obligations of the Company ............................................ 4
    3.4   Conditions of Obligations of Seller ....................................................... 5
    3.5   Seller Closing Deliverables.................................................................... 5
    3.6   The Company Closing Deliverables ....................................................... 5

SECTION 4.  REPRESENTATIONS AND WARRANTIES OF SELLER................................. 6
    4.1   Title and Right to Assign ....................................................................... 6
    4.2   Authority ................................................................................................. 6
    4.3   Execution, Delivery and Enforceability................................................. 6
    4.4   No Conflicts ............................................................................................ 6
    4.5   Consents, Approvals, etc......................................................................... 6
    4.6   Compliance with Law ............................................................................. 7
    4.7   No Litigation or Proceedings .................................................................. 7
    4.8   No Bankruptcy, etc. of Seller; Solvency................................................ 7
    4.9   Excluded Information, Etc. ..................................................................... 7

SECTION 5.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................... 8
    5.1   Organization............................................................................................ 8
    5.2   Authority ................................................................................................. 8
    5.3   Consents, Approvals, etc......................................................................... 8
    5.4   No Conflicts ............................................................................................ 9
    5.5   Execution, Delivery and Enforceability................................................. 9
    5.6   No Litigation or Proceedings .................................................................. 9
    5.7   Compliance with Law ............................................................................. 9
    5.8   No Bankruptcy, etc. of the Company; Solvency..................................... 9

SECTION 6.  CERTAIN COVENANTS ...................................................................................... 10
    6.1   Cooperation Regarding Certain Matters ............................................... 10
    6.2   Further Assurances................................................................................ 10
    6.3   Confidentiality ...................................................................................... 10
    6.4   Non-Disparagement .............................................................................. 11

SECTION 7.  RELEASE AND TERMINATION......................................................................... 11
    7.1   Releases................................................................................................. 11
    7.2   Termination ........................................................................................... 12

SECTION 8.  SURVIVAL and Indemnification .................................................. 12
    8.1    Survival ................................................................................ 12
    8.2    Mutual Indemnifications ........................................................ 12

SECTION 9.  Bankruptcy Provisions ............................................................. 13
    9.1    Bankruptcy Representations and Warranties ............................. 13
    9.2    Payment of Purchase Price ..................................................... 13
    9.3    Bankruptcy Claims ............................................................... 13

SECTION 10. MISCELLANEOUS ................................................................ 14
    10.1    Notices ............................................................................... 14
    10.2    Assignment ......................................................................... 15
    10.3    Successors and Assigns; Third Party Beneficiaries .................... 15
    10.4    Amendment and Waiver ........................................................ 15
    10.5    Joint Drafting ...................................................................... 16
    10.6    Counterparts; Signatures ....................................................... 16
    10.7    [Reserved] .......................................................................... 16
    10.8    [Reserved] .......................................................................... 16
    10.9    WAIVER OF JURY TRIAL .................................................. 16
    10.10    Specific Performance ......................................................... 16
    10.11    Severability ..................................................................... 16
    10.12    Expenses ......................................................................... 17
    10.13    Entire Agreement ............................................................. 17

EXHIBITS:

    A    &ndash;    Assignment
    B    &ndash;    [Reserved]
    C    &ndash;    Closing Date Payment Wire Transfer Account

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made as of October    , 2016 (the "Effective Date"), by and between KEN CANNATA, an individual ("Seller"), and PPC HOLDINGS, LLC, an Illinois limited liability company (the "Company").

## RECITALS

Seller wishes to sell, assign, and transfer to the Company, and the Company wishes to purchase and acquire, the Purchased Interest (as hereinafter defined), which constitutes and embodies all rights and interests of Seller in or with respect to the Company and the Company's assets at the price and on the terms hereinafter set forth.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises of the parties herein contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION 1.  DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Defined Terms. The following capitalized terms have the meanings ascribed to them in this Section 1.1:

"Affiliate" means, with reference to a specified person:  (a) a person who, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the specified person or (b) any person who is an officer, director, general partner, or trustee of, or serves in a similar capacity with respect to, the specified person or of which the specified person is an officer, director, general partner, or trustee, or serves in a similar capacity.

"Ancillary Agreements" means the agreements, instruments and certificates contemplated to be delivered by the Company and/or Seller pursuant to this Agreement.

"Business" means the business undertaken, and contemplated to be undertaken, by the Company as of the Effective Date.

"Business Day" means a day (other than Saturday or Sunday) on which banks are generally open for the ordinary conduct of business in New York, New York.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company's Knowledge" means, with respect to a particular fact or subject matter set forth in the representations and warranties of the Company, the actual knowledge of any senior executive officer of the Company concerning the existence of such fact or other subject matter of the Company and the imputation of knowledge of that fact or subject matter that any such senior executive officer of the Company could reasonably be expected to discover or otherwise become

aware in the course of conducting a reasonable investigation concerning the existence of such fact or other subject matter.

"Control" (including the terms "Controlling," "Controlled by," and "under common Control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting shares or interests, by contract, or otherwise.

