# EXHIBIT C

Buy Sell Agreement, as amended

## BUY SELL AGREEMENT

THIS BUY SELL AGREEMENT ("Agreement") is made and entered as of this __ day of March, 2008, by and between Keith Prociuk, Ken Cannata and Chris Piastri (collectively referred to as the "Members") and HP Tuners LLC, a California LLC (the "LLC"), with respect to all membership interests of the LLC now or hereinafter outstanding.

### RECITALS

WHEREAS, the Members desire to protect the LLC and the Members, as well as provide for the continuity of the LLC's business in the event of the occurrence of certain events discussed in this Agreement.

WHEREAS, the Members agree to perform the duties and obligations incident to being a Member in the LLC upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises exchanged, it is hereby agreed as follows:

**1.   THE COMPANY**

1.1   **Purpose.** As of the date of this Agreement, the Members agree and understand that the purpose of the LLC is to engage in any legal business activity and to generate profits which the LLC will distribute to the Members.

1.2   **Capital Structure.** As of the date of this Agreement, the LLC has 3,000 outstanding Membership interests. The Members own the following Membership Interests:

| Member | No. of Membership Interests | Ownership % |
|---|---|---|
| Keith Prociuk | 1,000 | 33.33% |
| Ken Cannata | 1,000 | 33.33% |
| Chris Piastri | 1,000 | 33.33% |
| Totals | 3,000 | 100% |

1

1.3   **Initial Capital Contributions.**  The Members agree and understand that each Member made the following initial capital contributions:

| Member | Contribution |
|---|---|
| Keith Prociuk | Cash and Founder's Services |
| Ken Cannata | Cash and Founder's Services |
| Chris Piastri | Cash and Founder's Services |

1.4   **Additional Capital Contributions as Memeber Loans.**  The Members are not required to make any additional capital contributions. However, if the LLC requires additional capital at any time, the Members shall give their best efforts to individually contribute such required additional capital on a pro rata basis (relative to then current stock ownership percentages).  If a Member (the "Non-Contributing Member") cannot make his pro rata share of the required additional capital contribution, then the LLC shall treat the difference between the contributions by the Non-Contributing Member and the contributing Member(s) as member loans (the "Member Loans").  All Member Loans shall be evidenced by a promissory note and shall earn the lowest possible interest rate allowed by law on the principal balance during the term of indebtedness. No Member shall have the right to receive any cash distributions from the LLC unless and until the LLC has paid the Member Loans in full.  The parties are free to enter into an agreement that is contrary to the terms set forth in this Section if such agreement is in writing and signed by all parties.

2. **CERTIFICATE LEGEND REQUIREMENTS**

On execution of this Agreement, each Member shall have placed on the certificates representing his interests the legend set forth in Section 3 of this Agreement. None of the interests presently owned or subsequently acquired by the Members shall be sold, pledged, encumbered, transferred, or disposed of in any way, whether voluntarily, involuntarily, or by operation of law, except under the terms of this Agreement.  Each Member shall have the right to vote his interests and receive the Member Distributions paid in connection with such interests until the interests are sold or transferred as provided in this Agreement. The legend stated in Section 3 of this Agreement shall have the same legal effect even if it is not placed on the share certificates in compliance with this Section.

3. **LEGEND ON MEMBERSHIP INTERESTS**

Each membership interest certificate, whether presently owned or subsequently issued, shall have conspicuously endorsed on its face the following words:

"**Sale, transfer, hypothecation, encumbrances, or disposition of the**

2

interests represented by this certificate is restricted by the provisions of the Buy Sell Agreement among the Members and the LLC of HP Tuners, LLC. All provisions of the Buy Sell Agreement are incorporated by reference in this certificate. A copy of the Agreement may be inspected at the principal office of the LLC."

4. **RESTRICTIONS ON VOLUNTARY TRANSFERS & ADDITIONAL ISSUANCES**

   4.1   Member Sales or Transfers.  No Member shall sell, transfer, pledge, encumber, hypothecate, or in any way dispose of any of his interests or any right or interest in them without obtaining the unanimous prior written consent of the other Members in accordance with this Agreement. Any transfer by any Member in violation of this Agreement shall be null and void and of no effect.

   4.2   LLC Sales or Transfers.  The LLC shall not issue additional interests without the **unanimous prior written consent** of all the Members. Any issuance by the LLC in violation of this Agreement shall be null and void and of no effect.

