MARKS & KLEIN
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail: andrew@marksklein.com

LEE HIGH, LTD.
Cecilia Lee, Esq.
Nevada Bar No. 3344
Elizabeth High, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.499.5712
Email: c.lee@lee-high.com
Email: e.high@lee-high.com

Attorneys for Plaintiff HP Tuners, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HP TUNERS, LLC, a Nevada limited liability company, | Case No. 3:18-cv-00527-LRH-WGC |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| vs. | |
| KENNETH CANNATA, | |
| Defendant. | |

CERTIFICATION: This Opposition is timely filed pursuant to Court Order. Docket No. 13.

Plaintiff HP TUNERS, LLC, a Nevada limited liability company ("HPT" or "Plaintiff"), by its attorneys, Andrew P. Bleiman, Esq., MARKS & KLEIN, and Cecilia Lee, Esq. and Elizabeth High, Esq., LEE HIGH, LTD. as local counsel, hereby submits its opposition to the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed by Defendant Kenneth Cannata ("Cannata" or "Defendant"). Docket No. 10.

///

1

2

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

3

## I.   INTRODUCTION: SUMARY OF ARGUMENT

4

Kenneth Cannata perpetrated a brazen fraud on the two men with whom he had been in

5

business for thirteen years.  In a buyout arrangement, Cannata took $6.8 million in exchange for

6

both a promise to protect the trade secrets of the firm and a promise not to participate in the

7

business of a direct competitor.  While negotiating this deal, Cannata concealed the fact that he

8

had already double-crossed his two business associates.  Cannata suppressed the material facts that

9

he had already given away the trade secrets of the firm to a direct competitor and that he had

10

already started actively participating in that direct competitor's operations.  In other words,

11

Cannata kept hidden the reality that he had *already done and was intending to continue to do* that

12

which his business associates were paying him $6.8 million *not to do*.

13

The bold fraud at the heart of this case is largely ignored in Defendant's brief.  Defendant

14

wants to keep the focus on the alleged absence of a "default" fiduciary duty, devoting 13 pages of

15

his brief to that issue.  Cannata argues that without a "default" fiduciary duty there was no duty to

16

disclose, and therefore his fraud is supposedly not actionable.  Cannata asserts he must be allowed

17

to get away with stealing $6.8 million from his long-time business associates because the law on

18

the subject of "default" fiduciary duties in limited liability companies somehow condones and

19

immunizes against accountability his audacious fraudulent scheme.  However, neither the law of

20

Nevada nor the law of Illinois is so solicitous of the interests of perpetrators of fraud.[1]  Moreover,

21

22

23

24

25

26

27

---

[1]     Defendant failed to address the issues concerning what law should be applied in this case, one where the Plaintiff has its principle place of business in Illinois and has sustained its injury in that State.  Defendant assumes without any analysis whatsoever that Nevada law applies to all issues.  Since jurisdiction is based on a federal question (*see* Counts 3, 4 and 5), federal common law choice-of-law rules apply.  *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006).  As is discussed below, Nevada law is properly applied to the first two issues raised in Defendant's motion, while Illinois law is controlling on the effect of the release.  The release was contained in an agreement which incorporated a clause specifying that Illinois law would be applied.  *See Jou v. Adalian*, No. 15-00155 JMS-KJM, 2018 U.S. Dist. LEXIS 69530, at *18-19, 2018 WL 1955415 (D. Haw. April 25, 2018) ("It is a well-settled principle of conflict-of-law analysis that different jurisdictions' laws can apply to different issues in the same case.").

Defendant's entire argument is based on a faulty premise because there are, in fact, specific contractual duties prescribed in the Operating Agreement at issue in this case. Cannata was obligated by the express terms of the Operating Agreement to act "for the Company's benefit" and to "assist the Company in every way" in protecting HPT's intellectual property. Consequently, Defendant ignores the plain language of the Operating Agreement and his arguments in this regard are disingenuous and without any merit.

Three arguments are raised in Defendant's motion. First, Defendant argues that the tort claim in Count 1 for breach of fiduciary duty cannot go forward because there was no "default" fiduciary duty imposed on Cannata under the law governing limited liability companies. Def. Memo. at 6-16. Defendant's second argument is related to the first. Defendant asserts that the tort claim for fraud in Count 2 fails because the suppression of material facts is purportedly not actionable as fraud without a fiduciary duty or some other special relationship that creates a duty to disclose. Def. Memo. at 16-18. Defendant's third argument is that the release in the Purchase Agreement bars the claims in Counts 1, 3-9, 11-12 of the Complaint. Def. Memo. at 18-20. For the reasons set forth herein, all of Defendant's arguments are unavailing and should be rejected.

Turning to Count 1, Defendant cites inapposite cases like *JPMorgan Chase Bank, N.A. v. KB* Home, 632 F. Supp. 2d 1013 (D. Nev. 2009), which involved an operating agreement that expressly stated "the Members do not owe fiduciary duties to each other." *See id.* at 1024. There is no such disavowal of fiduciary duties in this case. As noted above, here, the Operating Agreement for HPT affirmatively imposed a duty on all members to protect the trade secrets of the company. "[A] fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith." *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880–881 (9th Cir.2007) (quoting *Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238, 242 (1986)). Cannata was specifically obligated by the express terms of the Operating Agreement to act "for the Company's benefit" and to "assist

the Company in every way" in protecting HPT's intellectual property.[2]   Defendant clearly breached that duty – one that is properly described, in light of the circumstances of this case, as fiduciary in nature.

Though generally "an action in deceit will not lie for nondisclosure," the fraud here is actionable under what the Supreme Court of Nevada has called an "exception" to the "general rule." This exception applies "where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." *Epperson v. Roloff*, 102 Nev. 206, 719 P.2d 799, 803-804 (Nev. 1986). The court in *Villalon v. Bowen*, 70 Nev. 456, 273 P.2d 409, 414-415 (Nev. 1954), held that this type of action can be brought despite an absence of a fiduciary relationship between the parties:

> [E]ven in absence of a fiduciary or confidential relationship and where the parties are dealing at arm's length, <u>an obligation to speak can arise from the existence of material facts peculiarly within the knowledge of the party sought to be charged and not within the fair and reasonable reach of the other party</u>. Under such circumstances the general rule is that <u>a deliberate failure to correct an apparent misapprehension or delusion may constitute fraud</u>. This would appear to be particularly so where the false impression deliberately has been created by the party sought to be charged. [Underscoring added.]

