MARKS & KLEIN
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail: andrew@marksklein.com

LEE HIGH, LTD.
Cecilia Lee, Esq.
Nevada Bar No. 3344
Elizabeth High, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.499.5712
Email: c.lee@lee-high.com
Email: e.high@lee-high.com

Attorneys for Plaintiff HP Tuners, LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| HP TUNERS, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH CANNATA,<br><br>Defendant. | Case No. 3:18-cv-00527-LRH-WGC<br><br>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND CONSOLIDATED MEMORANDUM IN SUPPORT**<br><br>**ORAL ARGUMENT REQEUSTED** |

Plaintiff HP TUNERS, LLC, a Nevada limited liability company ("HPT" or "Plaintiff"), brings this Emergency Motion for Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rules of Civil Procedure 65(b) against Defendant KENNETH CANNATA, including those persons acting in concert with him ("Defendant" or "Cannata"). In support thereof, HPT states as follows:

///

///

# INTRODUCTION

On March 22, 2018, approximately three weeks ago and in connection with discovery in another pending action that has been sought since December 2017, HPT was finally provided with thousands of text messages between Defendant and Kevin Sykes-Bonnett for the time period November 19, 2017 to November 17, 2018. While the production received is incomplete, it nevertheless establishes the following: Defendant's wrongful possession, use and dissemination of HPT's confidential and proprietary information; Defendant's blatant and callous disregard for his contractual promises, obligations and duties; Defendant's express violation of representations, warranties and covenants which he made in the October 20, 2016 Membership Interest Purchase Agreement ("Purchase Agreement"); and Defendant's calculated, intentional and material breach of the Purchase Agreement in several material respects.

Notwithstanding Defendant's express obligations to protect HPT's confidential and proprietary intellectual property under the HP Tuners, LLC Operating Agreement ("Operating Agreement") – which he signed – and his express obligations under the Purchase Agreement to return, delete and not use, possess or misappropriate HPT's confidential and proprietary intellectual property, the text message communications demonstrably establish that Defendant wrongfully and improperly possessed, used and misappropriated Plaintiff's confidential and proprietary intellectual property after the Purchase Agreement transaction was consummated. In particular, the text message communications establish Defendant's continued possession of HPT's source code, hardware devices, firmware and other highly valuable intellectual property. Indeed, the communications detail Defendant's explicit and ongoing use of HPT's intellectual property in 2017 and throughout 2018 to assist a competitor with the development of their competing software product and with respect to a hardware device for use with the competitor's software product.

Despite having received nearly $7,000,000.00 in connection with the Purchase Agreement, the text messages make clear that Defendant's motive is revenge. Throughout the communications with his co-conspirator, there are many examples of threats made by the Defendant to publicly release HPT's intellectual property or to take steps to harm HPT's business.

Here, the fact that Defendant unquestionably possesses HPT's highly confidential and

proprietary information, that he has unlawfully used it to aid and assist a competitor and that he has made various threats to exact revenge on HPT by releasing source code and other intellectual property of HPT all give rise to this motion for Temporary Restraining Order and Preliminary Injunction.  Absent injunctive relief, HPT will suffer irreparable harm and the imminent threat to HPT's entire business is substantial.

As demonstrated herein, a temporary restraining order should be entered to compel Defendant, Kenneth Cannata, as well as all those acting in concert with him, to return any and all of HPT's confidential and proprietary information to HPT and to enjoin them from publicly releasing HPT's confidential and proprietary intellectual property.

Specifically, HPT seeks to restrain and enjoin Defendant as follows:

1. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, publicly releasing any confidential and proprietary information of HP Tuners LLC in any manner;

2. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, releasing any products or services using HPT's proprietary code to any third party, including the hardware device developed by Defendant in connection with the Syked ECU Tuning, Inc. software solution;

3. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, releasing any products or software that is based on or derived from HPT's software or products;

4. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, selling any products or software that is based on or derived from HPT's software or products;

5. That Defendant, as well as each of his agents, and all persons acting in concert with him, be ordered to provide HPT with any and all communications, documents and information received from Syked ECU Tuning, Inc, Kevin Sykes-Bonnett or John Martinson;

6. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, engaging in any activities related to

the planning, design, development, coding or creation of any software or products that in any way uses, relies upon, is based on or discloses any of HPT's confidential, proprietary or trade secret information, including but not limited to source code;

