```
 1  MARKS & KLEIN
    Andrew P. Bleiman, Esq.
 2  1363 Shermer Road, Suite 318
    Northbrook, Illinois 60062
 3  Telephone: (312) 206-5162
 4  E-mail:  andrew@marksklein.com

 5  LEE HIGH, LTD.
    Cecilia Lee, Esq.
 6  Nevada Bar No. 3344
    Elizabeth High, Esq.
 7  Nevada Bar No. 10082
 8  448 Ridge Street
    Reno, Nevada 89501
 9  Telephone:  775.499.5712
    Email: c.lee@lee-high.com
10  Email: e.high@lee-high.com
11
    Attorneys for Plaintiff HP Tuners, LLC
12
                    UNITED STATES DISTRICT COURT
13                        DISTRICT OF NEVADA
14
15  HP TUNERS, LLC, a Nevada limited liability )
    company,                                   )  CASE NO.  3:18-cv-00527-LRH-WGC
16                                             )
              Plaintiff,                       )  PLAINTIFF'S MOTION FOR
17                                             )  PREJUDGMENT WRIT OF
        vs.                                    )  ATTACHMENT
18                                             )
19  KENNETH CANNATA,                           )
                                               )  ORAL ARGUMENT REQUESTED
20            Defendant.                       )
                                               )
21  _____    )
```

22   Plaintiff HP TUNERS, LLC, a Nevada limited liability company ("HPT" or "Plaintiff"),

23 hereby brings this Motion for a Prejudgment Writ of Attachment against Defendant KENNETH

24 CANNATA ("Defendant" or "Cannata"). This Motion is supported by a declaration of Plaintiff

25 HPT's counsel, Andrew P. Bleiman, Esq., which sets forth the grounds for attachment and contents

26 required by Nevada law. *See* Declaration of Andrew P. Bleiman, Esq. Pursuant to N.R.S. §31.020

27 in Support of Plaintiff's Motion for Prejudgment Writ of Attachment ("Bleiman Declaration"). In

support thereof, HPT states as follows:

## I.  INTRODUCTION

Defendant Cannata is a former member and one of the founders of Plaintiff HPT. On October 20, 2016, HPT paid Cannata $6,800,000.00 for his interest in HPT and affiliated pursuant to a Membership Interest Purchase Agreement (the "Purchase Agreement"). This litigation ensued because unbeknownst to HPT, both prior and subsequent to execution of the Purchase Agreement, Cannata wrongfully shared, provided and disseminated highly confidential and proprietary intellectual property of HPT to a competitor and provided consulting and related services for said competitor. It was not until August 2018 that Defendant Cannata finally disclosed that he provided a flash drive storage device containing HPT's highly confidential and proprietary intellectual property to a competitor. Had Cannata not willfully concealed his malfeasance, which was already underway early in 2016, Plaintiff HPT would never have entered the subject Purchase Agreement or paid Cannata such an exorbitant sum for his interest in HPT. (Dkt. 1, at 1-2).

As Plaintiff was pursuing discovery this year, counsel for Defendant Cannata reported to the Court that Cannata had suffered a medical emergency on March 3, 2020, causing him to be placed into ICU for several weeks. Subsequently, Defendant Cannata was released home with full-time nursing care and was "not able to speak and will not be able to participate in discovery for some time, if at all." (Dkt. 72). In later reports to the Court, Defendant's counsel indicated that Cannata was "somewhat improved … [but his] communication abilities remain impaired." (Dkt. 73).

Amidst this dire turn of events regarding Defendant Cannata's declining health and altered condition, Plaintiff has reason to believe that he is no longer handling his own finances and affairs. These extraordinary circumstances have jeopardized the security of the assets held by Cannata and make it improbable for Plaintiff to reach the Cannata's property by execution in the event a judgment is entered. *See* N.R.S. §31.013(3). It is for this reason that Plaintiff HPT seeks a pre-judgment writ of attachment under Nevada law to protect Defendant's money and/or property available to sufficiently satisfy Plaintiff HPT's claims.