"Encumbrance" means any security interest, pledge, mortgage, lien (including tax liens), charge, encumbrance, adverse claim, preferential arrangement, option, right of first of refusal, purchase right or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (in each case, other than pursuant to this Agreement), regardless of whether or not notice of such Encumbrance has been provided, recorded in any public record, or otherwise perfected.

"Governmental Authority" means any nation or government, any state, province, city, municipal entity, or other political subdivision thereof, and any governmental, executive, legislative, judicial (including a court), administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau, or similar body, whether federal, state, provincial, territorial, local, or foreign.

"Governmental Order" means, unless otherwise indicated, any order, writ, judgment, injunction, decree, stipulation, determination or administrative ruling or award entered by or with or issued by any Governmental Authority.

"Law" means, unless otherwise indicated, any national, federal, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Litigation" means any claim, action, suit, complaint, dispute, demand, litigation, judicial proceeding, administrative proceeding, or arbitration proceeding.

"Material Adverse Change" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, is materially adverse to the business operations, assets, condition (financial or otherwise), results of operations or prospects of the Company.

"Purchase Price" means an amount equal to $340,000.

"Purchased Interest" means all of Seller's (i) rights, title and interests in and to any equity securities and other securities of the Company; (ii) rights and interests as a member of the Company, including any and all rights with respect to the Company or its respective assets, gains, profits, cash flow, distributions and business; and (iii) rights to vote on or have any voice in the affairs of the Company or with respect to any other matter affecting the Company under the governance documents of the Company, the laws of the state of formation of the Company or otherwise.

"Representative" means, with respect to any person, any director, officer, principal, attorney, employee, agent, financial advisor, consultant, accountant, or any other person acting in a representative capacity for such person.

"Seller's Knowledge" means, with respect to a particular fact or subject matter set forth in the representations and warranties of Seller, the actual knowledge concerning the existence of such fact or other subject matter of Seller and the imputation of knowledge of that fact or subject matter that Seller could reasonably be expected to discover or otherwise become aware in the course of conducting a reasonable investigation concerning the existence of such fact or other subject matter.

"Taxes" means any federal, state, or local taxes, including all income, gross receipts, unemployment compensation, payroll, social security, workers' compensation, estimated, transfer, excise, privilege, property, ad valorem, franchise, license, sales, use and any other tax or similar governmental charge or imposition under the applicable Laws of the United States, or any state or municipal or political subdivision thereof, together with any interest and penalties, additions to tax or additional amounts imposed with respect thereto.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with respect to Taxes, including any schedule or attachment thereto and any amendment thereof.

      1.2    Cross Reference to Additional Terms. The following terms are defined elsewhere in this Agreement:

"Agreement" ...................................................................... Preamble

"Assignment" ............................................................... Section 3.5(b)

"Closing" ......................................................................... Section 3.2

"Closing Date" ................................................................ Section 3.2

"Closing Date Payment" ............................................... Section 3.1(a)

"Company" ...................................................................... Preamble

"Company Released Claims" ........................................ Section 7.1(b)

"Company Releasors" .................................................. Section 7.1(b)

"Damages" ...................................................................... Section 8.2

"Effective Date" ............................................................... Preamble

"Excluded Information" ................................................ Section 4.9(b)

"Indemnified Party" ....................................................... Section 8.2

3

"Section 1542" .............................................. Section 7.1(a)

"Seller Released Claims" ........................................... Section 7.1(a)

"Seller Releasors" ....................................... Section 7.1(a)

## SECTION 2.  PURCHASE AND SALE

On the terms and subject to the conditions set forth in this Agreement, at the Closing and with effect as of the Closing Date, the Seller shall sell, assign and transfer to the Company, and the Company shall purchase and acquire from the Seller, for the Purchase Price, all rights, title, and interests in and to the Purchased Interest, free and clear of all Encumbrances.

## SECTION 3.  PURCHASE PRICE AND CLOSING

3.1    Purchase Price.

(a)    The total purchase price payable by the Company for the Purchased Interest shall equal the Purchase Price. On the Closing Date, the Company shall pay to Seller the entirety of the Purchase Price (the "Closing Date Payment").

3.2    Closing.   The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place as of the Effective Date, or at such other place or on such other date as Seller and the Company may mutually agree in writing (the date on which the Closing occurs is the "Closing Date"). The Closing shall be consummated at the offices of Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-4231. Subject to the satisfaction of the conditions and the deliveries to be made by Seller and the Company pursuant to Section 3.3, Section 3.5, and Section 3.6, respectively, it is the intention of Seller and the Company that, without any further action by the parties (other than such actions to be taken pursuant this Agreement and the Ancillary Agreements), all right, title and interest in and to the Purchased Interest shall transfer to the Company on the Closing Date.

3.3    Conditions of Obligations of the Company. The obligations of the Company to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by the Company (in its sole discretion) in writing:

(a)    the representations and warranties of Seller set forth in Section 5 shall have been true and correct on the date hereof and shall be true and correct as of the Closing Date;

(b)    Seller shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with thereby at or before the Closing; and

(c)    Seller shall have delivered to the Company those items required to be delivered by Seller pursuant to Section 3.5.