5. **TRIGGER EVENTS AND PURCHASE PRICE**

   5.1   Trigger Events.  The Members agree that the occurrence of certain events (the "Trigger Events") will necessitate the sale of interests owned by one Member or his estate to the Remaining Members or the LLC. The Trigger Events are listed below and are defined in the paragraphs referred to below:

   (1)   Voluntary Withdrawal No Third Party Offer – Section 6;
   (2)   Voluntary Withdrawal Third Party Offer – Section 7;
   (3)   Financial Distress of Member – Section 8;
   (4)   Death of Member – Section 9;
   (5)   Disability of Member – Section 10;
   (6)   Divorce of Member – Section 11;
   (7)   Termination of Employment – Section 12

   5.2   Definitions.  For purposes of Section 5.3, any Member who is the subject of a Trigger Event shall be considered the "Withdrawing Member" and the non-withdrawing Members shall be considered the "Remaining Members".

   5.3   Purchase Price.  Except as stated otherwise in this Agreement (see Death of Member and Divorce of Member), the purchase price (the "Purchase Price") of the Withdrawing Member's Interests (whether purchased by the Remaining Members or the LLC) shall be determined either by a written agreement entered into by the parties as of the Withdrawal Date or according to the formula set forth in Section 5.4.

   5.4   Fair Market Value.  Fair Market Value of an interest in the LLC at the time of a Trigger Event shall be equal to:

[((last 2 years **EBITDA /2) * 6)/** number of membership interests outstanding]. For example, if the EBITDA for the previous 2 years was $1,220,000 and $1,975,000 then the average EBITDA is equal to $1,597,500. When this is multiplied by the EBITDA multiple of 6, the LLC value is $9,585,000. Based on the current number of interests outstanding (3,000), the Purchase Price for each interest is equal to $3,195.00 per interest. If a Withdrawing Member owned 1000 interests, the aggregate purchase price would be $3,195,000.

    5.5    <u>Intentionally Left Blank</u>.

    5.6    <u>Terms of Purchase Price Payments</u>. The time period and other terms of the Purchase Price payments shall be negotiated by the parties as of the Withdrawal Date. If the parties cannot agree upon the terms, the terms shall be as follows:

A.    The LLC or Remaining Members shall make equal monthly payments of the Purchase Price over five (5) years with Eight Percent (8%) interest; and

B.    If the Purchase Price for the Withdrawing Member's Interests is not paid in full at the time of repurchase, then the Withdrawing Member, its spouse or other designated party, may file a UCC-1 financing statement secured by all the assets of the LLC. Upon receipt of the final payment for such Withdrawing Member's Interests, the UCC-1 will be extinguished.

## 6. VOLUNTARY WITHDRAWAL – NO THIRD PARTY OFFER

    6.1    <u>Voluntary Withdrawal – No Third Party Offer</u>. If any Member, in his sole discretion, desires to withdraw from his status as a Member of the LLC and such Member desires to sell his interests to the Remaining Member or the LLC, he (the "Withdrawing Member") must give written notice to the other Members (the "Remaining Members") of his intent to sell such interests (the "Withdrawing Member's Interests"). The date of such notice shall be referred to as the "Withdrawal Date".

    6.2    <u>Right to Purchase – Remaining Members</u>. First, the Remaining Members shall have the right to purchase the Withdrawing Member's Interests. Within thirty (30) days after receipt of notice from the Withdrawing Member, the Remaining Member shall deliver to the Withdrawing Member either: (1) a written election to purchase; or (2) a written rejection of the offer to purchase.

    6.3    <u>Right to Purchase – LLC</u>. If the Remaining Member rejects the option to purchase the Withdrawing Member's Interests, the LLC shall have the option to purchase the Withdrawing Member's Interests for a period of thirty (30) days in accordance with the same procedure set forth in Section 6.2. If the LLC does not elect to purchase the Withdrawing Member's Interests, the Withdrawing Member shall have the right to sell his interests to a third party in accordance with Section 7 of this Agreement or the parties may mutually agree to submit the matter to arbitration.

## 7. VOLUNTARY WITHDRAWAL – THIRD PARTY OFFER

7.1 <u>Third Party Offer</u>. If a Withdrawing Member desires to sell his interests of the LLC to a third party offeror **("Third Party Offeror")**, the Withdrawing Member must provide the Remaining Member with a <u>notarized written original</u> of the offer (the "Offer") made by the Third Party Offeror.

7.2 <u>Right of First Refusal and Purchase Price</u>. The Remaining Member *and* the LLC shall have the right of first refusal to purchase the Withdrawing Member's Interest at the purchase price and on the terms stated in the Offer. The Remaining Members and the LLC shall have sixty (60) days to exercise such right of first refusal and such exercise must be in writing signed either by the Remaining Member or the LLC.