*See also Mackintosh v. Matthews and Co.*, 109 Nev. 628, 855 P.2d 549, 553 (Nev. 1993) ("Nondisclosure will become the equivalent of fraudulent concealment when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him. The duty to speak does not necessarily depend on the existence of a fiduciary relationship.") (citations omitted); *and see Garner v. Bank of America Corp.*, No. 2:12–CV–02076-PMP-GWF, 2014 U.S. Dist. LEXIS 66203, at *20, 2014 WL 1945142 (D. Nev. May 13, 2014) ("[W]here the parties are involved in a transaction and the defendant knows material facts which are not accessible to the plaintiff, the defendant has a duty of disclosure.") (citing *Epperson*, *supra*, 719 P.2d at 804). Given the facts alleged in the pleading, the fraudulent concealment claim in Count 2 is legally sufficient regardless of whether or not Cannata had a fiduciary duty to HPT (which duty he had in any event).

---

[2]    *See* HP Tuners LLC Operating Agreement dated March 25, 2004, ECF Dkt. No. 1-1 (hereafter, "Operating Agreement"), at page 5, § 4.1 ("Intellectual Property").

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

1

2

Defendant's argument on the effect of the release also lacks merit. Defendant ignores both the language of the release and the applicable law. The release in this case provides in part:

3

4

[T]he Company Released Claims shall exclude claims arising out of fraud or willful misrepresentation, or claims arising as a result of any breach of this Agreement.[3]

5

6

7

8

9

10

As for the first part of the quoted language, the phrase "arising out of fraud" has a broad meaning that goes beyond "caused by fraud" and includes anything "incident to" or "having a connection with" Cannata's fraud.[4] Courts have held that language like this includes not only the specified claim (here, fraud), but also claims related to it.[5] This language therefore encompasses all of the causes of action advanced in the pleading because all of them have a connection with the fraud perpetrated by Cannata that is at the heart of the Complaint.

11

12

13

14

15

16

17

18

While the terminology "arising out of fraud" is broad, the phrase used in the final clause of the above-quoted language, "arising as a result of <u>any</u> breach of this Agreement (emphasis added)," is even more encompassing given the facts of this case. Though the phrase does include a causal element ("as a result of"), the use of the term "any" to modify "breach" coupled with the nature of the Purchase Agreement means that the clause excludes from the release all of the causes of action set forth in the pleading. The duty to protect the intellectual property of HPT was expressly provided for not only in the March 2004 Operating Agreement, but also in the October 2016 Purchase Agreement. In selling his membership interest in HPT in 2016, Defendant

19

20

21

22

---

[3]     *See* Membership Interest Purchase Agreement by and between Ken Cannata and HP Tuners LLC dated October 20, 2016, ECF Dkt. No. 1-2 (hereafter, "Purchase Agreement"), at page 18, § 7.1(b). We note that Defendant misquoted this language on page 4 of his brief, leaving out the words: "or claims arising as a result of any breach of this Agreement." Later, on page 18 of its brief, Defendant correctly quoted this part of the release.

23

24

[4]     *See Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 7 (1st Cir. 2000) (noting that the phrase "arising out of" has a broader meaning than "caused by" and is "generally understood to mean 'originating from,' 'growing out of,' 'flowing from,' 'incident to,' or 'having connection with'") (citations omitted).

25

26

27

[5]     *See Coakley & Williams Constr., Inc. v. Structural Concrete Equipment, Inc.*, 973 F.2d 349, 352-353 (4th Cir. 1992) (use of the words "arising out of" in an agreement "suggests that the parties intended to release more than just the claims contained in the pleadings"); *Trex Co. v. Exxonmobil Oil Corp.*, 234 F. Supp. 2d 572, 577 (D. Va. 2002) (the language "claims 'arising out of' certain listed claims" should "be broadly construed and not be strictly limited to the listed released claims").

promised to keep confidential all the trade secrets of the company and "permanently expunge" from his computer devices "all information containing or reflecting any Intellectual Property or Proprietary Information" of HPT.[6]  Defendant also promised to refrain from participating in the business of a competitor of HPT.[7]  The claims for violation of the Computer Fraud and Abuse Act, the Defend the Trade Secrets Act, and the Copyright Act, and the state statutory and common law claims for conversion, unfair competition, interference with prospective economic relations, and misappropriation of trade secrets, all arise directly out of Cannata's breach of his contractual duty to protect and keep secret HPT's confidential intellectual property and/or Cannata's breach of his contractual duty to refrain from working for a competitor.  Because all the claims arise as a result of one or more of his breaches of the Purchase Agreement and are related to Defendant's fraud, the exception clause in the release makes the release inapplicable to all the claims in this case.

Illinois law concerning releases, which along with federal common law supplies the controlling law,[8] also defeats Defendant's argument.  "Under Illinois law, a release will not be construed to defeat a valid claim that was not contemplated by the parties at the time the agreement was executed, and general words of release are inapplicable to claims that were unknown to the releasing party."  *Constr. Sys. v. FagelHaber, LLC*, 2015 IL App (1st) 141700, ¶26, 35 N.E.3d 1244, 1252 (Ill. App. 2015) (release of all claims "known and unknown" was ineffective to bar suit because there was no evidence plaintiff contemplated a potential legal malpractice claim at the time the release was executed).  *See Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447, 581 N.E.2d 664, 163 Ill. Dec. 510 (1991) ("Where the releasing party was unaware of other claims, Illinois case law has restricted general releases to the specific claims contained in the release agreement.").  Indeed, "[n]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding

---

[6]     *See* Purchase Agreement, ECF Dkt. No. 1-2, at pages 15-16, § 6.1(c).
[7]     *See* Purchase Agreement, ECF Dkt. No. 1-2, at pages 16-17, § 6.4(a).
[8]     We note that "federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340 (9th Cir. 1992) (citing *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977)).

circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 839, 648 N.E.2d 317, 321 (Ill. App. 1995) (quoting *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d 435, 439, 437 N.E.2d 817, 821 (Ill. App. 1982)). Because HPT was unaware of the existence of the claims being advanced in this litigation at the time it agreed to the release, the release is inapplicable to those claims. Use of broad language like "known or unknown" does not help Defendant because, absent Plaintiff's awareness of the claims, Illinois law brands the release ineffective "no matter how all encompassing" the language used is. *Carlile*, 648 N.E.2d at 321. For the reasons set forth in this Opposition, Defendant's motion to dismiss should be denied in its entirety.