7. That Defendant be required to immediately surrender and turn over any and all confidential and proprietary intellectual property of HPT, including but not limited to all source code, source code files, hardware devices, firmware, applications and software, and that Defendant is ordered not to possess any such materials at any time;

8. That Defendant be required to submit any and all computers, portable USB storage devices and drives, mobile phones, servers, FTP servers or other electronic device (collectively "Electronic Devices") used by them at any time since January 1, 2016 for forensic examination by an expert designated by Plaintiff and shall be restrained from changing, deleting, modifying or otherwise tampering with any contents of any Electronic Devices;

9. That this Court enter such other and further relief as deemed necessary and appropriate.

HPT requests that the Court expedite consideration of this Motion to avoid irreparable harm to HPT. The emergency nature of this Motion is supported by the Declaration of Elizabeth High, Esq. in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Consolidated Memorandum In Support (the "High Declaration"), filed concurrently herewith pursuant to LR 7-4 under separate cover.

The relief requested is a temporary restraining order, issued temporarily until such time as the Court may hear HPT's Motion for Preliminary Injunction. HPT also requests that the Court issue an order to show cause as to why the requested preliminary injunction should not issue.

While discussed in more detail in the Memorandum of Points and Authorities that follows, the legal authority in support of the requested relief is Fed. R. Civ. P. 65(b) and Local Rule 65. The Motion is based on the Declaration of Chris Piastri in Further Support of Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant (the "Piastri Declaration") attached as Exhibit 1, and submitted under seal, and such oral argument as the Court may allow.

**STATEMENT OF RELEVANT FACTS**

Keith Prociuk and Chris Piastri joined with Cannata to form HPT Tuners, LLC in December 2003. Complaint for Injunctive Relief and Damages, ECF Dkt. No. 1 (hereafter, "Dkt. 1"), at ¶ 13. At the heart of the enterprise was the intellectual property that each man contributed to HPT. Dkt. 1 at ¶¶ 16-28. This intellectual property consisted of computer software and hardware used for automotive tuning. *Id.* The Operating Agreement for the limited liability company, which was executed by the three men in March 2004, specified on an exhibit attached to the agreement the specific "intellectual property contributed by each member" that was used to start the business. ECF Dkt. No. 1-1, at pp. 2-3, 11-12 (Ex. A). This intellectual property was defined as the "Technology" in the agreement. ECF Dkt. No. 1-1, pp. 2-3. Section 4.1 of the Operating Agreement provided that each member of the LLC had a duty to act "for the Company's benefit" in ensuring the "legal protection for the Technology." This was a broad duty to "assist in every way" in HPT's protection of its intellectual property rights:

> 4.1 **Intellectual Property.** In exchange for his membership interests, each member has contributed and assigned to the Company the intellectual property described on Exhibit A ("Technology"). Each member hereby agrees to assist the Company in any reasonable manner to obtain for the Company's benefit legal protection for the Technology and will execute, when requested, any lawful documents deemed necessary by the Company to carry out the purposes of the Technology assignment. Each member will further assist the Company in every way to enforce its rights in the Technology, testifying in any suit or proceeding involving any of the Technology or by executing any documents deemed necessary by the Company.

ECF Dkt. No. 1-1, at p. 3, § 4.1. The Operating Agreement included a provision governing improvements and derivative works based on the intellectual property the three men contributed to the business. All such "Additional Technology" belonged to HPT. *Id.*, p. 3, § 4.2.

HPT's intellectual property was kept strictly confidential and was "not available through any public records and information sources." Dkt. 1 ¶ 29. It was the most critically important asset of the business. Dkt. 1 ¶¶ 17-29. It constituted HPT's "trade secrets." Dkt. 1 ¶ 28. The company expended "substantial time, money and resources to protect its confidential and

proprietary information," and to bar any efforts by third parties to "pirate HPT's products." Dkt. 1 ¶ 26.[1]