## II.     RELEVANT BACKGROUND AND FACTS

### A.     *Formation of HP Tuners/Covenants of Members Regarding Intellectual Property*

In December 2003, Keith Prociuk ("Prociuk") and Chris Piastri ("Piastri") joined with Cannata to form HPT. (Dkt. 1, at ¶13). Each of them contributed intellectual property to start HPT – primarily computer software and hardware used for automotive tuning – and HPT's Operating Agreement[1] specifically designated these respective "Technology" contributions of Prociuk, Piastri, and Cannata. (Dkt. 1, at ¶¶ 16-28; Dkt. 1-1, at 2-3, 11-12). Each HPT member had a duty to act "for the Company's benefit" in ensuring the "legal protection for the Technology", and was broadly required to "assist in every way" in HPT's protection of its intellectual property rights:

> 4.1 Intellectual Property. In exchange for his membership interests, each member has contributed and assigned to the Company the intellectual property described on Exhibit A ("Technology"). Each member hereby agrees to assist the Company in any reasonable manner to obtain for the Company's benefit legal protection for the Technology and will execute, when requested, any lawful documents deemed necessary by the Company to carry out the purposes of the Technology assignment. Each member will further assist the Company in every way to enforce its rights in the Technology, testifying in any suit or proceeding involving any of the Technology or by executing any documents deemed necessary by the Company.

(Dkt. 1-1, at §4.1)

All "Additional Technology" belonged to HPT. This was comprised of improvements and derivative works based on the original contributions of intellectual property. (Dkt. 1-1, at §4.2). HPT's intellectual property was the most critically important asset of the business, was kept strictly confidential, and was "not available through any public records and information sources." (Dkt. 1, at ¶¶17-29). It constituted HPT's "trade secrets" and involved HPT's expenditure of "substantial time, money and resources to protect its confidential and proprietary information," and to bar any

---

[1] HP Tuners LLC Operating Agreement dated March 25, 2004 (Dkt. 1-1).

efforts by third parties to "pirate HPT's products." (Id. at ¶¶26, 28).

   **B.** ***Cannata's Use, Possession, Disclosure and Misappropriation of HP Tuners' Intellectual Property and Prohibited Work With a Direct Competitor in Anticipation, During, and After Negotiating a Buyout of His Membership Interest***

  By 2015, the relationship between HPT's three founding members had deteriorated. In February 2016, Prociuk and Piastri initiated discussions with Defendant about buying him out of his membership interest in HPT. (Id. at ¶32). Almost immediately thereafter, Cannata secretly went into business with a direct competitor of HPT called Syked ECU Tuning, Inc. ("Syked") and, unbeknownst to HPT, secretly transferred to Syked a flash drive containing HPT's confidential and proprietary information. (Id. at ¶¶2, 36-51). Cannata's furtive transfer included HPT's "key generator" (including its algorithm, application, and source code), which was "the single most valuable piece of intellectual property that HPT possesses." (Id. at ¶¶43-47). Protecting the secrecy of the "key generator" was critical because it "is the tool that generates the overwhelming majority of user licenses [for HPT's automotive tuning products] and is the security control for substantially all of HPT's revenues." (Id. at ¶48). Cannata followed up his transfer of HPT's trade secrets to Syked by then secretly working with Syked and providing services. (Id. at ¶¶2, 51).

   Unaware of Cannata's secret double-dealing, Prociuk and Piastri continued to negotiate with Cannata in good faith from February to October, 2016, to buy him out of HPT. (Id. at ¶¶ 3, 36, 39, 52-53). At no time during these 9 months did Cannata ever disclose to Prociuk or Piastri that he had stolen and transferred HPT's trade secrets to a direct competitor or had been actively working for Syked. (Id. at ¶¶3, 53-56, 92-101). Instead, Defendant Cannata fraudulently concealed these facts from HPT up to, and including, their mutual execution of the Purchase Agreement dated October 20, 2016, pursuant to which Cannata received $6,460,000.00 from Prociuk and Piastri for his membership interest in HPT. (Id. at ¶¶ 58-59; Dkt. 1-2). Under the Purchase Agreement signed by Defendant Cannata, "Proprietary Information" meant "all confidential and proprietary information of the Company." (Dkt. 1, at ¶61; Dkt. 1-2, at §1.1). Cannata promised to deliver to HPT the software, hardware, firmware, source codes, designs,

schematics and other such information in his possession, and also to "destroy any and all copies of Proprietary Information" in his possession. Specifically, Cannata agreed to cooperate as follows:

> 6.1  Cooperation Regarding Certain Matters.
> ....
> (c)  At or prior to the Closing, Seller shall deliver to the Company each of the following: (i) any and all firmware and software source code in Seller's possession relating to the MPVI, (ii) any and all designs and schematics in Seller's possession relating to the MPVI, (iii) any and all hardware programming devices and programming devise software purchased by or otherwise belonging to the Company; (iv) any and all hardware design, layout and schematic creation software and license information of the Company, or that was purchased by the Company, in Seller's possession; (v) all Company phones, laptops or other personal devices and any other Company computer hardware, monitors and other peripherals (it being agreed that Seller may expunge from any such devices and equipment all information stored on such devices and equipment). Additionally, at or prior to the Closing, Seller shall destroy any and all copies of Proprietary Information (whether written or electronic) and destroy any and all documents or other media that contain or reflect any Intellectual Property or Proprietary Information (or, if such other media is an electronic device or hard drive that Seller is not required to deliver to the Company, Seller shall permanently expunge from such device or hard drive all information containing or reflecting any Intellectual Property or Proprietary Information, such expungement to the reasonable satisfaction of the Company's outside counsel).

(Dkt. 1-2 at §6.1(c)).

Defendant Cannata likewise agreed to keep HPT's "Proprietary Information", including its trade secrets, confidential and not to disclose such information to anyone after he left the company. Section 6.3 reads in part:

> 6.3  Confidentiality. From and after the date hereof, *Seller shall ... keep confidential and not disclose*, or otherwise use in any manner, any information that any of them have relating to: ... *the Proprietary Information....*".

(Id. at §6.3) (emphasis supplied)

Cannata also agreed not to participate in any company that competed with HPT for a period

of 18 months after the closing date of the Purchase Agreement, as follows:

> 6.4  Non-Competition and Non-Solicitation.
>
> (a)  Seller, for himself, and on behalf of each of his Affiliates, (collectively, the "Restricted Parties," and each individually, a "Restricted Party"), acknowledges that he is familiar with the Intellectual Property and Proprietary Information of the Company. Seller, for himself and on behalf of each of the other Restricted Parties, acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly compete with the Company or provide services to any person competing with the Company or engaging in the Business, and that such direct or indirect competition by any Restricted Party would harm the Company. In connection therewith, and in further consideration for Purchaser's payment of the Purchase Price under this Agreement (in respect of which payment the Restricted Parties derive a substantial and direct benefit), and in order to protect the value of the Company, Seller agrees not to, and Seller shall cause the other Restricted Parties not to, during the period commencing on the Closing Date and ending at the conclusion of eighteen (18) months from the Closing Date (the "Non-Competition Period"), directly or indirectly, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, or lend such Restricted Party's credit to any business or person that, directly or indirectly, owns or operates any business that competes with the Business anywhere in the world....

(Id. at §6.4(a)).

Defendant Cannata made these explicit promises in late October 2016, all while concealing that he had already transferred HPT's intellectual property to and had begun working for Syked, in direct competition with HPT. (Dkt. 1, at ¶¶3, 66-67, 92-100). Cannata similarly concealed from HPT that his wife had obtained an ownership interest in Syked within 90 days of the October 20, 2016 Purchase Agreement. (Id. at ¶69). Defendant Cannata's conduct flagrantly violated his agreement to keep HPT's intellectual property secret (Dkt. 1-2, at §§6.1(c), 6.3) and not to work for a competing firm (Id. at §6.4(a)). (Dkt. 1, at ¶¶ 6-7, 178-181). Cannata's malfeasance also breached his fiduciary duty to HPT and has put HPT's entire business at stake. (Id. at ¶¶2-5, 67, 83-85).

### C. *Revelations From Cannata's Text Messages with HP Tuners' Direct Competitor*

HPT also initiated litigation against Syked and its principal, Kevin Sykes-Bonnet (Sykes-Bonnett), which litigation is currently pending.[2] In connection with discovery in the Syked Litigation, Sykes-Bonnett produced text messages[3] between himself and Cannata which detailed Cannata's egregious and wholesale disregard for promises he made in the Purchase Agreement, and for which he received $6.46 million. Those text messages establish that Defendant Cannata continued to possess, use and disseminate HPT's highly confidential and proprietary information in late 2017 and throughout 2018 (more than a year after consummation of the Purchase Agreement transaction).