3.4    Conditions of Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by Seller (in his sole discretion) in writing:

(a)    the representations and warranties of the Company set forth in Section 5 shall have been true and correct in all material respects on the date hereof and shall be true and correct in all material respects as of the Closing Date;

(b)    the Company shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with by the Company at or before the Closing; and

(c)    the Company shall have delivered to the Seller Parties those items required to be delivered by the Company pursuant to Section 3.6.

3.5    Seller Closing Deliverables.  At the Closing, and with effect as of the Closing Date, Seller shall deliver to the Company the following, all of which shall be dated as of the Closing Date (unless otherwise specified):

(a)    a certificate, dated as of the Closing Date, certifying the fulfillment of the conditions set forth in Section 3.3(a) and Section 3.3(b);

(b)    an Assignment of Membership Interests in respect of the Company in substantially the form attached hereto as Exhibit A duly executed by Seller as of the Closing Date (the "Assignment"); and

(c)    a duly executed certificate reasonably acceptable to the Company and in accordance with Treasury Regulation 1.1445-2(b) affirming that Seller is not a foreign person for U.S. federal income tax purposes.

3.6    The Company Closing Deliverables. At the Closing, and with effect as of the Closing Date, the Company shall deliver to Seller the following, all of which shall be dated as of the Closing Date (unless otherwise specified):

(a)    a certificate, dated as of the Closing Date and executed by a duly authorized officer of the Company, certifying the fulfilment of the conditions set forth in Section 3.4(a) and Section 3.4(b).

(b)    the Closing Date Payment, paid by wire transfer of immediately available funds to the account set forth on Exhibit C; and

(c)    a cash payment equal to $201,943, which is an amount equal to one-half of the outstanding indebtedness secured by real property of the Company.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to the Company as follows:

5

4.1     Title and Right to Assign. Seller is the sole record and beneficial owner of, and has good and marketable title to, the Purchased Interest, free and clear of all Encumbrances. Other than the Purchased Interest, Seller and his respective Affiliates do not own any interests, other securities or any securities convertible, exercisable or exchangeable for any units, membership interests, capital stock, share capital or other securities of the Company, or any rights or options to subscribe for or to purchase any units, membership interests, capital stock, share capital or other securities of the Company or any unit appreciation or similar rights, phantom unit or stock or similar plans or similar rights of the Company. Other than the governance documents of the Company, this Agreement and the Ancillary Agreements, Seller is not a party to any agreement or contract relating to the Purchased Interest. At the Closing, Seller shall deliver to the Company (and the Company shall acquire and own) good, valid and marketable title to, and all beneficial and economic interest in, the Purchased Interest, free and clear of all Encumbrances.

4.2     Authority. Seller has full legal right, capacity, power, and authority to enter into and perform the terms of this Agreement and each Ancillary Agreement to which he is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance by Seller of this Agreement and each Ancillary Agreement to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby by Seller have been duly authorized by all required action on the part of Seller.

4.3     Execution, Delivery and Enforceability. This Agreement and each Ancillary Agreement to which Seller is or will be a party has been duly executed and delivered by Seller, and this Agreement and each Ancillary Agreement to which Seller is or will be a party constitutes or will constitute a valid and binding agreement and obligation of Seller in accordance with its terms, except to the extent: (i) that such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, preference, equitable subordination, marshaling, or other similar Laws of general application now or hereafter in effect relating to creditors' rights generally, and (ii) that the remedies of specific performance, injunction, and other forms of equitable relief are subject to certain tests of equity jurisdiction, equitable defenses, and the discretion of the court before which any proceeding therefor may be brought.

4.4     No Conflicts. The execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements to which Seller is a party does not and will not violate, conflict with, result in the breach of, or accelerate the performance required by Seller of (i) the articles of organization, operating agreement or other organizational document of the Company, (ii) any contract to which Seller is a party or by which Seller is bound, or (iii) any Law or Governmental Order to which Seller or his assets are subject, or constitute a default thereunder.

4.5     Consents, Approvals, etc. No consent of, notice to, approval of, or authorization of or declaration or filing with any person, including any Governmental Authority, is required in connection with the execution and delivery of this Agreement or any Ancillary Agreement by Seller, the consummation by Seller of the transactions contemplated hereby, or the performance of and compliance with the terms and conditions hereof by Seller.

4.6     Compliance with Law. Seller is not in violation of any Law or Governmental Order applicable to him or any of his properties or assets that could adversely affect the consummation of the transactions contemplated by this Agreement or by any Ancillary Agreement.

4.7     No Litigation or Proceedings. No Litigation or other proceeding, at law, in equity, or otherwise, is pending, or, to Seller's Knowledge, threatened, against Seller with respect to any matter whatsoever that could affect the consummation of the transactions contemplated hereby or by any Ancillary Agreement, and, to Seller's Knowledge, there is no basis for any such proceeding. There is no investigation by any Governmental Authority pending, or, to Seller's Knowledge, threatened, that relates to or involves the transactions contemplated by this Agreement or by any Ancillary Agreement, nor, to Seller's Knowledge, is there any basis for any such investigation.