7.3 <u>Exercise Period</u>. During the sixty (60) day period described above, the Withdrawing Member and the Third Party Offeror shall provide the Remaining Members and the LLC with any and all information necessary to evaluate the Offer. The Withdrawing Member and the Third Party Offeror shall personally meet with the Remaining Members on at least two (2) occasions during the sixty (60) day period to discuss the Offer and other matters relevant to the LLC business affairs.

7.4 <u>Co-Sale Rights of Remaining Members.</u> In the event the LLC and/or the Remaining Members fail to exercise their right of first refusal and/or reject the right of first refusal, the Remaining Members shall then have co-sale rights ("Co Sale Rights") to sell their interests to the Third Party Offeror on the same terms and condition as the Withdrawing Member. The Remaining Members shall be eligible to sell the number of interests that are set forth in the following formula: [(each Remaining Member's interests/ total number of outstanding interests) * total offer value]. By way of example, if the Offer to purchase the interests was for $100,000 and the Withdrawing Member owned 2,500 interests while the Remaining Members each owned 1,000, 5,000 and 1,500 interests, respectively, then each Member would be able to sell the following value of interests: Withdrawing Member $25,000, Member 1 - $10,000, Member 2- $50,000 and Member 3 - $15,000.

7.5 <u>Failure to Exercise Right to Purchase</u>. Failure by the Remaining Member or the LLC to exercise the right of first refusal and Co-Sale Rights shall be deemed acceptance and approval by the Remaining Member and the LLC of the Third Party Offeror as a new Member of the LLC. Upon payment by the Third Party Offeror of the purchase price stated in the Offer and execution of this Agreement or an amendment to this Agreement, the Third Party Offeror shall become a Member of the LLC.

## 8. FINANCIAL DISTRESS OF MEMBER

8.1 <u>Financial Distress</u>. In the event any Member becomes financially distressed, ("the Financially Distressed Member") by, including but not limited to,

5

adjudicating a bankruptcy (voluntarily or involuntarily), or making an assignment for the benefit of creditors or filing a petition seeking to force the involuntary winding up and dissolution of the LLC, or if substantially all the property of the Member is levied on and sold in a judicial proceeding, the Remaining Member and the LLC shall have the option for sixty (60) days following notice of any such events to purchase all of the interests owned by the Financially Distressed Member for a Purchase Price determined in accordance with Section 5.4.

8.2   Right to Repurchase. If the Financially Distressed Member terminates his financial difficulties within two (2) years of the Withdrawal Date, the previously Financially Distressed Member shall have the right to repurchase his previously held interests at the same ownership percentage (if and only if the LLC has no new Members) and at the same Purchase Price referenced above, plus interest at 8% per annum during for period of time the previously Financially Distressed Member had not owned his interests. If the LLC has new Members that were not Members on the Withdrawal Date then the previously Financially Distressed Member and the LLC shall give their best efforts to reach a mutually agreed upon Purchase Price and ownership percentage.

## 9. DEATH OF MEMBER

The Members or the LLC shall carry single or joint life insurance policies with a face amount of not less than **Two Million Dollars ($2,000,000)** on each Member naming the Remaining Members or the LLC as the beneficiary(s). Within the period commencing with the death of any Member (the "Deceased Member") and ending ninety (90) days after the death/qualification of his executor or administrator, the Deceased Members estate shall sell and the LLC shall purchase all the Deceased Member's interests of the LLC's interest using the proceeds of any and all life insurance policies covering the Deceased Member at the purchase price and on the terms provided in Section 5 of this Agreement. If the LLC does not own a life insurance policy on the Deceased Member at the time of his death, then the Remaining Members and then the LLC shall have the option to purchase all of the interests owned by the Deceased Member in accordance with Section 5 of this Agreement.

## 10. DISABILITY OF MEMBER

10.1   Definition of "Disabled". If the LLC purchases a disability insurance policy ("Disability Policy") on Member, the terms "disabled" or "disability" shall be defined in accordance with the terms of such policy. In the absence of such a disability insurance policy, a mutually agreed upon, third party medical doctor shall determine the term "disabled". Regardless of the definition of "disabled", a Member may be classified as "disabled" for a physical or mental disability.