## II.   FACTS

Keith Prociuk and Chris Piastri joined with Cannata to form HPT Tuners, LLC in December 2003. Complaint for Injunctive Relief and Damages, ECF Dkt. No. 1 (hereafter, "Dkt. 1"), at ¶ 13. At the heart of the enterprise was the intellectual property that each man contributed to HPT. Dkt. 1 at ¶¶ 16-28. This intellectual property consisted of computer software and hardware used for automotive tuning. *Id.* The Operating Agreement for the limited liability company, which was executed by the three men in March, 2004, specified on an exhibit attached to the agreement the "intellectual property contributed by each member" that was used to start the business. ECF Dkt. No. 1-1, at pp. 2-3, 11-12 (Ex. A). This intellectual property was defined as the "Technology" in the agreement. ECF Dkt. No. 1-1, pp. 2-3. Section 4.1 of the Operating Agreement provided that each member of the LLC had a duty to act "for the Company's benefit" in ensuring the "legal protection for the Technology." This was a broad duty to "assist in every way" in HPT's protection of its intellectual property rights:

> 4.1 **Intellectual Property.** In exchange for his membership interests, each member has contributed and assigned to the Company the intellectual property described on Exhibit A ("Technology"). Each member hereby agrees to assist the Company in any reasonable manner to obtain for the Company's benefit legal protection for the Technology and will execute, when requested, any lawful documents deemed necessary by the Company to carry out the purposes of the Technology assignment. Each member will further assist the Company in every way to enforce its rights in the Technology, testifying in any suit or proceeding involving any of the

Technology or by executing any documents deemed necessary by the Company. ECF Dkt. No. 1-1, at p. 3, § 4.1.  The Operating Agreement included a provision governing improvements and derivative works based on the intellectual property the three men contributed to the business.  All such "Additional Technology" belonged to HPT.  ECF Dkt. No. 1-1, p. 3, § 4.2.

HPT's intellectual property was kept strictly confidential and was "not available through any public records and information sources."  Dkt. 1 ¶ 29.  It was the most critically important asset of the business.  Dkt. 1 ¶¶ 17-29.  It constituted HPT's "trade secrets."  Dkt. 1 ¶ 28.  The company expended "substantial time, money and resources to protect its confidential and proprietary information," and to bar any efforts by third parties to "pirate HPT's products." Dkt. 1 ¶ 26.[9]

The relationship among the three founding members of the company had deteriorated by 2015.  Dkt. 1 ¶ 32.  In February 2016, Prociuk and Piastri initiated discussions with Defendant about  buying him out of his membership interest in HPT.  Dkt. 1 ¶ 32.  The next month, Cannata secretly went into business with a company called Syked ECU Tuning, Inc. ("Syked"), a direct competitor of HPT.  Dkt. 1 ¶¶ 2, 36-51.  In early 2016, without disclosing to Prociuk and Piastri what he was doing, Defendant secretly transferred to Syked a flash drive containing HPT's confidential and proprietary information.  Dkt. 1 ¶¶ 40-42.  Cannata's furtive transfer of the trade secrets of HPT included HPT's "key generator," which was "the single most valuable piece of intellectual property that HPT possesses."  Dkt. 1 ¶¶ 43-47.  Protection of the secrecy of HPT's "key generator" was critical because it "is the tool that generates the overwhelming majority of user licenses [for HPT's automotive tuning products] and is the security control for substantially

---

[9]     The numerous steps HPT took to protect against third parties stealing its trade secrets included restricting access to the confidential intellectual property to only those employees with a "need to know," using  "hard drive encryption of all employee's computers," employing "sophisticated firewalls" to bar outsiders' access to the secret automotive tuning software and hardware, and enforcing strict prohibitions against any employee "copying, transferring or otherwise duplicating" any of HPT's intellectual property.  Dkt. 1 ¶ 30.

all of HPT's revenues." Dkt. 1 ¶ 48.  Having transferred to Syked the trade secrets of HPT, including the "algorithm, application and source code" for the key generator, Cannata then secretly "worked with and provided services for" that competitor.  Dkt. 1 ¶¶ 2, 51.

Unaware that Cannata had double-crossed them, Prociuk and Piastri conducted negotiations with Defendant to buy him out of the LLC from February 2016 to October 2016.  Dkt. 1 ¶¶ 3, 36, 39, 52-53.  Never during these nine months of negotiations did Cannata disclose to his business associates that he had stolen and transferred to a direct competitor the trade secrets of HPT.  Dkt. 1 ¶¶ 3, 55-56, 92-101.  Never during these nine months of negotiations did Cannata disclose that he had actively gone to work for HPT's competitor Syked.  Dkt. 1 ¶¶ 3, 53-54, 98-101.  Instead, Defendant fraudulently concealed these facts.  Dkt. 1 ¶¶ 3, 53-56, 92-101.

The nine months of negotiations, extending from February to October 2016, culminated in the execution of the Purchase Agreement dated October 20, 2016.  Dkt. 1 ¶¶ 58-59 & Ex. B, found at ECF Dkt. No. 1-2.  The Purchase Agreement made the words "Proprietary Information" a defined term meaning "all confidential and proprietary information of the Company." Dkt. 1 ¶ 61 & Ex. B, ECF Dkt. No. 1-2, at pp. 6-7, § 1.1.  At or prior to closing Cannata was obligated to deliver to HPT the software, hardware, firmware, source codes, designs, schematics and other such information in his possession, and he was required to "destroy any and all copies of Proprietary Information" that he possessed.  In Section 6.1(c) of the Purchase Agreement, Defendant agreed to the following:

6.1  <u>Cooperation Regarding Certain Matters.</u>

....

(c)  At or prior to the Closing, Seller shall deliver to the Company each of the following: (i) any and all firmware and software source code in Seller's possession relating to the MPVI, (ii) any and all designs and schematics in Seller's possession relating to the MPVI, (iii) any and all hardware programming devices and programming devise software purchased by or otherwise belonging to the Company; (iv) any and all hardware design, layout and schematic creation software and license information of the Company, or that was purchased by the Company, in Seller's possession; (v) all Company phones, laptops or other personal devices and any other Company computer hardware, monitors and other peripherals (it being agreed that Seller may expunge from any such devices and equipment all information stored on such devices and equipment). Additionally, at or prior to the

Closing, Seller shall destroy any and all copies of Proprietary Information (whether written or electronic) and destroy any and all documents or other media that contain or reflect any Intellectual Property or Proprietary Information (or, if such other media is an electronic device or hard drive that Seller is not required to deliver to the Company, Seller shall permanently expunge from such device or hard drive all information containing or reflecting any Intellectual Property or Proprietary Information, such expungement to the reasonable satisfaction of the Company's outside counsel.)