The relationship among the three founding members of the company had deteriorated by 2015. Dkt. 1 ¶ 32. In February 2016, Prociuk and Piastri initiated discussions with Defendant about buying him out of his membership interest in HPT. Dkt. 1 ¶ 32. The next month, Cannata secretly went into business with a company called Syked ECU Tuning, Inc. ("Syked"), a direct competitor of HPT. Dkt. 1 ¶¶ 2, 36-51. In early 2016, without disclosing to Prociuk and Piastri what he was doing, Defendant secretly transferred to Syked a flash drive containing HPT's confidential and proprietary information. Dkt. 1 ¶¶ 40-42. Cannata's furtive transfer of the trade secrets of HPT included HPT's "key generator," which is "the single most valuable piece of intellectual property that HPT possesses." Dkt. 1 ¶¶ 43-47. Protection of the secrecy of HPT's "key generator" was critical because it "is the tool that generates the overwhelming majority of user licenses [for HPT's automotive tuning products] and is the security control for substantially all of HPT's revenues." Dkt. 1 ¶ 48. Having transferred to Syked the trade secrets of HPT, including the "algorithm, application and source code" for the key generator, Cannata then secretly "worked with and provided services for" that competitor. Dkt. 1 ¶¶ 2, 51.

Unaware that Cannata had double-crossed them, Prociuk and Piastri conducted negotiations with Defendant to buy him out of the LLC from February 2016 to October 2016. Dkt. 1 ¶¶ 3, 36, 39, 52-53. Never during these nine months of negotiations did Cannata disclose to his business associates that he had stolen and transferred to a direct competitor the trade secrets of HPT. Dkt. 1 ¶¶ 3, 55-56, 92-101. Never during these nine months of negotiations did Cannata disclose that he had actively gone to work for HPT's competitor Syked. Dkt. 1 ¶¶ 3, 53-54, 98-101. Instead, Defendant fraudulently concealed these facts. Dkt. 1 ¶¶ 3, 53-56, 92-101.

---

[1] The numerous steps HPT took to protect against third parties stealing its trade secrets included restricting access to the confidential intellectual property to only those employees with a "need to know," using "hard drive encryption of all employee's computers," employing "sophisticated firewalls" to bar outsiders' access to the secret automotive tuning software and hardware, and enforcing strict prohibitions against any employee "copying, transferring or otherwise duplicating" any of HPT's intellectual property. Dkt. 1 ¶ 30.

The nine months of negotiations, extending from February to October 2016, culminated in the execution of the Purchase Agreement dated October 20, 2016. Dkt. 1 ¶¶ 58-59 & Ex. B, found at ECF Dkt. No. 1-2. The Purchase Agreement made the words "Proprietary Information" a defined term meaning "all confidential and proprietary information of the Company." Dkt. 1 ¶ 61 & Ex. B, ECF Dkt. No. 1-2, at pp. 6-7, § 1.1. *At or prior to closing Cannata was obligated to deliver to HPT the software, hardware, firmware, source codes, designs, schematics and other such information in his possession, and he was required to "destroy any and all copies of Proprietary Information" that he possessed*. In Section 6.1(c) of the Purchase Agreement, Defendant agreed to the following:

> 6.1   <u>Cooperation Regarding Certain Matters.</u>
>
> ....
>
> (c)   At or prior to the Closing, Seller shall deliver to the Company each of the following: (i) any and all firmware and software source code in Seller's possession relating to the MPVI, (ii) any and all designs and schematics in Seller's possession relating to the MPVI, (iii) any and all hardware programming devices and programming devise software purchased by or otherwise belonging to the Company; (iv) any and all hardware design, layout and schematic creation software and license information of the Company, or that was purchased by the Company, in Seller's possession; (v) all Company phones, laptops or other personal devices and any other Company computer hardware, monitors and other peripherals (it being agreed that Seller may expunge from any such devices and equipment all information stored on such devices and equipment). Additionally, at or prior to the Closing, Seller shall destroy any and all copies of Proprietary Information (whether written or electronic) and destroy any and all documents or other media that contain or reflect any Intellectual Property or Proprietary Information (or, if such other media is an electronic device or hard drive that Seller is not required to deliver to the Company, Seller shall permanently expunge from such device or hard drive all information containing or reflecting any Intellectual Property or Proprietary Information, such expungement to the reasonable satisfaction of the Company's outside counsel).

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at pp. 15-16, § 6.1(c).

In Section 6.3 of the Purchase Agreement, Defendant agreed to keep the "Proprietary Information" of HPT, including its trade secrets, confidential and not to disclose such information

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

to anyone after he left the company.  Section 6.3 reads in part:

> 6.3  <u>Confidentiality.</u> From and after the date hereof, *Seller shall ... keep confidential and not disclose*, or otherwise use in any manner, any information that any of them have relating to: ... *the Proprietary Information....* [Italics added.]