Specifically, on January 19, 2018, Cannata advised Sykes-Bonnett that the Syked software did not work properly with his own prototype cable but no such issues were present with HPT's VCM Suite software. This indicated that the hardware device Defendant Cannata was developing (the "Eliminator Cable") was compatible with HPT's VCM Suite software, which could only be possible if the Eliminator Cable's communication and security unlock routines were identical to HPT's MPVI1 interface.

On March 15, 2018, Cannata told Sykes-Bonnett that he changed some security unlock commands on the Eliminator Cable to be different from HPT's MPVI1 and commented further on functionality that had not been implemented in HPT's VCM Suite. This revealed that Cannata based his Eliminator Cable firmware on HPT's MPVI1.

On March 25, 2018, Cannata advised Sykes-Bonnett to release all of HPT's software and professed to be able to do a "special version" of firmware that would doom HPT. Defendant Cannata also commented that Sykes-Bonnett should get Christopher Breton-Jean (an individual

---

[2] *HP Tuners, LLC v. Kevin Sykes-Bonnett, et al.*, Case No. 3:17-cv-05760 in the United States District Court for the Western District of Washington ("Syked Litigation").
[3] The referenced text messages were filed under seal on April 23, 2019 with the Declaration of Chris Piastri in Further Support of Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant. (Dkt. 19-1).

involved in the subject misconduct and who resides in Canada) under control or the owners of HPT "are in for the fight of their life." Sykes-Bonnett professed that Mr. Breton-Jean "has a video of my computer getting him a key and says he gave it to HPT . . . and everything else him and I did". Cannata responded by stating that he "didn't hack software or firmware but could make it all public. Be very careful [Breton-Jean] and HPT." Cannata's apparent threat illustrates that: (a) he still maintained and possessed HPT's software and firmware source code files in violation of the Purchase Agreement; and (b) his intent to exact revenge on HPT.

On April 5, 2018, Cannata plainly admitted that the Eliminator Cable firmware source code is the same as HPT's MPVI1 firmware source code, and that he had given Sykes-Bonnett and Syked a HPT MPVI1 interface, a controller and other cables. On April 7, 2018, while discussing a protocol issue Sykes-Bonnett was trying to debug on the Eliminator Cable, Cannata admitted that he was using HPT's MPVI1 for development purposes. On April 13, 2018, Cannata likewise admits to using HPT's MPVI1 in the course of the Eliminator Cable development.

Text messages from May 6, 2018 confirm that Cannata was modifying or cloning HPT's MPVI1 Interfaces for Sykes-Bonnett and third parties, and Sykes-Bonnett asked Cannata for three (3) MPVI1's to be cloned to a particular serial number. This is significant because Defendant Cannata could not have cloned or modified the interfaces but for his access to and possession of HPT's confidential and proprietary intellectual property. Cannata engaged in more text messages that day revealing his improper possession of HPT's property by discussing his access to HPT files on his home FTP (file transfer protocol) server, including bootloaders and binaries, that were located in a folder named "HPT" and which he was downloading at Sykes-Bonnett's request. In response, Sykes-Bonnett frantically instructed Cannata to move the HPT files to another folder. The next day, on May 7, 2019, Defendant Cannata went so far as to boldly proclaim to Sykes-Bonnett that he has to use HPT's code to test the Eliminator Cable because the Syked software was not ready. Several weeks later, on May 31, 2018, Defendant Cannata reminded Sykes-Bonnett that he had given him an HPT MPVI1 which was being used for Syked software development.

The Cannata-Sykes-Bonnett text exchange on June 19, 2018 demonstrated their use of

HPT's MPVI to develop the Syked software. Defendant Cannata desired for Sykes-Bonnett to change his code to match HPT's VCM Suite software code because the Eliminator Cable works just fine with HPT's VCM Suite software. Sykes-Bonnett's commented regarding intricacies of HPT's VCM Suite software source code, which he only could've known by having possession of HPT's source code. Thereafter, on June 20, 2018, Cannata explicitly instructed Sykes-Bonnett to review the HPT documents and source code which Cannata provided as a means to understand how certain features work.