4.8     No Bankruptcy, etc. of Seller; Solvency. Neither Seller nor any other person has filed or, to Seller's Knowledge, threatened to file against Seller any proceeding seeking to adjudicate Seller insolvent, or seeking the liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of Seller or of his respective debts under any Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or similar official for him or any part of his property, nor has Seller made any assignment of any property for the benefit of any creditors, nor is there currently existing or, to Seller's Knowledge, threatened, any tax or creditor's Encumbrance or any other execution, levy, attachment or other process of Law upon the property of Seller, nor is there outstanding any legal process against Seller or his property that enjoins or could enjoin Seller from consummating the transactions contemplated by this Agreement or by any Ancillary Agreement. Seller is solvent and able to pay his debts and fulfill his obligations as they come due.

4.9     Excluded Information, Etc.

(a)     Seller is not relying on the Company or any of its subsidiaries or Affiliates for investment, legal or tax advice, and Seller has consulted with his own counsel, accountants and advisors regarding the various legal, tax and economic considerations relating to the sale of the Purchased Interest and the transactions contemplated by this Agreement and by the Ancillary Agreements.

(b)     Seller has adequate information concerning the Purchased Interest and the Company to make an informed decision regarding the transactions contemplated hereby and by the Ancillary Agreements, and Seller has had the opportunity to access all information that he has deemed necessary or advisable in connection herewith and therewith and he has independently, and without reliance upon the Company or any of its Affiliates for information or advice (other than Seller's reliance on the representations and warranties of the Company expressly set forth in Section 5), made his own analysis and decision to enter into this Agreement and the Ancillary Agreements and sell the Purchased Interest and engage in the transactions contemplated by this Agreement and enter into and consummate each of the Ancillary Agreements and the transactions contemplated thereby. Seller acknowledges and agrees that the Company and its Affiliates may possess information regarding the Purchased Interest, the

7

Company and its respective Affiliates, and the transactions contemplated hereby and the Ancillary Agreements, that has not been provided to Seller and that is not publicly available ("Excluded Information"). Excluded Information may be material to the Purchased Interest, the Company and its respective Affiliates, the transactions contemplated by this Agreement and by the Ancillary Agreements, and to Seller's decision to enter into this Agreement and the Ancillary Agreements and to sell the Purchased Interest and engage in the transactions contemplated by the Ancillary Agreements. Seller acknowledges and agrees that he has determined to enter into this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby, notwithstanding his lack of knowledge of Excluded Information, whether or not material. Seller agrees none of the Company or its subsidiaries or Affiliates shall have any liability to him with respect to the non-disclosure of Excluded Information, waives and releases any claims that he might have against the Company or any of its subsidiaries or Affiliates arising out of or relating to any matters contemplated by this Section 4.9(b), including the nondisclosure of Excluded Information.

(c)     Seller acknowledges and agrees that neither the Company nor any of its Affiliates has made any representation or warranty, express or implied, written or oral, relating to the transactions contemplated by this Agreement or by the Ancillary Agreements, except for those representations and warranties of the Company expressly set forth in Section 5.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Seller as follows:

5.1     Organization. The Company is a limited liability company duly organized and validly existing and in good standing under the laws of the State of Illinois and has all requisite power and authority to carry on its business.

5.2     Authority. The Company has full legal right, capacity, power, and authority to enter into and perform the terms of this Agreement and each Ancillary Agreement to which the Company is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which the Company is a party, and the consummation of the transactions contemplated hereby and thereby by the Company, have been duly authorized by all required action on the part of the Company.

5.3     Consents, Approvals, etc. No consent of, notice to, approval of, or authorization of or declaration or filing with any person, including any Governmental Authority, is required in connection with the execution and delivery of this Agreement or any Ancillary Agreement by the Company, the consummation by the Company of the transactions contemplated hereby, or the performance of and compliance with the terms and conditions hereof by the Company.

5.4     No Conflicts. The execution, delivery and performance by the Company of this Agreement and the Ancillary Agreements to which the Company is a party does not and will not violate, conflict with, result in the breach of, or accelerate the performance required by the Company of (i) the articles of organization, operating agreement or other organizational

8

document of the Company, (ii) any contract to which the Company is a party or by which the Company is bound, or (iii) any Law or Governmental Order to which the Company or its assets are subject, or constitute a default thereunder.

   5.5 Execution, Delivery and Enforceability. This Agreement and each Ancillary Agreement to which the Company is a party has been duly executed and delivered by the Company, and this Agreement and each Ancillary Agreement to which the Company is a party constitutes a valid and binding agreement and obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent: (i) that such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, preference, equitable subordination, marshaling, or other similar Laws of general application now or hereafter in effect relating to creditors' rights generally and (ii) that the remedies of specific performance, injunction, and other forms of equitable relief are subject to certain tests of equity jurisdiction, equitable defenses, and the discretion of the court before which any proceeding therefor may be brought.