10.2   Disabled Member. If the LLC owns a disability policy on any Member who is rendered disabled (the "Disabled Member") for more than twenty four (24) months, the LLC shall purchase all of the interests owned by the Disabled Member using the

proceeds from the disability policy at the Purchase Price and on the terms provided in Section 5 of this Agreement. If the disability policy proceeds exceed the Purchase Price to be paid to the Disabled Member, the LLC shall retain, and the Disabled Member shall have no claim to, such excess. If the LLC does not own a disability policy on the Disabled Member, then the Remaining Members and then the LLC shall have the option to purchase all of the interests owned by the Disabled Member in accordance with Section 5 of this Agreement.

10.3 <u>Disagreement</u>. In the event the Remaining Members and the Disabled Member or his personal representative fail to agree on whether the Disabled Member is totally and permanently disabled for purposes of this Section, the Disabled Member or his personal representative and the Remaining Member shall be bound by the professional medical judgment of a mutually agreed upon third party medical doctor, acting in good faith.

10.4 <u>Death Before Sale</u>. If the Disabled Member should die after becoming disabled, but before the actual sale of his interests, then the purchase and sale of his interests will be treated as the purchase and sale of a Deceased Members interests under Section 9 of this Agreement.

## 11. DIVORCE OF MEMBER

11.1 <u>Divorced Member</u>. If any Member (the "Divorced Member") enters into a final divorce decree or divorce settlement agreement at any time during the term of this Agreement and the Divorced Members former spouse (the "Divorced Members Spouse") receives an ownership interest in the Divorced Members interests, then the Divorced Members Spouse shall immediately sell and the LLC shall immediately purchase all the interests owned by the Divorced Members Spouse upon the date of the divorce decree or divorce settlement pursuant to Section 5.3 of this Agreement over a period of five (5) years at eight percent (8%) interest. The Divorced Member shall use his best efforts to retain his interests in any divorce decree or divorce settlement.

11.2 <u>Purchase Price and Payment Terms</u>. The Purchase Price for the interests owned by the Divorced Members Spouse shall equal the "Fair Market Value" of the interests as determined by a mutually agreed upon third party business valuation expert. The LLC may effect such a purchase via execution of a Promissory Note payable to the Divorced Members Spouse. The Promissory Note shall be in the amount of the "Fair Market Value" of the interests and shall be payable over five (5) years with six percent (8%) interest.

11.3 <u>Spousal Consent</u>. Each Members spouse has executed the Spousal Consent attached hereto as **Exhibit A** and incorporated by reference herein. Each Member Agrees that in the event it later becomes married or re-married it will immediately have its new spouse execute such consent.

## 12. TERMINATION OF SERVICE

7

Notwithstanding any other provision in this Agreement, in the event a Member's services with the LLC is terminated for "Cause" (which is defined to mean any act that is materially injurious to the LLC or intended to benefit the Member at the expense of the LLC), then the remaining Members and the LLC shall have the purchase rights set forth in Section 6.1 except that the valuation on which the LLC and/or the Remaining Members shall purchase the terminated Member's Interests shall be no more than the lesser of book value or the value set forth in Section 5.4 of this Agreement.

## 13. MEMBER VOTING

Except as otherwise stated in this Agreement, the Members agree and understand that the following actions specifically require unanimous approval of the outstanding interests:

A. Admission of new Members;

B. Dissolution and/or winding up of the LLC;

C. Any commitment, contract, or expenditure equaling or totaling more than $100,000;

## 14. UPDATES/AMENDMENTS TO AGREEMENT

The Members hereby agree that they shall meet every year to discuss any updates or amendments to this Agreement. If the Members determine in their sole and absolute discretion that they desire to update or amend this Agreement, all such updates or amendments shall in a writing signed by all Members.

## 15. OBLIGATIONS OF TRANSFEREES

Unless this Agreement expressly provides otherwise, each transferee or any subsequent transferee of interests in the LLC, or any interest in such interests, shall hold the interests or interest in the interests subject to all provisions of this Agreement and shall make no further transfers except as provided in this Agreement. Transfer of the interests shall not be entered on the books of the LLC until the prospective transferee has executed an amended copy of this Agreement. Failure or refusal to sign such an amended copy of this Agreement shall not relieve any transferee from any obligations under this Agreement.

## 16. MEMBER DISTRIBUTIONS

The minimum distribution the LLC shall make will be equal to the tax imposed on the Members on the basis of the LLC's earnings for that particular quarter. The occurrence, amount and timing of any additional Member distributions shall be agreed upon by a majority vote of all the then currently outstanding interests.

## 17. OTHER MATTERS

17.1 <u>Certificates</u>. Upon the occurrence of a Trigger Event or other transfer of interests, the appropriate Purchase Price to be paid for the interests shall be paid as set forth in this Agreement, and the Remaining Members shall cause the certificates representing the purchased interests to be properly endorsed in compliance with this Agreement and shall issue new certificates in the name of the purchaser or purchasers.