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at pp. 15-16, § 6.1(c).

In Section 6.3 of the Purchase Agreement, Defendant agreed to keep the "Proprietary Information" of HPT, including its trade secrets, confidential and not to disclose such information to anyone after he left the company.  Section 6.3 reads in part:

6.3  Confidentiality. From and after the date hereof, *Seller shall ... keep confidential and not disclose*, or otherwise use in any manner, any information that any of them have relating to: ... *the Proprietary Information....* [Italics added.]

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 16, § 6.3.

Cannata also agreed not to participate in any company that competed with HPT for a period of 18 months after the closing date of the Purchase Agreement.  Section 6.4 read in part:

6.4  Non-Competition and Non-Solicitation.

(a)  Seller, for himself, and on behalf of each of his Affiliates, (collectively, the "Restricted Parties," and each individually, a "Restricted Party"), acknowledges that he is familiar with the Intellectual Property and Proprietary Information of the Company.  Seller, for himself and on behalf of each of the other Restricted Parties, acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly compete with the Company or provide services to any person competing with the Company or engaging in the Business, and that such direct or indirect competition by any Restricted Party would harm the Company. In connection therewith, and in further consideration for Purchaser's payment of the Purchase Price under this Agreement (in respect of which payment the Restricted Parties derive a substantial and direct benefit), and in order to protect the value of the Company, Seller agrees not to, and Seller shall cause the other Restricted Parties not to, during the period commencing on the Closing Date and ending at the conclusion of eighteen (18) months from the Closing Date (the "Non-Competition Period"), directly or indirectly, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, or lend such Restricted Party's credit to any business or person that, directly or indirectly, owns or operates any business that competes with the Business anywhere in the world....

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at pp. 16-17, § 6.4(a).

As of late October 2016, when he entered into these agreements to preserve the confidentiality of HPT's intellectual property and to refrain from working with a competitor, Cannata concealed the facts that he had *already* transferred HPT's intellectual property to Syked and had begun working for that competing firm.  Dkt. 1 ¶¶ 3, 66-67, 92-100.  Cannata also concealed the fact that his wife had "obtained an ownership interest in Syked ECU Tuning, Inc. in or about January 2017, less than 90 days after the execution of the Purchase Agreement."  Dkt. 1 ¶ 69.  Defendant's conduct constituted flagrant violations of the above-quoted provisions of the Purchase Agreement which required keeping HPT's intellectual property secret (§§ 6.1(c) and 6.3) and which mandated that Cannata not go to work for a competing firm (§6.4(a)).  Dkt. 1 ¶¶ 6-7, 178-181.  It also constituted a breach of the fiduciary duty that Cannata owed HPT.  Dkt. 1 ¶¶ 2-5, 67, 83-85.  This misconduct has put HPT's "entire business at stake."  Dkt. 1 ¶ 67.

Because Plaintiff had no reason to suspect the true facts, Defendant's fraud about the most basic facts of the transaction enabled Defendant to secure the $6.8 million payment from HPT, a payment that would never have been made had HPT known the true facts.  Dkt. 1 ¶¶ 5, 101-103.  It was not until August 2018 that Plaintiff first learned about Cannata's double dealing.  Dkt. 1 ¶ Defendant's concealment was effective in part because he made a series of false representations

in Section 3.3,[10] Section 4.6,[11] and Section 4.7[12] of the Purchase Agreement regarding his conduct. Consequently, Cannata assured HPT that he was honoring the obligations at the center of the Purchase Agreement and respecting the legal interests of HPT in its intellectual property. The fraudulent concealment at the core of this case was aided by these positive misrepresentations of fact by Cannata.

## III.   <u>ARGUMENT</u>

### A.   Choice-Of-Law Issues.

This is a case where the Court has jurisdiction over the Complaint under 28 U.S.C. §§ 1331 and 1367(a) (federal question and supplemental jurisdiction). *See* Dkt. 1 ¶ 11. "[A] federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits," but where jurisdiction is based on the existence of a federal question, "federal common law applies to the choice-of-law rule determination." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d

---

[10]     Section 3.3(b) of the Purchase Agreement provided that "Seller [Cannata] shall have performed and complied in all material respects with each of the covenants and obligations under this Agreement to be performed and complied with thereby at or before the Closing." Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 9, § 3.3(b).     These were express misrepresentations because, as of the October 20, 2016 execution of the Purchase Agreement, Defendant had already breached and was continuing to violate his contractual obligations to protect HPT's intellectual property and to refrain from working with competitors.

[11]     Section 3.3(a) of the Purchase Agreement provided that "the representations and warranties of Seller set forth in Section 4 shall have been true and correct on the date hereof and shall be true and correct as of the Closing Date." Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 9, § 3.3(a).     The warranties in Section 4 included the representation in Section 4.6 that "Seller is not in violation of any Law ... that could adversely affect the consummation of the transactions contemplated by this Agreement ...." Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 12, § 4.6. The word "Law" is a defined term in the Purchase Agreement meaning "any national, federal, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law)." Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 6, § 1.1. Defendant had committed, and was continuing to commit, violations of both federal and state statutory law and the common law of torts and of contract when he made the false representation that he was "not in violation of any Law" in Section 4.6.

[12]     Defendant also falsely represented in Section 4.7 that there was "no basis for" any litigation proceeding "against Seller" with respect to the transactions contemplated in the Purchase Agreement. Dkt. 1 at Ex. B, ECF 1-2, at p. 12, § 4.7. Here too, as with the false representation in Section 4.6, Cannata was already engaging in the misconduct that serves as the basis for the causes of action advanced in the Complaint.