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at p. 16, § 6.3.

Cannata also agreed not to participate in any company that competed with HPT for a period of 18 months after the closing date of the Purchase Agreement.  Section 6.4 read in part:

> 6.4  <u>Non-Competition and Non-Solicitation.</u>
>
> (a)  Seller, for himself, and on behalf of each of his Affiliates, (collectively, the "<u>Restricted Parties</u>," and each individually, a "<u>Restricted Party</u>"), acknowledges that he is familiar with the Intellectual Property and Proprietary Information of the Company. Seller, for himself and on behalf of each of the other Restricted Parties, acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly compete with the Company or provide services to any person competing with the Company or engaging in the Business, and that such direct or indirect competition by any Restricted Party would harm the Company. In connection therewith, and in further consideration for Purchaser's payment of the Purchase Price under this Agreement (in respect of which payment the Restricted Parties derive a substantial and direct benefit), and in order to protect the value of the Company, Seller agrees not to, and Seller shall cause the other Restricted Parties not to, during the period commencing on the Closing Date and ending at the conclusion of eighteen (18) months from the Closing Date (the "<u>Non-Competition Period</u>"), directly or indirectly, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, or lend such Restricted Party's credit to any business or person that, directly or indirectly, owns or operates any business that competes with the Business anywhere in the world....

Dkt. 1 at Ex. B, ECF Dkt. No. 1-2, at pp. 16-17, § 6.4(a).

As of late October 2016, when he entered into these agreements to preserve the confidentiality of HPT's intellectual property and to refrain from working with a competitor, Cannata concealed the facts that he had *already* transferred HPT's intellectual property to Syked and had begun working for that competing firm.  Dkt. 1 ¶¶ 3, 66-67, 92-100.  Cannata also

concealed the fact that his wife had "obtained an ownership interest in Syked ECU Tuning, Inc. in or about January 2017, less than 90 days after the execution of the Purchase Agreement." Dkt. 1 ¶ 69. Defendant's conduct constituted flagrant violations of the above-quoted provisions of the Purchase Agreement which required keeping HPT's intellectual property secret (§§ 6.1(c) and 6.3) and which mandated that Cannata not go to work for a competing firm (§6.4(a)). Dkt. 1 ¶¶ 6-7, 178-181. It also constituted a breach of the fiduciary duty that Cannata owed HPT. Dkt. 1 ¶¶ 2-5, 67, 83-85. This misconduct has put HPT's "entire business at stake." Dkt. 1 ¶ 67.

Recently, in connection with discovery in another pending action, Kevin Sykes-Bonnett (one of the defendants in that separate action) provided a production of documents (albeit incomplete), which included various text messages between himself and Defendant Kenneth Cannata. The communications detailed Defendant's egregious and wholesale disregard and breach of the various provisions of the Purchase Agreement. In particular, the text messages establish that Defendant continued to possess, use and disseminate highly confidential and proprietary information of HPT in November 2017 (more than a year after the consummation of the Purchase Agreement transaction) and throughout 2018.[2]

The text messages, which are attached to the Piastri Declaration filed under seal, reveal the following:

On January 19, 2018, Cannata advises Sykes-Bonnett that the Syked ECU Tuning, Inc. ("SET") software does not work properly with a prototype cable that Cannata was developing but that none of the issues are present with the HPT's VCM Suite software. This is significant because it means that the hardware device being developed by Defendant (the "Eliminator Cable") was compatible with HPT's VCM Suite software. The only way this would have been possible is if the communication and security unlock routines in the Eliminator Cable being developed by Defendant were identical to HPT's MPVI1 interface.

On March 15, 2018, Cannata comments to Sykes-Bonnett that he has now changed some

---

[2] Importantly, the production of text messages from Mr. Sykes-Bonnett (conveniently) did not include any text messages for the time period prior to November 19, 2017 or since November 17, 2018.

security unlock commands on the Eliminator Cable to be different than the MPVI1. Defendant comments on various functionality that had not been implemented in HPT's VCM Suite. This indicates again that the Eliminator Cable firmware is based on the MPVI1.