These communications between Defendant Cannata and Sykes-Bonnett establish that not only did Cannata wrongfully possess, use and disseminate HPT's confidential and proprietary information in violation of the Purchase Agreement, but that he was directly and indirectly (through his wife's ownership in Syked) participating in the ownership, management, operation and control of a competitive business in direct violation of the restrictive covenants set forth in Section 6.4 of the Purchase Agreement. (Dkt. 1-2, §6.4). Based on the express provisions of the Purchase Agreement, Cannata should never have had possession of or been in any position to release HPT's confidential and proprietary information. Nor should he have ever been actively marketing competitive products for sale (e.g. Syked's software, the Eliminator Cable, tuning credits, etc.) to unfairly compete with HPT's products and offerings, and which are based on, derived from and/or incorporate HPT's confidential and proprietary information.

D. *Preliminary Injunction Entered Against Defendant Cannata on May 19, 2019 (Dkt. 28)*

Accordingly, on May 19, 2019, this Court enjoined Defendant Cannata, his agents, and any persons acting in concert with him (including but not limited to Sykes-Bonnett), from the following activities:

(a) Releasing any confidential or proprietary intellectual property belonging to HP Tuners to the public;

(b) Releasing or selling any products or services that have been developed using HP Tuners' proprietary code, including "the hardware device developed by [Cannata] in connection with the Syked ECU Tuning, Inc. software solution";

(c) Releasing or selling any products or software based on or derived from HP Tuners' software or products;

(d) Developing, planning, designing, researching, or, in any way creating any software or hardware based on or derived from HP Tuners' proprietary intellectual property;

(e) Destroying, selling, concealing, or modifying any electronic storage devices, including but not limited to USB flash drives, mobile phones, servers, FTP servers, computers, hard drives, and solid-state drives that they have used since January 1, 2016;

(f) Destroying, concealing, or modifying any communications received from Syked ECU Tuning, Inc., Kevin Sykes-Bonnett, and John Martinson, since January 1, 2016; and,

(g) Destroying, selling, concealing, or modifying any of HP Tuners' proprietary intellectual property that may be in their possession, including hardware devices and physical documents.

(Dkt. 28, at ¶2).

Plaintiff has identified an expert witness to testify in connection with this matter. Plaintiff's expert conducted a forensic examination of certain devices of provided by Cannata. The forensic examination revealed Cannata's possession, use and misappropriation of Plaintiff's intellectual property in violation of the Purchase Agreement. In addition, Plaintiff identified a damages expert, which opined that Cannata has caused Plaintiff to sustain damages in excess of $15,000,000. Cannata did not identify any expert witnesses prior to the deadline for initial Rule 26 expert disclosures.

E. *Defendant Cannata's Incapacitation Following a March 3, 2020 Medical Emergency*

As this Court is aware, following the Court's entry of this preliminary injunction, Cannata suffered a medical emergency on March 3, 2020, which led to his hospitalization in the ICU, and resulted in communication impairment and full-time nursing care. (Dkts. 72-73). Cannata's health is in jeopardy and third parties are responsible for handling his affairs. Consequently, Plaintiff has a legitimate and supportable belief that the custody, control, and disposition of Defendant Cannata's assets that would be used to satisfy a potential judgment in this case are presently jeopardized. Because these extraordinary circumstances exist and judgment in favor of Plaintiff is probable given Plaintiff's likelihood of success on the merits of its claims,[4] the prejudgment writ of attachment is warranted under the facts and circumstances of this case.