   5.6 No Litigation or Proceedings. No Litigation or other proceeding, at law, in equity, or otherwise, is pending, or, to the Company's Knowledge, threatened, against the Company with respect to any matter whatsoever that could affect the consummation of the transactions contemplated hereby or by any Ancillary Agreement, and, to the Company's Knowledge, there is no basis for any such proceeding. There is no investigation by any Governmental Authority pending, or, to the Company's Knowledge, threatened, that relates to or involves the transactions contemplated by this Agreement or by any Ancillary Agreement, nor, to the Company's Knowledge, is there any basis for any such investigation.

   5.7 Compliance with Law. The Company is not in violation of any Law or Governmental Order applicable to it or any of its properties or assets that could adversely affect the consummation by the Company of the transactions contemplated by this Agreement or any Ancillary Agreement.

   5.8 No Bankruptcy, etc. of the Company; Solvency. Neither the Company nor any other person has filed or, to the Company's Knowledge, threatened to file against the Company, any proceeding seeking to adjudicate the Company insolvent, or seeking the liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of the Company or of its respective debts under any Law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or similar official for it or any part of its property, nor has the Company made any assignment of any property for the benefit of any creditors, nor is there currently existing or, to the Company's Knowledge, threatened, any tax or creditor's Encumbrance or any other execution, levy, attachment or other process of Law upon the property of the Company, nor is there outstanding any legal process against the Company or its respective property that enjoins or could enjoin the Company from consummating the transactions contemplated by this Agreement or by any Ancillary Agreement. The Company is, and after the consummation of the transaction described in the Agreement and the payment of the Purchase Price by the Company, will continue to be solvent and able to pay its debts and fulfill its obligations as they come due.

9

## SECTION 6.  CERTAIN COVENANTS

6.1     Cooperation Regarding Certain Matters.

(a)     All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest with respect thereto) incurred in connection with this Agreement or any Ancillary Agreement, shall be paid by Seller when due, and Seller will file all necessary Tax Returns and other documentation with respect to such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, the Company will join in the execution of any such Tax Returns and documentation.

(b)     After the Closing, upon reasonable written notice, Seller shall furnish or cause to be furnished to the Company as promptly as practicable such information in Seller's possession and assistance relating to the Company (including access to books, records and personnel) as is reasonably requested for the filing of all Tax Returns (including any extensions thereof), the making of any election related to Taxes, the preparation for any audit or tax contest, and the prosecution or defense of any action related to any Tax or Tax Return. Seller agrees to retain all books and records in his possession with respect to Tax matters and pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Company, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Governmental Authority.

6.2     Further Assurances. The Company (subject to its rights set forth herein), Seller and their respective Affiliates shall take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements in accordance with their respective terms. Each party hereto agrees to, and each party hereto shall cause its/his respective Affiliates to, from time to time, upon the request of another party, execute, acknowledge and deliver, or shall cause to be executed, acknowledged and delivered, to the requesting party all such further transfers, assignments, deeds, powers, and assurances of title, and additional instruments, and do or cause to be done all acts or things, as often as may be reasonable, proper, or necessary to (i) sell, transfer, and assign the Purchased Interest, (ii) to transfer any other rights, interest or title Seller may have in the Company or any assets of the Company, (iii) to carry out the intent of this Agreement and the Ancillary Agreements and to vest in the Company or its designees the entire right, title, and interest of Seller in the Purchased Interest.

6.3     Confidentiality. From and after the date hereof, Seller shall, and shall cause his Affiliates and his Representatives to, keep confidential and not disclose, or otherwise use in any manner, any information that any of them have relating to: (i) this Agreement; (ii) the Ancillary Agreements; (iii) the transactions contemplated by this Agreement or the Ancillary Agreements (including details relating to the Purchase Price); or (iv) any other confidential or proprietary information of the Company; provided, however, the foregoing shall not prevent Seller from making any disclosure of the foregoing to the extent such disclosure is required by Law.

10

6.4    Non-Disparagement. From and after the date hereof, Seller shall not make, and shall cause his respective Affiliates not to make, any negative, derogatory or disparaging statements or communications regarding the Company, any Affiliate of the Company, or the Business. From and after the date hereof, the Company shall not make, and it shall cause its Affiliates not to make, any negative, derogatory or disparaging statements or communications regarding Seller. For the avoidance of doubt, this Section 6.5 shall not restrict the making of claims, or bringing of enforcement actions, relating to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby.

## SECTION 7.  RELEASE AND TERMINATION

7.1    Releases.

(a)    Seller Release. From and after the Closing, Seller shall release and forever discharge, and shall cause each of his Affiliates, successors, and assigns (collectively with Seller, the "Seller Releasors") to release and forever discharge the Company and its respective officers, directors, managers, employees, shareholders, members, Affiliates, successors, and assigns from any and all claims, obligations, liabilities, and causes of action of any kind (whether at law or in equity and including claims in tort or for breach of contract or breach of warranty), known or unknown, fixed or contingent, that any of the Seller Releasors previously had or may have had, now has or may have, or may in the future have that in any way arises out of or relates to (i) the Company or its respective operations or management, (ii) the formation documents, operating agreement, limited liability company agreement or similar agreement or other governance documents applicable to the Company, or (iii) the Purchased Interest (collectively, the "Seller Released Claims"); provided, however, the Seller Released Claims shall exclude claims arising out of fraud or willful misrepresentation, or claims arising as a result of any breach of this Agreement. Seller hereby represents and warrants to the Company that none of the Seller Released Claims have been assigned or otherwise transferred to any third party.