17.2 <u>Personal Guarantees</u>. Prior to or as soon as reasonably practicable after the buyout of the Withdrawing Member, the LLC shall take all actions necessary to terminate any and all personal guarantees executed by the Withdrawing Member on the LLC's behalf including any such guarantees of loans, credit lines or other debt in the name of the LLC. The Purchase Price paid to the Withdrawing Member shall be reduced by any and all costs related to terminating such personal guarantees.

## 18. TERMINATION OF AGREEMENT

This Agreement shall terminate on:

    (a)    The written agreement of all parties; or

    (b)    The dissolution, bankruptcy, or insolvency of the LLC.

## 19. MEMBER WILLS/TRUSTS

Any Member may transfer his/her Interests subject to compliance with applicable laws: (i) in a will to any spouse, parent, sibling, in-law, child or grandchild of the Member, or (ii) to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member. However, each Member agrees to include in his/her will or trust a direction and authorization to his/her executor to comply with this Agreement. However, the failure of any Member to do so shall not affect the validity or enforceability of this Agreement.

## 20. AGREEMENT TO PERFORM NECESSARY ACTS

Each party to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

## 21. AMENDMENTS

The provisions of this Agreement may be waived, altered, amended, modified, or repealed, in whole or in part, only on the **written consent** of all parties to this Agreement.

## 22. SUCCESSORS AND ASSIGNS

This Agreement shall be binding on and enforceable by and against the parties to it and his respective heirs, legal representatives, successors, and assigns.

## 23. SEVERABILITY

All provisions of this Agreement are separate and divisible, and if any part is held invalid, the remaining provisions shall continue in full force and effect.

## 24. NOTICE

All notices, requests, demands, and other communication under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or within forty eight (48) hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed to the party.

## 25. MEDIATION/ARBITRATION

Except as otherwise provided herein, in the event that the Members cannot agree on a matter involving the LLC and a deadlock occurs, the Members shall first submit the matter to mediation and then to binding arbitration in Los Angeles County County, California in order to break the deadlock.

## 26. GOVERNING LAW

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

## 27. ATTORNEYS FEES

In the event any litigation, mediation or arbitration is commenced in connection with this Agreement, the parties hereby agree that the prevailing party (in the event of a judgment or settlement) shall be entitled to payment by the other party of reasonable attorneys' fees expended in connection therewith.

## 28. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes all prior, written or oral negotiations,

representations or agreements. No modification of this Agreement shall be binding on either party unless it is in writing and signed by both parties.

## 29. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first shown above.

"MEMBERS"

_____
Keith Prociuk

_____
Ken Cannata

_____
Chris Piastri

# FIRST AMENDMENT TO BUY SELL AGREEMENT

This FIRST AMENDMENT TO BUY SELL AGREEMENT (the "First Amendment") dated this 20th day of July, 2015, by and among HP Tuners LLC (the "Company") KEN CANNATA ("Cannata"), KEITH PROCIUK ("Prociuk") and CHRIS PIASTRI ("Piastri").

W I T N E S S E T H :

WHEREAS, Cannata, Prociuk and Piastri, in their capacity as Members of the Company, entered into that certain Buy Sell Agreement dated as of March, 2008, a copy of which is attached hereto as Exhibit A and is hereby made a part hereof (the "Agreement");

WHEREAS, as set forth in Section 21 of the Agreement, "the provisions of this Agreement may be waived, altered, amended, modified, or repealed, in whole or in part, only on the written consent of all parties to this Agreement"; and

WHEREAS, the parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. The recitals above are incorporated herein by this reference.

2. The initial paragraph of the Agreement is modified by deleting "California" and inserting "Nevada" in its place and stead.

3. Section 13C of the Agreement is hereby deleted and the following is hereby inserted in its place and stead:

> "C. Any commitment, contract, or expenditure equaling or totaling more than $200,000, it being understood agreed that the foregoing shall not apply to decisions in the ordinary course of the Company's business including, without limitation, hiring, compensating and firing employees; hiring, compensating and firing independent contractors; expenditures related to sales and marketing; and/or expenditures related to research and development budgets."

4. The parties hereto hereby ratify and confirm the Agreement except as amended herein.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on this 20th day of July 2015.

_____
KEN CANNATA

_____
KEITH PROCIUK

_____
CHRIS PIASTRI


HP TUNERS, LLC

BY: _Keith Prociuk_

Title: _CEO, HP Tuners LLC_

2