Lee High, Ltd.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

1189, 1194 (N.D. Cal. 2012) (quoting *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)).  Federal common law follows the Restatement (Second) of Conflict of Laws (1971) (hereafter, "Restatement").  *Dougherty*, 847 F. Supp. 2d at 1194.  We shall examine what law should apply to each of the three issues under consideration.[13]

(1)  **The Two Issues Raised In The Motion About The Purported Absence Of A "Default" Fiduciary Duty Can Be Determined Under Nevada Law Because They Are Rooted In An Argument Directed To A Nevada Limited Liability Company's Operating Agreement.**

Courts applying federal common law have embraced the "internal affairs doctrine."[14] Whether there is a "default" fiduciary duty in a Nevada LLC is pretty clearly something that falls within the "internal affairs doctrine."  *See Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 377 (7th Cir. 1984) ("The corporate law of the state of incorporation is controlling with respect to the fiduciary duties of its directors as well as other internal corporate affairs.").

Whether the internal affairs doctrine should apply to the issue of whether the purported absence of a "default" fiduciary duty defeats the tort claim for fraudulent concealment in Count 2 is a harder question.  If the issue is construed as being whether or not, in the absence of an express fiduciary duty in the operating agreement, a member of an LLC can ever be sued by the LLC for fraudulent concealment, then one could view the issue as potentially falling within the "internal affairs" of the company.  Admittedly, the issue is extreme, but it is the way Defendant has chosen to argue the case.  If, on the other hand, the issue is viewed more broadly as being whether or not

---

[13]     The Restatement embraces the principle of "depecage."  *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 (7th Cir. 1996). *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3rd Cir. 2006) ("Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'").

[14]     *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation.); *In re Harnischfeger Indus.*, 293 B.R. 650, 661 & n.16 (Bankr. (noting that courts applying federal common law "apply the internal affair doctrine when warranted") (Bankr. D. Del. 2003).  The internal affairs doctrine has been codified in many states.  *See* 805 ILCS 180/45-1(a) ("The laws of the State or other jurisdiction under which a foreign limited liability company is organized govern its organization and internal affairs and the liability of its managers, members, and their transferees.").

1  any person can be sued for fraudulent concealment in the absence of a fiduciary duty, then the

2  question really is just a question of tort law having nothing to do with the internal affairs of LLCs.

3       The drafters of the Restatement have explained that the rationale for the internal affairs

4  doctrine is based on the interest of a state in applying its laws uniformly to issues relating to "the

5  organic structure or internal administration of a corporation" incorporated in that state.

6  Restatement § 309 cmt. c.  In contrast, more common issues, such as those "relating to the liability

7  of the directors and officers for [the making of a contract or the commission of a tort] can

8  practicably be decided differently in different states."  *Id.  See Wadsworth, Inc. v. Schwarz-Nin*,

9  951 F. Supp. 314, 320-21 (D.P.R. 1996) (quoting  Restatement  § 309, cmt. c, at length).  The

10  internal affairs doctrine should not be controlling in such cases, and a court should consider all

11  relevant factors to discern which state has the most significant relationship to the issue.[15]

12       With respect to the issues concerning the tort of common law fraud in this case generally,

13  one can argue that the numerous contacts with the State of Illinois, including the fact that HPT is

14  based in Illinois,[16] *see* Dkt. 1 ¶ 9, the fact that Illinois is where the deception was received and

15  where the deception was relied upon,[17] and the fact that HPT sustained its injury in Illinois and

16  continues to suffer damages there, argue strongly for the application of Illinois fraud law.[18]

17

---

18  [15]    *See, e.g.*, *Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 560 (S.D. N.Y. 2010) (holding

19  that despite the internal affairs doctrine, New York law rather than the law of the place of

20  incorporation, Bermuda, applied to a corporation's claims against its former chief executive who
stole funds from the corporation and falsified records to hide his activities) (citing Restatement §
309 cmt. c).

21  [16]    In tort cases a "corporation's principal place of business is a more important [factor] than

22  the place of incorporation."  Restatement § 145, cmt. (e).  *See Boise Tower Assocs., LLC v. Wash.
Capital Joint Master Trust*, No. CV 03-141-S-MHW, 2006 U.S. Dist. LEXIS 45851, at *31, 2006

23  WL 1749656 (D. Idaho June 22, 2006) (observing that in a case involving a business tort "a

24  corporation's principal place of business is a more important contact than the place of
incorporation") (quoting Restatement § 145, cmt. (e)).

25  [17]    The residence of the party defrauded is typically the place where the deception and the
reliance thereon are viewed as having taken place.  *See, e.g.*, *In re Arizona Theranos, Inc., Litig.*,

26  256 F. Supp. 3d 1009, 1028 (D. Ariz. 2017).

27  [18]    *See In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, 860 F.
Supp. 2d 1062, 1075 (C.D. Cal. 2012) (applying the reasoning of Restatement § 148, Comment
(j)).

1    Though Illinois law differs somewhat from the law of Nevada on fraudulent concealment issues,

2    the differences are not outcome determinative, and because at least an argument can be made that

3    Defendant's motion is based on nothing other than a rather arcane and false conjecture about LLC

4    law, we shall not contest the position that Nevada law governs the issue raised as to Count 2.

5    **(2)      The Court Should Apply Illinois Law To Determine The Validity Of The**
     **Release As To The State Law Causes Of Action And Federal Common Law**
6    **To Determine The Validity Of The Release As To The Federal Statutory**
     **Causes Of Action.**
7

8        **(1)      State Law Claims.**

9        A release is a contract and thus choice-of-law principles governing contracts apply.  Under

10   the Restatement, the rights and duties of the parties with respect to an issue in contract are

11   determined by the local law of the state which, with respect to that issue, has the most significant

12   relationship to the transaction and the parties.  All relevant contacts are properly considered.  The

13   most important factor in this case is that the parties chose Illinois law to govern.  It has frequently

14   been held that choice-of-law provisions take precedence over the internal affairs doctrine.  *See*

15   *Johnson v. Myers*, No. CV-11-00092 JF (PSG), 2011 U.S. Dist. LEXIS 112897, at *28-29, 2011

16   WL 4533198 (N.D. Cal. Sept. 30, 2011) (holding "the choice-of-law clause takes precedence over

17   the internal affairs doctrine" to apply the law chosen by the parties in a breach of contract claim).