On March 25, 2018, Cannata advises Sykes-Bonnett to release all of HPT's software and professes to be able to do a "special version" of firmware that would doom HPT. He comments to Sykes-Bonnett to get Christopher Breton-Jean (another party from Canada who was involved in the misconduct) under control or the owners of HPT "are in for the fight of their life." In this communication, Sykes-Bonnett admits that Mr. Breton-Jean "has a video of my computer getting him a key and says he gave it to hpt . . . And everything else him and I did." In response, Cannata writes that he "didn't hack software or firmware but could make it all public. Be very careful Canada [referring to Breton-Jean who is Canadian] and HPT." Notably, this illustrates that Cannata still maintains and possesses the software and firmware source code files in violation of the various terms and provisions of the Purchase Agreement and his intention to exact revenge on HPT.

On April 5, 2018, Cannata even admits that the Eliminator Cable firmware source code is the same as HPT's MPVI1 firmware source code and that he had given Sykes-Bonnett and SET an HPT MPVI1 interface, a controller and other cables.

On April 7, 2018, Cannata further admits that he was using the MPVI1 for development purposes while discussing a protocol issue Sykes-Bonnett and SET were trying to debug on the Eliminator Cable. He commented that the MPVI1 works but the Eliminator Cable did not.

On April 13, 2018, Cannata likewise admits to using the MPVI1 in the course of the Eliminator Cable development.

On May 6, 2018, the text messages confirm that Cannata was modifying or cloning HPT's MPVI1 Interfaces for Sykes-Bonnett and third parties. In connection with these communications, Sykes-Bonnett asks Cannata for three (3) MPVI1's to be cloned to a particular serial number. This is significant because Cannata would not have been able to clone or modify the interfaces without access to and possession of HPT's confidential and proprietary intellectual property.

Cannata's possession of such information is further evidenced by a series of text messages

on that same day relating to HPT files, including bootloaders and binaries, that were located in a folder named "HPT" on a file transfer protocol ("FTP") server that Cannata had access to from his home in Nevada. Sykes-Bonnett frantically instructed Cannata to move the HPT files to another folder and Cannata confirms that he was downloading the files at Sykes-Bonnett's request.

Cannata even boldly proclaims to Sykes-Bonnett on May 7, 2018 that he has to use HPT's code to test the Eliminator Cable because the SET software was not ready.

Several weeks later, on May 31, 2018, Cannata even reminds Sykes-Bonnett that he gave him a MPVI1 which was being used for SET software development.

On June 19, 2018, the communications between Cannata and Sykes-Bonnett demonstrate that HPT's MPVI was being used to develop the SET software. The communications reveal that Cannata desires for Sykes-Bonnett to change his code to match HPT's VCM Suite software code because the Eliminator Cable works just fine with HPT's VCM Suite software and Sykes-Bonnett comments regarding intricacies of HPT's VCM Suite software source code which he could not know without possession of the source code.

Thereafter, on June 20, 2018, Cannata instructed Sykes-Bonnett to review the HPT documents and source code he had provided to him to understand how certain features work. See Piastri Declaration and exhibits thereto.

Overall, the communications establish that not only did Cannata wrongfully possess, use and disseminate HPT's confidential and proprietary information in violation of the Purchase Agreement but that he was directly and indirectly (through his wife's ownership in SET) participating in the ownership, management, operation and control of a competitive business in direct violation of the restrictive covenants set forth in Section 6.4 of the Purchase Agreement.

Defendant should not possess and be in a position to release HPT's confidential and proprietary information at this time based on the express provisions of the Purchase Agreement. Likewise, Defendant, in connection with SET, is actively marketing competitive products for sale (*e.g.* Syked's software, the Eliminator Cable, tuning credits, etc.) which unfairly compete with HPT's products and offerings, and which are based on, derived from and/or incorporate confidential and proprietary information of HPT.

Because of the threat that Defendant will exact revenge by releasing confidential and proprietary intellectual property or by taking other unlawful action, unless Defendant's conduct is enjoined, HPT's entire business is at stake. For these reasons, Plaintiff's motion should be granted and the injunctive relief requested herein should be entered.

## ARGUMENT
## THE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED.

### A. LEGAL STANDARDS

A court has the discretion to grant injunctive relief when a plaintiff establishes that it is likely to succeed on the merits, it is likely to suffer irreparable harm in the absence of the preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest. *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (*quoting Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (also quoting *Winter*).