### III. ARGUMENT

**THE COURT SHOULD ISSUE A PREJUDGMENT WRIT OF ATTACHMENT ON CANNATA'S ASSETS TO PRESERVE HIS ABILITY TO SATISFY A JUDGMENT**

A. *Legal Standard*

Federal Rule of Civil Procedure 64 provides that local state law governs the availability and procedure for issuing writs of attachment. *See* Fed. R. Civ. P. 64. See also *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 436 n.10, 94 S. Ct. 1113 (1974) (stating that "long-settled federal law provid[es] that in all cases in federal court … state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment

---

[4] Plaintiff HPT has valid claims for relief against Defendant Cannata including causes of action for: (i) breach of fiduciary duty; (ii) fraud; (iii) violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030; (iv) violation of the Defend Trade Secrets Act, 18 U.S.C. §1836 et seq.; (v) violation of the Copyright Act, 17 U.S.C. § 1201(a)(1)(A); (vi) misappropriation of trade secrets arising under the Nevada Uniform Trade Secrets Act, N.R.S. Chapter 600A; (vii) violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.; (viii) unfair competition under the Nevada Deceptive Trade Practices Act, NRS Chapter 598; (ix) unfair competition under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.; (x) breach of contract; (xi) tortious interference with prospective economic relations; and (xii) conversion. (Bleiman Decl., ¶3).

ultimately entered.").  The applicable state law in this instance is found in Sections 31.010-31.230 of the Nevada Revised Statutes, which prescribes that a plaintiff:

> … may apply to the court for an order directing the clerk to issue a writ of attachment and thereby cause the property of the defendant to be attached as security for the satisfaction of any judgment that may be recovered, unless the defendant gives security to pay such judgment as provided in this chapter.

N.R.S. §31.010(1). *See also* Coombs v. Heers, 366 F. Supp. 851, 853 (D. Nev. 1973).

More specifically, N.R.S. §31.013 provides that the Court may, after notice and hearing, order the clerk to issue a writ of attachment in any "case where the court finds that extraordinary circumstances exist which will make it improbable for the plaintiff to reach the property of the defendant by execution after the judgment has been entered." N.R.S. §31.013(3).

**B.  *Issuance of a Writ of Attachment is Warranted Based on Extraordinary Circumstances***

Extraordinary circumstances exist in the present case that make it improbable for HPT to reach the property of Defendant Cannata post-judgment.  Given Defendant Cannata's past conduct in willfully deceiving HPT and transferring HPT's property in violation of agreements, as well as his deteriorated medical condition (as represented to this Court), there is a high degree of uncertainty regarding the custody of and activity pertaining to Cannata's assets.  (*See* Bleiman Declaration, ¶5; Dkts. 72-73). It seems improbable that Defendant Cannata is currently able to control and direct his assets; thus, it is more likely than not that one or more third party individuals are managing Defendant Cannata's affairs, including his real and personal property.  Plaintiff HPT has no way of knowing (1) what occurred with Cannata's assets prior to his medical event; (2) who or what entity is currently controlling the assets that will potentially satisfy a judgment; or (3) what is being done, if anything, to protect these assets from being dissipated or fraudulently transferred. For this reason, Plaintiff HPT seeks the attachment of $6.8 million along with two (2) real properties in this state (Bleiman Declaration, ¶6) to be preserved for the satisfaction of any judgment that may be recovered.  *See* N.R.S. §31.010.

### IV.   CONCLUSION

WHEREFORE, HP TUNERS, LLC, respectfully prays that this Court grant Plaintiff's Motion for a Prejudgment Writ of Attachment against Defendant, KENNETH CANNATA, order the clerk of court issue a writ of attachment in accordance with N.R.S. §31.013, and for any other relief which this Honorable Court deems necessary and appropriate.

Dated this 1st day of December, 2020.

Respectfully submitted,

/s/ *Andrew P. Bleiman*
Attorneys for HP Tuners, LLC

MARKS & KLEIN
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail: andrew@marksklein.com

LEE HIGH, LTD.
Cecilia Lee, Esq.
Nevada Bar No. 3344
Elizabeth High, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.499.5712
Email: c.lee@lee-high.com
Email: e.high@lee-high.com

Attorneys for Plaintiff HP Tuners, LLC

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I certify under penalty of perjury that I am an employee of LEE HIGH, LTD., 448 Ridge Street, Reno, Nevada 89501, and that on December 1, 2020, I served the PLAINTIFF'S MOTION FOR PREJUDGMENT WRIT OF ATTACHMENT via the Court's Notice of Electronic Filing to all those persons listed on the United States District Court CM/ECF Confirmation Sheet.

DATED this 1st day of December, 2020.

/s/ Elizabeth Dendary, CP
ELIZABETH DENDARY, CP
Certified Paralegal