(b)    Company Release. From and after the Closing, the Company shall release and forever discharge, and shall cause each of its Affiliates, successors, and assigns (collectively with the Company, the "Company Releasors") to release and forever discharge Seller and its Affiliates, agents, representatives, successors, and assigns from any and all claims, obligations, liabilities, and causes of action of any kind (whether at law or in equity and including claims in tort or for breach of contract or breach of warranty), known or unknown, fixed or contingent, that any of the Company Releasors previously had or may have had, now has or may have, or may in the future have that in any way arises out of or relates to (i) the formation documents, operating agreement, limited liability company agreement or similar agreement or other governance documents of the Company applicable to the Seller or (ii) the Purchased Interest (collectively, the "Company Released Claims"); provided, however, the Company Released Claims shall exclude claims arising out of fraud or willful misrepresentation, or claims arising as a result of any breach of this Agreement. The Company hereby represents and warrants to Seller that none of the Company Released Claims have been assigned or otherwise transferred to any third party.

(c)      Each party hereto has read Section 1542 of the Civil Code of the State of California ("Section 1542"), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each party hereto understands and agrees that such party is aware that Section 1542 gives such party the right not to release existing claims of which such party is not now aware unless such party voluntarily chooses to waive this right. Being aware of this right, each of Seller and the Company nevertheless hereby voluntarily waives the rights described in Section 1542, and elects to assume all risks for claims that now exist in the Company' or Seller's favor, respectively, known or unknown, arising from the subject matter of this Agreement.

7.2    Termination.  Seller hereby agrees to the termination of any of Seller's rights under any and all agreements, arrangements and understandings between Seller and the Company and/or any other members of the Company in respect of the Purchased Interest, including, without limitation, the Buy Sell Agreement dated March 2008 among the Company, Seller and the other parties thereto, as amended by the First Amendment to Buy Sell Agreement dated July 20, 2015.

## SECTION 8.  SURVIVAL AND INDEMNIFICATION

8.1    Survival. Each party's respective representations, warranties, covenants and agreements contained in this Agreement shall survive the Closing.

8.2    Mutual Indemnifications. Each of Seller and the Company shall indemnify the other and its/his respective Affiliates, successors, assigns, owners, controlling persons, directors, officers and employees (each, an "Indemnified Party"), against, and hold each Indemnified Party harmless from, any and all claims, losses, liabilities, damages, judgments, assessments, fines, costs, expenses or deficiencies, including reasonable attorneys' fees and disbursements, as well as the reasonable fees of experts and consultants incurred by a party entitled to indemnification under this Agreement (collectively, "Damages") arising out of, resulting from or based upon:

(a)      any inaccuracy in or any breach of any representation or warranty of the other party contained in this Agreement or in any Ancillary Agreement;

(b)      any breach of any covenant by, or agreement of, the other party contained in this Agreement or in any Ancillary Agreement;

The indemnification obligations in this Section 8.2 shall survive the date of this Agreement, and claims for indemnification under this Section 8.2 may be made at any time.

12

## SECTION 9.  BANKRUPTCY PROVISIONS

9.1    Bankruptcy Representations and Warranties.    The Company hereby represents, warrants and agrees that, in consideration of the recitals and mutual covenants contained herein and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the Company has no current intent (i) to file any voluntary petition under any Chapter of the Bankruptcy Code, or in any manner to seek relief, protection, reorganization, liquidation, dissolution or similar relief for debts under any other local, state, federal or other insolvency laws or laws providing for relief of debtors in equity, or directly or indirectly to cause any party who holds any interest in the Company to file any such petition to seek any such relief, either at the present time, or at any time hereafter, or (ii) directly or indirectly to cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against the Company or directly or indirectly to cause the Company to become the subject of any proceedings pursuant to any other state, federal or other insolvency laws or laws providing for the relief of debtors, either at the present time, or at any time hereafter.

9.2    Payment of Purchase Price.    The Company hereby stipulates and agrees that in the event it shall (a) file with any bankruptcy court of competent jurisdiction, or be the subject of, any petition under Title 11 of the Bankruptcy Code, as amended, (b) be the subject of any order for relief issued under the Bankruptcy Code, as amended, (c) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or bankruptcy, insolvency, or other relief for debtors, (d) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (e) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution or bankruptcy, insolvency or relief for debtors, then the Company hereby irrevocably acknowledges and agrees that the payment of the Purchase Price is intended as a contemporaneous exchange for new value given to the Company, and that the payment of the Purchase Price is in fact a substantially contemporaneous exchange.    The Company hereby further agrees and acknowledges that it is receiving valuable consideration under this Agreement, that Seller would be prejudiced if this acknowledgement were not enforced in such bankruptcy proceeding, that the other creditors of the Company, if any, will not be prejudiced by enforcement of this acknowledgement, and that but for the Company's acknowledgement and agreement herein, Seller would not have entered into this Agreement.