18       Plaintiff and Defendant agreed to a choice-of-law provision in the Assignment which

19   formed part of the Purchase Agreement: "This Assignment shall be governed, construed and

20   enforced in accordance with the laws of the State of Illinois (without regard to the choice of law

21   provisions thereof)."  Purchase Agreement, ECF Dkt. No. 1-2, at p. 29, § 5.  The Assignment was

22   Exhibit A to the Purchase Agreement, *see* ECF Dkt. No. 1-2, at pp. 27-28, and by the terms of the

23   merger clause found in Paragraph 10.13 of the Purchase Agreement, the provisions of the

24   Assignment were made an "integral part of" and "incorporated into" the Purchase Agreement, *see*

25   ECF Dkt. No. 1-2, at p. 24, § 10.13.  "[C]ourts honor the parties' choice-of-law [determination]

26   unless: (1) 'the chosen state has no substantial relationship to the parties or the transaction,' or (2)

27   honoring the parties' choice 'would be contrary to a fundamental policy of a state that has a

materially greater interest' in the dispute." *Augustine v. TLC Resorts Vacation Club, LLC*, No.: 3:18-cv-01120-H-JMA, 2018 U.S. Dist. LEXIS 139183, at *10, 2018 WL 3913923 (S. D. Cal. Aug. 16, 2018) (quoting Restatement § 187(2)).  Even if this were a case where the parties had not agreed to a choice-of-law clause, the factors properly considered under the Second Restatement,[19] would lead to the choice of Illinois law.  Illinois is the state at the center of the parties' dealings.  The most important issue raised by the release is whether HPT will be able to protect the intellectual property that is at the heart of its Illinois-based business.  Illinois law should apply to this critical question.  *See, e.g.*, *Rutherford v. The Gray Line, Inc.*, 615 F.2d 944, 946-948 (2d Cir. 1980) (Pennsylvania forum where plaintiff was domiciled and where release was executed was found to have superior interest in having its law applied).[20]

**(2)   Federal Claims.**

The validity of a release of federal rights is determined by federal law.  *See U.S. v. Northrop Corp.*, 59 F.3d 953, 960 (9th Cir. 1995) ("It is well established that federal common law properly is invoked to determine the validity of a release of a statutorily-conferred federal right."); *Botefur v. City of Eagle Point*, 7 F.3d 152, 155 (9th Cir. 1993); *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir. 1981).  Saying that federal common law must be applied does not mean, however, that state law principles cannot be considered.  *Mardan v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir. 1986).

**B.   The Breach Of Fiduciary Duty Claim (Count 1) Is Legally Sufficient.**

The determination of whether one is a fiduciary for another, and whether that person has engaged in a breach of fiduciary duty is a fact-intensive inquiry.  This is evident from even the

---

[19]   Contacts to be taken into account include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564-565 (9th Cir. 1992) (citing Restatement § 188).

[20]   Application of Illinois law is also consistent with the majority view that interpretation of the effect of a release of tort claims should be governed by the law of the state whose law is applicable to the tort claims.  *See Mackey v. Judy's Foods, Inc.*, 654 F. Supp. 1465, 1470 (M.D. Tenn. 1987) ("[I]t appears that a majority of courts that have considered the question have decided that the effect of a release asserted as a defense to a tort action is determined by the law that governs the substantive tort rights of the parties.") (citations omitted).

cases Defendant cited.[21]   Under the Restatement (Second) of Torts, a "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874 cmt. a (1979).  *See Stalk v. Mushkin*, 125 Nev. 21, 199 P.3d 838, 843 (Nev. 2009) (quoting Restatement).  As explained in the Introduction, pursuant to the terms of the Operating Agreement Defendant undertook to act "for the Company's benefit" and to "assist the Company in every way" in protecting HPT's intellectual property.  ECF 1-1, at p. 5, § 4.1.  Cannata was a member and an agent of the LLC, acting as "President, CFO and Secretary" at various times.  ECF 1-1, at p. 15. Intellectual property constitutes personal property, and Cannata was also obligated under Nevada law to "hold" all such property in the name of the company.  *See* Nev. Rev. Stat. § 86.311.  Taken together, the express language of the agreement obligating Cannata to act for the LLC's "benefit" and "assist...in every way" in protecting the trade secrets of the firm, the duty to at all times hold the property of the LLC for the LLC and not give it away to a third person, and the fact that Cannata served as a key agent of the company, *under the circumstances presented by this case*, gave rise to a fiduciary duty which  Cannata breached by his actions.  Indeed, this kind of case is a classic example of the most frequently reported breach of fiduciary duty – where an agent of a business secretly strips the firm of its assets or furtively competes with it.

The governing case law consists of such cases as *Aliya Medcare Fin., LLC v. Nickell*, No. CV 14-07806 MMM (EX), 2015 U.S. Dist. LEXIS 189214, at *39, 2015 WL 11072179 (C.D. Cal. Oct. 28, 2015), where the court analyzed a breach of fiduciary duty claim under Nevada law.  The counterclaimant (CTB) "adequately pled a breach of fiduciary duty claim" because it "outline[d] in detail" how the counterclaim defendant (Aliya) breached its duty:

> [I]n conjunction with Aliya's role as CTB's agent, CTB shared with Aliya "proprietary billing and patient demographic information" that belonged to it. Rather than using this information in an authorized manner - to collect receivables

---

[21]     For instance, in *Plyam v. Precision Dev., LLC*, 530 B.R. 456, 473 (9th Cir. B.A.P. 2015), the court stated it could not decide whether or not a fiduciary relationship existed because the factual record before it was not fully developed on the question of whether a trust relationship might have existed between the parties.

Lee High, Ltd.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

it had purchased from CTB - Aliya has purportedly "us[ed] that information to CTB's detriment and for [its] own benefit by intercepting monies owed to CTB.... CTB also alleges that Aliya made intentional misrepresentations and intentionally misleading statements to third parties regarding the scope of its authority to benefit itself at CTB's expense.

*Aliya*, 2015 U.S. Dist. LEXIS 189214, at *44.  This is precisely the kind of fiduciary duty breach that is alleged in the present case.  An agent of the plaintiff firm, with express rules dictating his required conduct (here, protecting intellectual property; in *Aliya*, handling proprietary billing and patient information in an "authorized manner"), radically breaks those rules, and siphons the economic value of his principal into his own pocket.  *See* Restatement (Third) of Agency § 8.05 ("An agent has a duty not to use property of the principal for the agent's own purposes....").