Alternatively, the Ninth Circuit has authorized a sliding scale approach where, even if the plaintiff has not established that it is likely to succeed on the merits, a court may nevertheless grant the requested relief if the plaintiff raises "serious questions going to the merits … and the balance of hardships tips sharply in [plaintiff's] favor." *Cottrell*, 632 F.3d at 1131-32, *quoting Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003).

If a defendant claims to have an affirmative defense, once the plaintiff establishes likelihood of success on the merits, it is the defendant's burden to show it is likely to succeed on its affirmative defense. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

### B. HPT IS LIKELY TO SUCCEED ON THE MERITS AND TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF THE REQUESTED RELIEF AND THERE IS NO PREJUDICE TO DEFENDANT IN GRANTING THE RELIEF REQUESTED HEREIN.

The evidence presented in connection with the Complaint and this Motion establishes that HPT is likely to succeed on the merits of its claims.

As detailed herein and in the Piastri Declaration, Defendant wrongfully possesses and has

used and misappropriated HPT's confidential and proprietary information in violation of the provisions of the Operating Agreement and the Purchase Agreement. *See Piastri Declaration* and Exhibit A thereto. Defendant's own communications in the form of text messages unequivocally establish his wrongful possession, use and misappropriation of HPT's confidential and property intellectual property in violation of his express contractual obligations. *Id*. For these reasons, HPT's claims for breach of contract[3] are all well founded in law and fact, and HPT has a substantial likelihood of success on this claim for relief.

Here, there is no harm to Defendant by virtue of the relief requested herein; however, HPT will suffer irreparable harm if Defendant's conduct is not restrained. *See Piastri Declaration*. It is indisputable that Defendant's possession, use and misappropriation of HPT's confidential, proprietary and trade secret information is improper and unlawful. *Id*. If Defendant is permitted to continue to possess, use and misappropriate HPT's confidential, proprietary and trade secret information, then HPT's entire business is at risk. *Id*. The very survival of HPT is at stake if Defendant is not enjoined from his conduct because Defendant is using its proprietary intellectual property upon which HPT's business is based. *Id*.

Moreover, it is indisputable that Defendant will not suffer any harm in having to cease his possession of HPT's confidential, proprietary and trade secret information. Pursuant to the Purchase Agreement, Defendant was supposed to have returned, deleted and destroyed HPT's confidential, proprietary and trade secret information long ago. Instead, he has surreptitiously kept it, used it and shared it with a competitor in blatant disregard of his contractual obligations. His continued use, possession and misappropriation of HPT's confidential, proprietary and trade secret information is improper and gives rise to liability for the claims asserted in the Complaint. The losses to HPT if Defendant continues to possess, use and misappropriate HPT's confidential,

---

[3] Defendant's misconduct also gives rise to liability and Plaintiff has a substantial likelihood of success on the other counts of the Complaint as well. However, for purposes of this motion, the express violations of the contractual provisions governing his possession, use and misappropriation as well as the blatant violations of the restrictive covenants are sufficient to support the injunctive relief sought herein.

proprietary and trade secret information cannot be ascertained and are not known.  It is difficult to imagine harm that could be more irreparable as HPT's entire business is in jeopardy.  *See Piastri Declaration*.

Furthermore, it is not only HPT that will suffer irreparable harm; harm will also be inflicted upon all of HPT's employees, who will be substantially impacted if the business is compromised.  *Id*.  There can be no doubt that HPT has demonstrated a strong likelihood of success on the merits and a high likelihood of very serious and irreparable harm.

### C. THE BALANCE OF EQUITIES TIPS SHARPLY IN HPT'S FAVOR AND THE REQUESTED RELIEF IS IN THE PUBLIC INTEREST.

If Defendant, and those acting in concert with him, is enjoined as requested, he will only be prevented from (unlawfully) continuing to possess, use and misappropriate confidential and information of HPT which is not his.  Defendant was provided with substantial consideration – nearly $7,000,000 – for his interest in HPT and the promises, obligations, representations and covenants he made in the Purchase Agreement, which he has materially and brazenly breached.  Conversely, if Defendant continues to possess HPT's confidential and proprietary intellectual property and to misappropriate it as he has since before the Purchase Agreement was even signed, HPT stands to lose its entire business.  *See Piastri Declaration*.  Therefore, the relief should be granted and Defendant, and those acting in concert with him, should be enjoined as detailed herein.