9.3    Bankruptcy Claims.    If any claim is ever made by the Company, or any other individual or entity, including, without limitation, any trustee appointed in any case commenced by or against any of the foregoing under the Bankruptcy Code, upon, in connection with or relating to this Agreement or the transactions contemplated hereby (including, but not limited to, any claim for avoidance of any obligation or transfer, or for repayment or recovery of any portion of the Purchase Price paid to Seller in connection with this Agreement, because of any assertion that any such obligation or transfer constituted a preferential transfer or fraudulent conveyance, or for any other reason whatsoever in connection with a bankruptcy, insolvency or other proceeding) (a "Bankruptcy Claim"), then, at Seller's option, before or after any such a Bankruptcy Claim has been resolved, settled or determined, Seller may choose to treat the transaction which is the subject of the Bankruptcy Claim as not having occurred and to revive in

13

full any and all interests of Seller in the Company, and any and all claims that Seller had against the Company prior to this Agreement. The revival set forth in this Section 9.3 shall be in addition to all of Seller's other rights and remedies.

**SECTION 10. MISCELLANEOUS**

10.1   <u>Notices</u>. All notices, consents, and other communications required or permitted under this Agreement shall be in writing and shall be effective: (i) upon receipt when delivered by hand; (ii) five (5) Business Days after mailing to the addressee by U.S. registered or certified mail, return receipt requested; (iii) one (1) Business Day after being sent to the addressee by overnight or next-day commercial courier or delivery service; or (iv) the next Business Day after sending by email (<u>provided</u> that receipt of such email is specifically confirmed by the recipient), in the case of (ii), (iii) and (iv) addressed to the party as follows:

If to Seller:

Ken Cannata 
Reno NV 89511
Email:

With a copy (which shall not constitute legal notice) to:

Kolesar & Leatham
400 S. Rampart Blvd., Suite 400
Las Vegas, NV 89145
Attention: Shlomo S. Sherman, Esq.; Joseph J. Mugan, Esq.
Email: ssherman@klnevada.com; jmugan@klnevada.com

If to the Company:

PPC Holdings, LLC
701 Dartmouth Lane
Buffalo Grove, IL 60089
Attention:
Email:

With a copy (which shall not constitute legal notice) to:

Kaye Scholer LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602-4231
Attention: Sheldon Solow, Esq.
Email: Sheldon.Solow@kayescholer.com

14

A party may, by notice given in accordance with this Section 10.1, designate another address or person for receipt of notices hereunder.

10.2    Assignment. No party hereto may assign this Agreement or any of its/his rights hereunder, or delegate performance of any of its/his obligations, to any other person without the prior written consent of the other parties.

10.3    Successors and Assigns; Third Party Beneficiaries. Subject to the restrictions on assignment herein contained, this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties. This Agreement is not intended to create, and shall not be deemed to create, enforceable legal rights in any person other than the parties hereto, as a third party beneficiary or under any other legal theory, except that (a) each Indemnified Party is an intended third party beneficiary of Section 8.2 (entitled to enforce same as if an actual party hereto) and (b) each applicable released party under Section 7 is an intended third party beneficiary of Section 7 (entitled to enforce same as if an actual party hereto).

10.4    Amendment and Waiver.

(a)    No failure or delay on the part of either party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(b)    Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by any party from the terms of any provision of this Agreement shall be effective (i) only if it is made or given in writing and signed by the party against whom it is sought to be enforced, and (ii) only in the specific instance and for the specific purpose for which made or given.

10.5    Joint Drafting. The parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements. In the event an ambiguity or question of intent or interpretation arises, this Agreement and each Ancillary Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement or the Ancillary Agreements.

10.6    Counterparts; Signatures. This Agreement may be executed in any number of counterparts, and by the parties in separate counterparts, each of which when so executed shall be deemed an original and all of which taken together shall constitute one and the same agreement. A counterpart signature page to this Agreement transmitted by fax or other electronic means shall have the same effect as an original.

10.7    [Reserved].

10.8    [Reserved].

15

10.9   WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.10   Specific Performance. The parties hereby acknowledge and agree that the failure by the parties to perform their agreements and covenants under this Agreement will cause irreparable injury to the other parties for which monetary damages, even if available, will not be an adequate remedy. Accordingly, each party hereby consents to the granting of equitable relief (including specific performance and injunctive relief) by the courts specified in Section 10.8 to enforce the other parties' obligations hereunder. The parties further agree to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such equitable relief and that this Section 10.10 is without prejudice to any other rights or remedies that the parties may have for any failure to perform this Agreement.

10.11   Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby in such jurisdiction, and such provision or obligation shall not in any way be affected or impaired thereby in any other jurisdiction.