Decisional law relied upon by the court in *Aliya* is properly cited here in support of Plaintiff's position.  *See*, *e.g.*, *New England Life Ins. Co. v. Lee*, No. 1:14-CV-1797 JCM NJK, 2015 U.S. Dist. LEXIS 39462, at *15-16, 2015 WL 1413391 (D. Nev. Mar. 27, 2015) ("Plaintiff's complaint adequately states a claim for breach of fiduciary duty. As plaintiff's employee, Hall owed a duty of loyalty to plaintiff.... Hall allegedly breached this duty by recruiting plaintiff's employees while working for plaintiff.  Plaintiff claims that it suffered damages as a result of Hall's conduct... Plaintiff's contentions are sufficient at this stage in the proceedings.") (citations omitted); *Rapaport v. Soffer*, No. 2:10-cv-935-MMD-RJJ, 2012 U.S. Dist. LEXIS 90324, at *13-14, 2012 WL 2522069 (D. Nev. June 29, 2012) ("Though it cites authority for the proposition that parties who have merely contracted with one another are not fiduciaries, this is not such a case. Soffer has adequately pled that the Trust knowingly engaged in a series of actions with the intent of devaluing the company in violation of its fiduciary obligations to Soffer. For these reasons, Soffer's breach of fiduciary duty claim survives [the motion to dismiss]."); *and see Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 416, 58 Cal. Rptr. 3d 527 (2007) (finding a likelihood of success on the merits of a breach of fiduciary duty claim because "[p]laintiffs alleged that appellants breached one or more of th[eir] duties by secretly organizing a competing business, utilizing confidential information acquired during the course of their employment by plaintiffs, and informing customers of Huong Que that Huong Que had changed owners and was now operating

under the name Pro Calendar") (internal quotations omitted).

*New England Life Ins.*, *Rapaport*, *Huong Que*, like the *Aliya* case, all involved agents who – like Cannata in this case – possessed duties to act for the benefit of their principal, and violated those duties by secretly misusing confidential information, unfairly competing with their firm, or stripping the firm of its assets. There may be no "default" fiduciary duty of a member of an LLC governed by Nevada law. But, that does not mean that a person acting as an officer and agent of a Nevada LLC, bound by specifically imposed duties in the operating agreement that obligate him to protect the interests of the firm, is liberated from any liability for classic breaches of fiduciary duty like those seen here. *See Cleverley v. Ballantyne*, No.: 2:12-cv-00444-GMN-GWF, 2013 U.S. Dist. LEXIS 46689, at \*49-51, 2013 WL 1338205 (D. Nevada Mar. 29, 2013). In *Cleverley*, while recognizing that under Nevada law "a member is not generally liable to a limited liability company or to other members for breach of fiduciary duty," the court found that a member of a limited liability company could sue another member for breach of fiduciary duty for usurping corporate opportunities through furtive deals with other corporations the defendant member controlled. *Id*. at \*50-51. Here, however, Cannata failed to protect and, in fact, misappropriated and wrongfully disseminated Plaintiff's intellectual property to third parties in direct violation of the express duties set forth in the Operating Agreement. Defendant's motion to dismiss Count 1 for breach of fiduciary duty should be denied.

**C.    The Fraud Claim (Count 2) Is Legally Sufficient.**

Nevada has recognized that "even in absence of a fiduciary or confidential relationship and where the parties are dealing at arm's length, an obligation to speak can arise from the existence of material facts peculiarly within the knowledge of the party sought to be charged and not within the fair and reasonable reach of the other party." *Villalon*, 273 P.2d at 414-415. A "deliberate failure to correct an apparent misapprehension or delusion may constitute fraud," and this is "particularly so where the false impression deliberately has been created by the party sought to be charged." *Id.* at 415. No better words could describe the circumstances alleged in the Complaint. Defendant alone possessed facts about how he double-crossed his business associates. Through

Cannata's cunning, the facts regarding his furtive transfer of the trade secrets of the LLC and his having secretly gone to work for its chief competitor were peculiarly within his knowledge. HPT had no way to learn these facts. By their very nature they were intended by Cannata to be hidden, and they remained undisclosed. HPT was under an understandable misapprehension that Cannata was behaving honestly and that the $6.8 million HPT was paying him would ensure his future protection of the intellectual property of the firm. Defendant not only failed to correct this misapprehension, he also "deliberately" cultivated it by making a series false statements in the Purchase Agreement including the false representations that he had "complied in all material respects with each of the covenants and obligations under this Agreement," that he was "not in violation of any Law," and that there was "no basis for" any litigation proceeding "against Seller" with respect to the transactions contemplated in the Purchase Agreement. ECF Dkt. No. 1-2, at p. 9, § 3.3(b), p. 12, §§ 4.6 & 4.7. Cannata assured HPT that all such "representations and warranties of Seller" were "true and correct on the date hereof and shall be true and correct as of the Closing Date." Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 9, § 3.3(a).

This conduct is clearly actionable under the theory of fraud embraced in *Villalon*, 273 P.2d at 414-415, and recognized or applied in numerous other decisions of the Nevada courts. *See*, *e.g.*, *Epperson*, 719 P.2d at 803-804; *Mackintosh*, 855 P.2d at 553; *Garner*, 2014 U.S. Dist. LEXIS 66203, at *20; and *Summit Growth Management, LLC v. Marek*, No. 3:12–cv–170, 2013 WL 2285077, at *7 (D. Nev. May 22, 2013) ("A duty to disclose may also arise in certain transactions where the defendant alone has knowledge of material facts that are not within the fair and reasonable reach of the plaintiff.") (citing *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98, 110 (1998)).

The conduct alleged in the Complaint also suffices to effectively plead fraud because false promises as to future conduct, knowingly made, constitute actionable deceit.[22] The facts set forth

---

[22]    While it is elementary that the mere nonperformance of a promise does not constitute fraud, it is also recognized that a fraud claim is alleged where "the promisor had no intention to perform at the time the promise was made." *Bulbman, Inc. v. Nev. Bell*, 108 Nev. 105, 825 P.2d 588, 592 (Nev. 1992). *See also Baroi v. Platinum Condo. Devel., LLC*, *BAROI, et al., Plaintiffs*, No. 2:09–

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

in the Complaint also state actionable fraud under the doctrine that half-truths can make one liable for fraud.[23]  All the representations made by Cannata in the Purchase Agreement at a minimum suppressed and concealed material information.  Furthermore, such representations in the Purchase Agreement are also proof of direct fraudulent misrepresentations, which are always actionable.  Consequently, Defendant's motion to dismiss Count 2 should be denied.