Notably, HPT has not unreasonably delayed in filing this motion.  (*See Cybermedia, Inc. v. Symantec Corp.,* 19 F. Supp. 2d 1070, 1078 (N.D. Cal. 1998) (three-month delay to investigate not an unreasonable delay)).  HPT received the text messages giving rise to the specific information relating to Defendant's continued use, possession and misappropriation of HPT's confidential and proprietary intellectual property approximately three (3) weeks ago on March 22, 2018, despite that the documents of this nature had been requested in December 2017.  HPT took immediate action to prepare and file this Motion.  Accordingly, the balance of equities tips strongly in HPT's favor.  Finally, the potential devastation of HPT's business and loss of jobs implicate a strong interest by the public in granting the requested relief.

### D. CONCLUSION

Because the factors weigh in favor of granting the relief requested by HPT, HPT respectfully requests that the Court enter an order granting the following relief against Defendant Kenneth Cannata:

1. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, publicly releasing any confidential and proprietary information of HP Tuners LLC in any manner;

2. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, releasing any products or services using HPT's proprietary code to any third party, including the hardware device developed by Defendant in connection with the Syked ECU Tuning, Inc. software solution;

3. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, releasing any products or software that is based on or derived from HPT's software or products;

4. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, selling any products or software that is based on or derived from HPT's software or products;

5. That Defendant, as well as each of his agents, and all persons acting in concert with him, be ordered to provide HPT with any and all communications, documents and information received from Syked ECU Tuning, Inc, Kevin Sykes-Bonnett or John Martinson;

6. That Defendant, as well as each of his agents, and all persons acting in concert with him, be immediately restrained from, directly or indirectly, engaging in any activities related to the planning, design, development, coding or creation of any software or products that in any way uses, relies upon, is based on or discloses any of HPT's confidential, proprietary or trade secret information, including but not limited to source code;

7. That Defendant be required to immediately surrender and turn over any and all confidential and proprietary intellectual property of HPT, including but not limited to all source

1  code, source code files, hardware devices, firmware, applications and software, and that Defendant
2  is ordered not to possess any such materials at any time;
3      8.   That Defendant be required to submit any and all computers, portable USB storage
4  devices and drives, mobile phones, servers, FTP servers or other electronic device (collectively
5  "Electronic Devices") used by them at any time since January 1, 2016 for forensic examination by
6  an expert designated by Plaintiff and shall be restrained from changing, deleting, modifying or
7  otherwise tampering with any contents of any Electronic Devices; and
8      9.   That this Court enter such other and further relief as deemed necessary and
9  appropriate.
10     DATED this 23rd day of April, 2019.

LEE HIGH, LTD.

/s/ Elizabeth High, Esq.
CECILIA LEE, ESQ.
ELIZABETH HIGH, ESQ.

MARKS & KLEIN

/s/ Andrew P. Bleiman, Esq.
ANDREW P. BLEIMAN, ESQ.

Attorneys for Plaintiff HP Tuners, LLC

LEE HIGH, LTD.
448 Ridge Street
Reno, NV 89501
(775) 324-1011

## INDEX OF EXHIBITS

| Exhibit | Description | Number of Pages |
|---|---|---|
| 1 | Declaration of Chris Piastri in Further Support of Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant | **FILED UNDER SEAL** |

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify under penalty of perjury that I am an employee of LEE HIGH, LTD., 448 Ridge Street, Reno, Nevada 89501, and that on April 23, 2019, I served copies of the **EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND CONSOLIDATED MEMORANDUM IN SUPPORT** (the "Motion") via the Court's Notice of Electronic Filing to all those persons listed on the United States District Court CM/ECF Confirmation Sheet.

I further state that I am familiar with the practice of LEE HIGH, LTD. for depositing items for delivery in the United States mail and that, in accordance with that standard practice and pursuant to LR IA 10-5 and LR IC 4-1(c)(4), on April 23, 2019, I placed copies of the Motion and Exhibit 1 thereto filed separately under seal in the United States mail, first class postage prepaid, addressed to the following:

>Bart Larsen, Esq.
>Kolesar & Leatham
>400 S. Rampart Blvd., Suite 400
>Las Vegas, NV 89145
>*Counsel for Defendant Kenneth Cannata*

DATED this 23rd day of April, 2019.

>/s/ Elizabeth Dendary, CP
>ELIZABETH DENDARY, CP
>Certified Paralegal