10.12   Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party hereto incurring such costs and expenses.

10.13   Entire Agreement. This Agreement, together with the Exhibits hereto (which are an integral part of and by this reference are hereby incorporated into this Agreement), is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties, or undertakings other than those set forth or referred to herein or therein. This Agreement, together with the Exhibits hereto, supersedes all prior agreements and understandings between the parties with respect to such subject matter.

*[Balance of this page intentionally blank]*

16

IN WITNESS WHEREOF, the undersigned have executed this Membership Interest Purchase Agreement as of the Effective Date.

**THE COMPANY**

PPC HOLDINGS, LLC

By: _Keith Prociux_

Name: Keith Prociux

Title: CEO

**SELLER**

_____

Name: Ken Cannata

IN WITNESS WHEREOF, the undersigned have executed this Membership Interest Purchase Agreement as of the Effective Date.

**THE COMPANY**

PPC HOLDINGS, LLC

By: _____
     Name:
     Title:

**SELLER**

_____
Name:  Ken Cannata

**EXHIBIT A**

(See attached)

# ASSIGNMENT

This Assignment (this "Assignment") is made as of October __, 2016 by and between KEN CANNATA, an individual ("Assignor"), and PPC HOLDINGS, LLC, an Illinois limited liability company (the "Company").

## RECITALS

WHEREAS, this Assignment is being delivered in connection with the Membership Interest Purchase Agreement, dated as of October __, 2016 (the "Agreement"), by and between the Company and Assignor;

WHEREAS, Assignor is a member of the Company, and, as of the date hereof, Assignor is the record owner of Purchased Interests of the Company, representing 33.33% of the outstanding Purchased Interests of the Company (the "Company Interests"); and

WHEREAS, pursuant to the Agreement, in exchange for the consideration set forth in the Agreement, Assignor has agreed to sell, assign and transfer to the Company, free and clear of all Encumbrances, and the Company has agreed to purchase and acquire from Assignor, free and clear of all Encumbrances, the Company Interests.

## AGREEMENTS

In consideration of the above recitals and of the mutual agreements and covenants contained in this Assignment and the Agreement (and the consideration payable thereunder), the parties to this Assignment, intending to be legally bound hereby, agree as follows:

1.      Assignment. Assignor hereby sells, assigns and transfers the Company Interests to the Company, free and clear of all Encumbrances, and Assignor acknowledges payment, in accordance with the Agreement, of the consideration due and payable with respect to such sale, assignment and transfer of the Company Interests. Assignor confirms and agrees that the payment of the applicable consideration with respect to the Company Interests constitutes full satisfaction of all obligations of the Company in respect of the obligation to pay such consideration.

2.      Acknowledgment; Release. Assignor hereby acknowledges and agrees that: (i) the sale, transfer and assignment of the Company Interests is effective immediately upon the execution and delivery of this Assignment between Assignor and the Company; and (ii) following the effectiveness of this Assignment, (a) Assignor shall no longer have any rights or interests whatsoever with respect to the Company Interests, (b) Assignor expressly disclaims any rights or interests with respect to the Company Interests, including, without limitation, rights or interests in the allocation of profits and losses of the Company, distributions by the Company, any right to direct or control the Company or its business and affairs, or any other rights and privileges in or with respect to the Company under law or contract with respect to the Company Interests and (c) Assignor releases, and shall cause each of his Affiliates, directors, officers, employees, representatives and agents to release, the Company and each of their respective Affiliates, directors, officers, employees, representatives and agents from any and all claims, demands, actions, proceedings, debts, liabilities, rights, obligations, duties, contracts, agreements

and/or expenses (whether known or unknown, contingent or actual) relating to or arising from the Company Interests and/or any other matter relating to the Company arising contemporaneously or prior to the Closing. The foregoing shall not, and is in no way intended to, limit or amend the Agreement.

3.   <u>Defined Terms</u>. Capitalized terms not otherwise defined herein shall have the respective meanings given to them in the Agreement.

4.   <u>Other Documents</u>.   Assignor hereby agrees to execute and deliver such other documents and instruments as may be necessary to accomplish the assignment and assumption contemplated by this Assignment as reasonably requested by the Company.

5.   <u>Governing Law</u>.  This Assignment shall be governed, construed and enforced in accordance with the laws of the State of Illinois (without regard to the choice of law provisions thereof).

6.   <u>Counterparts</u>.  This Assignment may be signed in two or more counterparts with the same effect as if the signature on each counterpart were upon the same instrument.

7.   <u>Binding Effect</u>. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

*[Balance of this page intentionally blank]*

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first written above.

ASSIGNOR

Name:  Ken Cannata

THE COMPANY

PPC HOLDINGS, LLC


By: _____
    Name:
    Title:

3

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first written above.

ASSIGNOR

_____

Name:  Ken Cannata

THE COMPANY

PPC HOLDINGS, LLC

By: _____

Name:  Keith Prociuk

Title:  CEO

3

**EXHIBIT C**

**CLOSING DATE PAYMENT AND WIRE TRANSFER ACCOUNT**