**D.     The Release In The Purchase Agreement Does Not Bar Plaintiff's Claims.**

     **(1)     The Express Language Of The Release Makes It Inapplicable To This Case.**

As explained in the Introduction, since the express terms of the release exclude all legal claims "arising out of fraud" or "arising as a result of any breach" of the Purchase Agreement, and since all of the causes of action in the Complaint relate to the fraud and arise out of actions that breached the contract, none of the causes should be deemed to be barred.[24]

     **(2)     Even If The Release Is Deemed Applicable To This Case, Illinois And Federal Common Law Require That It Not Be Construed To Bar Either The State Or Federal Claims.**

     **(a)     State Claims.**

As discussed in the Introduction, "[u]nder Illinois law, a release will not be construed to defeat a valid claim that was not contemplated by the parties at the time the agreement was executed, and general words of release are inapplicable to claims that were unknown to the releasing party." *Constr. Sys.*, 35 N.E.3d at 1252.  Because Plaintiff did not know about the claims set forth in the Complaint as of the time it executed the Purchase Agreement, none of the claims are barred.

While Illinois law easily disposes of the issue, we note parenthetically that even if Nevada

---

CV–00671, 2012 WL 2847919, at *2 (D. Nev. July 11, 2012) ("[P]romises as to future conduct are actionable if the plaintiff can show the defendant made the promise with no intent to perform.").

[23]     *See Epperson*, 719 P.2d at 803 ("[A] defendant may be found liable for misrepresentation even when the defendant does not make an express misrepresentation, but instead makes a representation which is misleading because it partially suppresses or conceals information.").

[24]     Defendant concedes that the language in the release makes the release ineffective to defeat both the fraud claim in Count 2 and the breach of contract claim in Count 10, the latter of which was not put at issue in the motion.

1   law were applied, the release must be deemed unenforceable and subject to rescission since it was

2   procured through fraud and was the product of a unilateral mistake where the advantaged party

3   had reason to know of the mistake or caused the mistake.[25]

4            **(b)**     **Federal Claims.**

5        Federal common law as applied in the Ninth Circuit emphasizes that in order to be

6   enforceable a release must have been "voluntary, deliberate, and informed." *Stroman v. W. Coast*

7   *Grocery Co.*, 884 F.2d 458, 462 (9th Cir.1989). "In the Ninth Circuit, the validity of a release is

8   determined by examining the totality of the circumstances surrounding plaintiff's execution of the

9   release." *Aikins v. Tosco Refining Co.*, No. C-98-00755-CRB, 1999 WL 179686, at *2 (N.D. Cal.

10  Mar. 26, 1999). Here, the totality of the circumstances makes it clear that any purported release

11  of the pending claims was not the product of informed consent. Furthermore, even where the

12  language of a release is clear and unambiguous on its face, a court will not enforce it if it was the

13  product of fraud or material mistake, which are recognized defenses to the enforceability of

14  releases under state law principles, and consistent with federal interests in ensuring "voluntary,"

15  "deliberate," and "informed" consent.[26] *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630 (1948).

16  Where the facts are in conflict, it is appropriate to allow the jury to decide the issue of the validity

17  of the release. *Id.* at 630; *and see Dice v. Akron, C. & Y. R. Co.,* 342 U.S. 359, 363 (1952).

18  ///

19

---

20  [25]    *See Borton v. New United Motor Mfg., Inc.*, No. 3:10-CV-00253-RCJ, 2010 U.S. Dist.
LEXIS 85119, at *23-24, 2010 WL 3259907 (D. Nev. Aug. 17, 2010) ("A release may be
21  ineffective if induced by fraud or material misrepresentation. Therefore, the Court cannot conclude
at this stage that the release precludes Plaintiffs' claims for fraud and negligent
22  misrepresentation.") (citations omitted); *Oh v. Wilson*, 112 Nev. 38, 910 P.2d 276, 278 (Nev. 1996)
23  ("[A] unilateral mistake can be the basis for a rescission [of a release] if 'the other party had reason
to know of the mistake or his fault caused the mistake.'") (quoting *Home Savers v. United Sec.*
24  *Co.*, 103 Nev. 357, 741 P.2d 1355, 1356-57(Nev. 1987)).

[26]    *See Morta v. Korea Ins. Corp.,* 840 F.2d 1452, 1455-57 (9th Cir. 1988) (noting that a jury
25  was properly instructed that a release containing a waiver of unknown claims under Guam Civ.
Code § 1542, which is identical to Cal. Civ. Code § 1542, could be set aside if induced by fraud,
26  undue influence, mistake or deceit); *Graham v. Atchison, T. & S. F. R. Co.*, 176 F.2d 819, 824 (9th
Cir. 1949) ("mistake or fraud are recognized grounds for the rescission of agreements of
27  compromise and release of any character").

Lee High, Ltd.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

## IV.   <u>CONCLUSION</u>

It is Defendant's position that a member of a limited liability company can engage in the most rank form of fraud, one that involves the secret theft of the most critical intellectual property of a company and one that threatens that company's very existence, and be immune from suit provided that the LLC's operating agreement does not expressly impose a fiduciary duty by using nomenclature which includes the word "fiduciary."  There is no support for that proposition in Nevada law or any other jurisdiction.  The motion to dismiss must be denied.

WHEREFORE, Plaintiff, HP TUNERS, LLC, respectfully prays for an order DENYING Defendant's Motion to Dismiss and for such other relief as this Court deems necessary and appropriate.

DATED this 7th day of January, 2019.

Respectfully Submitted,

LEE HIGH, LTD.

/s/ Elizabeth High, Esq.
CECILIA LEE, ESQ.
ELIZABETH HIGH, ESQ.

MARKS & KLEIN

/s/ Andrew P. Bleiman, Esq.
ANDREW P. BLEIMAN, ESQ.
Attorneys for Plaintiff HP Tuners, LLC

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b) and Local Rule IC 4-1, I certify under penalty of perjury that I am an employee of LEE HIGH, LTD., 448 Ridge Street, Reno, Nevada 89501, and that on January 7, 2019, I served copies of the <u>Plaintiff's Opposition to Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)</u> by the United States District Court's electronic filing system to the following:

> Bart K. Larsen, Esq.
> blarsen@klnevada.com
> jierien@klnevada.com
> mbarnes@klnevada.com
> usdistrict@klnevada.com
> Attorney for Defendant Kenneth Cannata

DATED this 7th day of January, 2019.

/s/ Elizabeth Dendary
ELIZABETH DENDARY, CP
Certified Paralegal

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011