MARKS & KLEIN
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail:  andrew@marksklein.com

LEE HIGH, LTD.
Cecilia Lee, Esq.
Nevada Bar No. 3344
Elizabeth High, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone:  775.499.5712
Email: c.lee@lee-high.com
Email: e.high@lee-high.com

Attorneys for Plaintiff HP Tuners, LLC

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

HP TUNERS, LLC, a Nevada limited liability company,

          Plaintiff,

   vs.

KENNETH CANNATA,

          Defendant.

CASE NO.  3:18-cv-00527-LRH-WGC

**PLAINTIFF'S MOTION FOR SANCTIONS**

**<u>ORAL ARGUMENT REQUESTED</u>**

     Plaintiff HP TUNERS, LLC, a Nevada limited liability company ("HPT" or "Plaintiff"), brings this Motion for Sanctions pursuant to Federal Rules of Civil Procedure 11(c), 26(g), and 37, and 28 U.S.C. §1927, against Defendant KENNETH CANNATA ("Defendant" or "Cannata") and in support thereof, states as follows:

## INTRODUCTION

Throughout pleadings and discovery, Defendant Cannata has blatantly misrepresented and concealed from both Plaintiff and the Court facts and information material to this case. His malfeasance has forced Plaintiff HPT to expend considerable time and resources to independently discover what Cannata, in defiance of applicable rules and procedures, would not and did not provide.

It was not until Cannata was under oath at his March 11, 2021 deposition and confronted with his own never-produced texts and emails, did he make repeated admissions which laid bare his years-long pattern of deception. Defendant Cannata has thumbed his nose at Plaintiff and the Court, undermining both the letter and purpose of the federal rules and statutes pertaining to signed pleadings and discovery. Defendant Cannata's behavior provides a textbook example of sanctionable conduct prescribed by said rules and cannot be permitted to stand lest the applicable rules be rendered as meaningless.

Defendant Cannata is a former member and one of the founders of Plaintiff HPT. On October 20, 2016, HPT paid Cannata $6,800,000.00 for his interests in HPT and an affiliate. This litigation ensued because unbeknownst to HPT, both prior and subsequent to execution of the Membership Interest Purchase Agreement (the "Purchase Agreement") conveying his interest in HPT, Cannata wrongfully shared, provided and disseminated highly confidential and proprietary intellectual property of HPT to a competitor and provided consulting and related services to said competitor in violation of the express terms and provisions of the Purchase Agreement. It was not until August 2018 that Defendant Cannata finally disclosed that he had provided a flash drive storage device containing HPT's highly confidential and proprietary intellectual property to a competitor. Had Cannata not willfully concealed his malfeasance, which was already underway early in 2016, Plaintiff HPT would never have entered the subject Purchase Agreement or paid Cannata the exorbitant sum for his interest in HPT. (Dkt. 1, at 1-2).

This was far from the only instance where Cannata did not disclose, actively concealed, and/or blatantly lied in Court filings and his verified discovery responses. Both prior to, during, and

subsequent to his execution of the subject Purchase Agreement, Cannata was continuously working in conjunction with and providing a constant flow of HPT's highly confidential and proprietary intellectual property to HPT's competitor Syked ECU Tuning Incorporated n/k/a Syked Performance Engineering LLC ("Syked") and its principals, Kevin Sykes-Bonnet ("Sykes-Bonnett") and John Martinson ("Martinson").  In both pleadings and discovery, however, Cannata knowingly concealed information, refused to admit known facts, and blatantly and repeatedly made denials of factual contentions he knew to be false, and which were not warranted on any lack of evidence or reasonably based on belief or lack of information.  *See* Fed. R. Civ. P. 11(b)(4), Fed R. Civ. P. 26(g)(1), Fed R. Civ. P. 37(b)-(c).

Defendant Cannata first scoffed at the Purchase Agreement he signed in exchange for $6.8 million, then exuded the same above-the-law arrogance by utterly disregarding the Federal Rules of Civil Procedure.  He has willfully led HPT on a proverbial wild goose chase to obtain the information and documentation that he did not and would not provide.  His belated admissions during his recent deposition were not borne out of good faith or rules compliance, but purely because he got caught and confronted with his own texts and emails, which he likely presumed would never be seen due to his concealment and lies. Cannata undermined HPT every step of the way, and HPT had an uphill battle, incurring significant time and expense to discover what should have been available long ago had Cannata not been intentionally deceitful and dilatory.

Simply put, Cannata lied, and HPT found out.  Only when confronted with the inescapable fact that his opponent independently learned of the matters Cannata had hid, did his admission flow.  But an enormous amount of work, money and independent investigation would never have had to be spent or undertaken by Plaintiff had Cannata not lied from the outset.  For this reason and to deter repetition of his conduct and of those similarly situated, the full extent of sanctions available under the Federal Rules of Civil Procedure should be assessed against Defendant Cannata, including but not limited to entry of a default judgment against Defendant Cannata, payment of a penalty to the Court, and payment to the

movant HPT of reasonable attorney's fees and expenses resulting from his violations.  *See* Fed. R. Civ. P. 11(c)(4), Fed. R. Civ. P. 26(g)(3), Fed R. Civ. P. 37(b)-(c).

## RELEVANT BACKGROUND AND FACTS

### *Formation of HP Tuners/Covenants of Members Regarding Intellectual Property*

In December 2003, Keith Prociuk ("Prociuk") and Chris Piastri ("Piastri") joined with Cannata to form HPT.  (Dkt. 1, at ¶13).  Each of them contributed intellectual property to start HPT – primarily computer software and hardware used for automotive tuning – and HPT's Operating Agreement[1] specifically designated these respective "Technology" contributions of Prociuk, Piastri, and Cannata. (Dkt. 1, at ¶¶ 16-28; Dkt. 1-1, at 2-3, 11-12).  Each HPT member had a duty to act "for the Company's benefit" in ensuring the "legal protection for the Technology," and was broadly required to "assist in every way" in HPT's protection of its intellectual property rights:

> 4.1 Intellectual Property.  In exchange for his membership interests, each member has contributed and assigned to the Company the intellectual property described on Exhibit A ("Technology"). Each member hereby agrees to assist the Company in any reasonable manner to obtain for the Company's benefit legal protection for the Technology and will execute, when requested, any lawful documents deemed necessary by the Company to carry out the purposes of the Technology assignment. Each member will further assist the Company in every way to enforce its rights in the Technology, testifying in any suit or proceeding involving any of the Technology or by executing any documents deemed necessary by the Company.

(Dkt. 1-1, at §4.1)

All "Additional Technology" belonged to HPT.  This was comprised of improvements and derivative works based on the original contributions of intellectual property.  (Dkt. 1-1, at §4.2).  HPT's intellectual property was the most critically important asset of the business, was kept strictly confidential, and was "not available through any public records and information sources."  (Dkt. 1, at ¶¶17-29).  It constituted HPT's "trade secrets" and involved HPT's expenditure of "substantial time,

---

[1]     HP Tuners LLC Operating Agreement dated March 25, 2004 (Dkt. 1-1).

money and resources to protect its confidential and proprietary information," and to bar any efforts by third parties to "pirate HPT's products." (Id. at ¶¶26, 28).

### *Cannata's Use, Possession, Disclosure and Misappropriation of HP Tuners' Intellectual Property and Prohibited Work With a Direct Competitor in Anticipation, During, and After Negotiating a Buyout of His Membership Interest*

By 2015, the relationship between HPT's three founding members had deteriorated.  In or around February 2016, Prociuk and Piastri initiated discussions with Defendant about buying him out of his membership interest in HPT. (Id. at ¶32). Almost immediately thereafter, Cannata secretly began working with Syked and its principals Sykes-Bonnett and Martinson, direct competitors of HPT.

Unbeknownst to HPT, Cannata executed a Non-Disclosure Agreement with Syked and secretly transferred a flash drive to Syked containing HPT's confidential and proprietary information.  (Id. at ¶¶2, 36-51).  Cannata's furtive transfer included HPT's "key generator" (including its algorithm, application, and source code), which was "the single most valuable piece of intellectual property that HPT possesses." (Id. at ¶¶43-47).  Protecting the secrecy of the "key generator" was critical because it "is the tool that generates the overwhelming majority of user licenses [for HPT's automotive tuning products] and is the security control for substantially all of HPT's revenues." (Id. at ¶48).  Cannata followed up his transfer of HPT's trade secrets to Syked by then secretly working with Syked and providing services. (Id. at ¶¶2, 51).

Unaware of Cannata's secret double-dealing, Prociuk and Piastri continued to negotiate with Cannata in good faith from February to October 2016, to buy him out of HPT. (Id. at ¶¶ 3, 36, 39, 52-53).  At no time during these nine (9) months of extensive back and forth did Cannata ever disclose to Prociuk or Piastri that he had stolen and transferred HPT's trade secrets to a direct competitor or had been actively working with Syked. (Id. at ¶¶3, 53-56, 92-101).

Instead, Defendant Cannata fraudulently concealed these facts from HPT up to, and including, their mutual execution of the Purchase Agreement dated October 20, 2016, pursuant to which Cannata received $6.8 million from Prociuk and Piastri for his membership interest in HPT. (Id. at ¶¶ 58-59;

Dkt. 1-2).   Under the Purchase Agreement signed by Defendant Cannata, "Proprietary Information" meant "all confidential and proprietary information of the Company." (Dkt. 1, at ¶61; Dkt. 1-2, at §1.1). Cannata promised *to deliver to HPT the software, hardware, firmware, source codes, designs, schematics and other such information in his possession, and also to "destroy any and all copies of Proprietary Information" in his possession*.   Specifically, Cannata agreed to cooperate as follows:

> 6.1  Cooperation Regarding Certain Matters.
> ....
> (c)  At or prior to the Closing, Seller shall deliver to the Company each of the following: (i) any and all firmware and software source code in Seller's  possession relating to the MPVI, (ii) any and all designs and schematics in Seller's possession relating to the MPVI, (iii) any and all hardware programming devices and programming devise software purchased by or otherwise belonging to the Company; (iv) any and all hardware design, layout and schematic creation software and license information of the Company, or that was purchased by the Company, in Seller's possession; (v) all Company phones, laptops or other personal devices and any other Company computer hardware, monitors and other peripherals (it being agreed that Seller may expunge from any such devices and equipment all information stored on such devices and equipment). Additionally, at or prior to the Closing, Seller shall destroy any and all copies of Proprietary Information (whether written or electronic) and destroy any and all documents or other media that contain or reflect any Intellectual Property or Proprietary Information (or, if such other media is an electronic device or hard drive that Seller is not required to deliver to the Company, Seller shall permanently expunge from such device or hard drive all information containing or reflecting any Intellectual Property or Proprietary Information, such expungement to the reasonable satisfaction of the Company's outside counsel).

(Dkt. 1-2 at §6.1(c)).

Defendant Cannata likewise agreed to keep HPT's "Proprietary Information," including its trade secrets, confidential and not to disclose such information to anyone after he left the company.  Section 6.3 reads in part:

> 6.3  Confidentiality. From and after the date hereof, *Seller shall ... keep confidential and not disclose*, or otherwise use in any manner, any information that any of them have relating to: ... *the Proprietary Information*....".

(Id. at §6.3) (emphasis supplied)

Cannata also agreed not to participate in any company that competed with HPT for a period of 18 months after the closing date of the Purchase Agreement, as follows:

> 6.4  Non-Competition and Non-Solicitation.
>
> (a)   Seller, for himself, and on behalf of each of his Affiliates, (collectively, the "Restricted Parties," and each individually, a "Restricted Party"), acknowledges that he is familiar with the Intellectual Property and Proprietary Information of the Company.  Seller, for himself and on behalf of each of the other Restricted Parties, acknowledges and agrees that the Company would be irreparably damaged if any of the Restricted Parties were to directly or indirectly compete with the Company or provide services to any person competing with the Company or engaging in the Business, and that such direct or indirect competition by any Restricted Party would harm the Company. In connection therewith, and in further consideration for Purchaser's payment of the Purchase Price under this Agreement (in respect of which payment the Restricted Parties derive a substantial and direct benefit), and in order to protect the value of the Company, Seller agrees not to, and Seller shall cause the other Restricted Parties not to, during the period commencing on the Closing Date and ending at the conclusion of eighteen (18) months from the Closing Date (the "Non-Competition Period"), directly or indirectly, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, or lend such Restricted Party's credit to any business or person that, directly or indirectly, owns or operates any business that competes with the Business anywhere in the world....

(Id. at §6.4(a)).

Defendant Cannata made these explicit promises in late October 2016, all while concealing that he had already transferred HPT's intellectual property to and had begun working for Syked, in direct competition with HPT.  (Dkt. 1, at ¶¶3, 66-67, 92-100).  Cannata similarly concealed from HPT that his wife had obtained an ownership interest in Syked within 90 days of the October 20, 2016 Purchase Agreement.  (Id. at ¶69).  Defendant Cannata's conduct flagrantly violated his agreement to keep HPT's intellectual property secret (Dkt. 1-2, at §§6.1(c), 6.3) and not to work for a competing firm (Id. at

§6.4(a)).  (Dkt. 1, at ¶¶ 6-7, 178-181).  Cannata's malfeasance also breached his fiduciary duty to HPT and has put HPT's entire business at stake. (Id. at ¶¶2-5, 67, 83-85).

### *Revelations From Cannata's Text Messages with HP Tuners' Direct Competitor*

HPT also initiated litigation against Syked and its principal, Kevin Sykes-Bonnet (Sykes-Bonnett), which litigation is currently pending.[2]  In connection with discovery in the Syked Litigation, Sykes-Bonnett produced text messages[3] between himself and Cannata which detailed Cannata's egregious and wholesale disregard for promises he made in the Purchase Agreement, and for which he received $6.8 million.  These communications were not produced by Cannata himself in this case.  As has been detailed in prior pleadings, those text messages establish that Defendant Cannata continued to possess, use and disseminate HPT's highly confidential and proprietary information in late 2017 and throughout 2018 (more than a year after consummation of the Purchase Agreement transaction).

The text message communications between Defendant Cannata and Sykes-Bonnett establish that not only did Cannata wrongfully possess, use and disseminate HPT's confidential and proprietary information in violation of the Purchase Agreement, but that he was directly and indirectly (through his wife's ownership in Syked) participating in the ownership, management, operation and control of a competitive business in direct violation of the restrictive covenants set forth in Section 6.4 of the Purchase Agreement.  (Dkt. 1-2, §6.4).  Based on the express provisions of the Purchase Agreement, Cannata should never have had possession of or been in any position to release HPT's confidential and proprietary information.  Nor should he have ever been actively working to develop and market competitive products for sale (e.g. Syked's software, the Eliminator Cable, tuning credits, etc.) to

---

[2]     *HP Tuners, LLC v. Kevin Sykes-Bonnett, et al.*, Case No. 3:17-cv-05760 in the United States District Court for the Western District of Washington ("Syked Litigation").

[3]     The referenced text messages were filed under seal on April 23, 2019 with Dkt. 19-1, Declaration of Chris Piastri in Further Support of Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant.

unfairly compete with HPT's products and offerings, and which are based on, derived from and/or incorporate HPT's confidential and proprietary information.

### *Cannata's Concealment From Disclosure and False Pleading and Discovery Responses*

Cannata's responses to pleadings and discovery in this case have been false and misleading from the outset.  For instance, HPT alleged that Cannata, while still a member of HPT and beginning in 2016, disseminated highly confidential and proprietary information of HPT to a competitor, that Cannata concealed having done so, and that he had entered into agreements with Syked and/or Sykes-Bonnett and was working with said competitors.  (Dkt. 1 at ¶¶2-4, 6-7, 36, 39, 41-42, 44, 51, 53-56, 66, 70-80).  Cannata **denied** each and every one of these allegations.  (Dkt. 45, at ¶¶2-4, 6-7, 36, 39, 41-42, 44, 51, 53-56, 66, 70-80).

On May 6, 2019, Plaintiff HPT served Defendant Cannata with its First Set of Requests for Admission pursuant to Federal Rule(s) of Civil Procedure 26 and 36.  Cannata filed responses on June 14, 2019 ("RFA Responses," attached hereto as <u>Exhibit A</u>) and his First Supplemental Responses ("RFA Supplemental Responses," Dkt. 49-7) on September 10, 2019.    Amongst other things, Cannata wrongfully and unlawfully ***denied*** that he:

- Provided Sykes-Bonnett with technical and/or confidential information relating to HPT's MPVI (Request No. 13) (*see* <u>Ex. A</u>, p. 5; Dkt. 49-7, at 5-6);
- Provided Sykes-Bonnett with one or more of HPT's source code files (Request No. 22) (*see* <u>Ex. A</u>, p. 8; Dkt. 49-7, at 9);
- Possessed one or more of HPT's source code files (Request No. 23) or had one or more of HPT's source code files in his possession at any time on or after October 21, 2016 (Request No. 24) (*see* <u>Ex. A</u>, p. 8-9; Dkt. 49-7, at 9-10);
- Possesses or possessed HPT's MPVI communication protocol documents (Requests No. 29-30) or provided Sykes-Bonnett with one or more of HPT's MPVI communication protocol documents (Request No. 28) (*see* <u>Ex. A</u>, p. 10-11; Dkt. 49-7, at 11); and,
- Possesses or possessed any HPT firmware documents (Requests No. 32-33) or that he provided Sykes-Bonnett with one or more of HPT's firmware documents (Request No. 31)

(*see* Ex. A, p. 11; Dkt. 49-7, at 12-13).

Defendant Cannata asserted similar wrongful and unlawful ***denials*** in his answers to interrogatories,[4] notably:

- He denied having anything in his possession which referred or related to HPT's source code, software, programming, products, and/or credits after October 21, 2016 (with the sole exception of "an administrative version of HPT's VCM Suite software) (*see* Interrogatory Nos. 2-3, p. 4-5, attached hereto as Exhibit B; Dkt. 49-8, at 3-4; and Exhibit C, attached hereto, at p. 2-3).

- He denied having any documents relating to HPT's MPVI in his possession at any time after October 21, 2016 (Ex. B, Interrogatory No. 4, at 5; Dkt. 49-8, at 4; Ex. C, p. 4-5).

Similarly, Defendant Cannata wrongfully and unlawfully lied about, concealed, and did not produce items that were clearly in his possession when requested.[5]  Among other things, Cannata wrongfully and unlawfully ***denied*** having and failed to produce:

- Documents or communications relating to HPT's code, software, programming, products, or credits (Requests No. 1, 8, 11) (*see* Exhibit D, attached hereto, at p. 4, 8-10);

- HPT interfaces, source code, designs, schematics, program files, software, firmware, or other HPT intellectual property (Request No. 2) (*see* Ex. D, p. 4-5);

- Documents, communications, Firmware and software source code relating to HPT's MPVI (Request No. 3, 39) (*see* Ex. D, p. 5, 25);

- Communications with Sykes-Bonnett and Martinson (Request No. 9), or which refer to their products or work (Requests No. 20-24) (*see* Ex. D, p. 9-10, 15-17);

- Documents or communications which evidence, refer or relate to HPT's VCM Suite Software (Request No. 16) (*see* Ex. D, p. 13);

---

[4]    Defendant Cannata's Answers and Objections to Plaintiff HP Tuners, LLC's First Set of Interrogatories (June 14, 2019) ("Answers to Interrogatories") are attached hereto as Exhibit B. Defendant Cannata's verified First Supplemental Answers and Objections (September 11, 2019) ("First Supplemental Answers") are found at Dkt. 49-8.  Defendant Cannata's verified Second Supplemental Answers and Objections (December 17, 2020) are attached hereto as Exhibit C.

[5]    Defendant Cannata's Response to HPT's First Set of Requests for Production, dated June 14, 2019, "Production Responses," are attached hereto as Exhibit D.

- Documents which refer to various folder names and titles including, but not limited to, "Firmware," "License," or "VCM" (Requests No. 29-38) (*see* <u>Ex. D</u>, p. 20-24);

- Documents or communications which refer or relate to any Key Generation Tool, PCM Tools Software, or PCM Harness (Requests No. 40-42) (*see* <u>Ex. D</u>, p. 25-27).

Cannata's assertions were knowingly false and misleading. Only after Cannata learned that HPT had obtained a vast history of his text messages and emails independently to prove these falsehoods, did he then admit to the foregoing misconduct.

## **ARGUMENT**

### I.  **Legal Standard**

The Court derives sanctioning power from various sources. Under Federal Rule of Civil Procedure 11, the Court may impose appropriate sanctions against another party for any violation of Rule 11(b). By presenting a pleading, written motion, or other paper to the Court, the party and attorney are certifying that to the best of that person's knowledge:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

Rule 11(b) imposes a duty on parties to conduct a reasonable factual investigation and perform adequate legal research to confirm that positions taken in the document are warranted. The Court will apply an objective standard of reasonableness. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1130 (9th Cir. 2002); *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.3d 1531, 1537 (9th Cir. 1986);

1   *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 522, 549-50 (1991);

2   *Oracle United States v. Rimini St.*, 2021 U.S. Dist. LEXIS 62496, at *67-68 (D. Nev. March 31, 2021).

3   The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on

4   motion and warranted for effective deterrence, an order directing payment to the movant of part or all of

5   the reasonable attorney's fees and other expenses directly resulting from the violation.  Fed R. Civ. P.

6   11(c)(4).

7       Sanctions are alternatively available under 28 U.S.C. §1927, which requires a heightened

8   showing of bad faith but allows the Court to impose an award of fees *sua sponte*.  *Oracle United States,*

9   2021 U.S. Dist. LEXIS at *68.  *See also* 28 U.S.C. §1927.  Section 1927 brings conduct occurring

10  outside of the pleadings within the ambit of sanctionable activities and is intended to discourage

11  unnecessary delays in litigation by requiring the offending party to compensate other litigants for costs

12  due to the dilatory conduct.  *Id., citing Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759-60 (1980).

13  The movant must show that the offending party (1) multiplied the proceedings (2) in a vexatious and

14  unreasonable manner, causing (3) an increase in the cost of proceedings.  *Oracle United States,* 2021

15  U.S. Dist. LEXIS at *68-69.  This occurs when a party acts recklessly, plus "something more," such as

16  frivolousness, harassment, or an improper purpose.  *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir.

17  2001).  Recklessness plus knowledge is sufficient for Section 1927 sanctions.  *See B.K.B. v. Maui Police*

18  *Department*, 276 F.3d 1091, 1107 (9th Cir. 2002).  The Court may further sanction an offending party

19  pursuant to its inherent power to manage its own affairs and dispose of cases in an orderly and

20  expeditious manner.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

21  ///

22  ///

23  ///

Federal Rule of Civil Procedure 37(c)(1) provides:

> (1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e)[6], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>>
>> (B) may inform the jury of the party's failure; and
>>
>> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Rule 37(c)(1) is an "automatic" sanction that authorizes appropriate sanctions "[i]n addition to or instead of [exclusion]." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  It is the party facing sanctions who bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless. *R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).  District courts have "wide latitude" under Rule 37(c)(1) and that "the burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly*, 259 F.3d at 1106-07.  See also *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017). As such, if the noncompliant party fails to argue harmlessness, a district court need not hold a *sua sponte* hearing on that issue before imposing Rule 37(c)(1)'s default sanction. *See generally Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175 (9th Cir. 2008).

Federal Rule of Civil Procedure 37(c)(2) provides that where a party fails to admit something in response to a request for admission and the requesting party later proves the matter to be true, the

---

[6]    Rule 26(e) requires that a party who has responded to an interrogatory, request for production, or request for admission must supplement or correct its disclosure or response if the party learns that in some material respect the response is incomplete or incorrect.  *See* Fed. R. Civ. P. 26(e).

requesting party may move for sanctions in the amount of "the reasonable expenses, including attorney's fees, incurred in making that proof." *See* Fed. R. Civ. P. 37(c)(2)(A)-(D); *see also Brincko v. Rio Properties, Inc.*, 2013 U.S. Dist. LEXIS 5986, at *47 (D. Nev. January 14, 2013).[7]

A federal court has the inherent power to sanction for conduct which abuses the judicial process. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991).  This power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962).  This inherent power is discretionary and extends to a full range of litigation abuses.  *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (*quoting Chambers*, 501 U.S. at 46-47); s*ee also Chambers*, 501 U.S. at 44.  Imposing sanctions under the court's inherent power requires "a finding of bad faith or conduct, or conduct tantamount to bad faith."  *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001); *see also Fink* 239 F.3d at 992 ("In reviewing sanctions under the court's inherent power, our cases have consistently focused on bad faith."); *see also Burriola v. Nevada*, 2012 U.S. Dist. LEXIS 94180, at *6-7 (D. Nev. June 7, 2012).  Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980).

Outright dismissal (or judgment) is a severe sanction, but one which falls within the Court's discretion.  *See Chambers*, 501 U.S. at 45; *see also Chavarin-Arreola v. LeGrand*, 2015 U.S. Dist. LEXIS 146902 (D. Nev. October 28, 2015).  Courts have the inherent power to dismiss an action or enter judgment "when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d

---

[7]   Sanctions were not awarded in *Brincko* because this Court determined that the refusals to admit therein were "relatively harmless".  By contrast, Defendant Cannata's refusals in the instant case were carried out over a period of years and go directly to issues most material to this case.

585, 589 (9th Cir. 1983).  "It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders[,]." *Huntley v. City of Carlin*, 2014 U.S. Dist. LEXIS 113573, at *4-5 (D. Nev. August 15, 2014) *citing Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982).  In order for dismissal or default judgment to be proper pursuant to the court's inherent authority, the sanctionable conduct must be due to "'willfulness, fault, or bad faith.'" *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).  Due process concerns further require that there exists a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" *Id*.   Yet, dismissal or default judgment is appropriate where discovery violations are what threaten to interfere with the "rightful decision in th[e] case." *BFOW, Inc. v. Hurt*, No. 98-16455, 2000 U.S. App. LEXIS 1861, at *10 (9th Cir., Feb. 8, 2000).

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Huntley,* 2014 U.S. Dist. LEXIS at *5-6; *see also Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)).

Defendant Cannata has clearly engaged in willful and deliberately deceptive practices which are not peripheral to the case, but rather go to core material issues.  His efforts have been intended to unfairly hamper the presentation of Plaintiff HPT's claims.  In several instances, Cannata repeatedly and continuously lied about and concealed (but ultimately admitted to) his own communications.  He did so knowingly, and in bad faith, in the hope that this evidence may never come to light, and he could avoid accountability for his bad acts.  This is an egregious case of willful bad faith intended to make a

mockery of the Court's orderly administration of justice and which undermined the very integrity of these judicial proceedings – and the rule of law in general -- by attempting to preclude the court from reaching any reasonable assurance that the truth will be available. Accordingly, Defendant Cannata should be subject to terminating damages, and the Court should issue a default judgment in Plaintiff's favor and/or such other sanctions as this Court deems necessary and appropriate.

## II. <u>Cannata's Deposition Admissions Showing That His Earlier Denials and Concealment Were Later Proven By Plaintiff HPT</u>

Defendant Cannata appeared for his videotaped deposition on March 11, 2021.  (A copy of the confidential transcript, "Cannata Tr.," is being filed under seal contemporaneously herewith).   At deposition, confronted with his previously concealed emails and text messages dating back to early 2016, Cannata made multiple admissions revealing his longstanding and continuously willful pattern of deceit and concealment.

At the outset, Cannata admitted that he had not produced any text messages in this case. (Cannata Tr., at 16; *but see* <u>Ex. C</u>, Response Nos. 1, 3, 8, 11, 16, 20-24, 39-42).  He further conceded that his text messages and e-mails with Sykes-Bonnett and Martinson were provided by HPT.  (Cannata Tr., at 25-27).  The lengthy history of text messages presented to Cannata at his deposition were all obtained independently by HPT despite Cannata's false responses and concealment.   Furthermore, Cannata conceded that he emailed both information and attachments to Sykes-Bonnett, beginning in early 2016, which were related to the confidential and proprietary information of HPT, and that he did so without ever informing the other HPT members, Chris Piastri and Keith Prociuk.  (*Id.*, at 29-31, 108). While still at HPT, he had been communicating with Sykes-Bonnett from a previously undisclosed email address and admitted never having told his HPT co-members about this.  (*Id.*, at 125).

Despite the non-compete provisions in the Purchase Agreement, Cannata came clean in his testimony that he was involved in "research and development" for Syked during the restricted period, and that he was engaged in development of products for Syked and communicating frequently with Sykes-Bonnett at this time, including about supporting his software during 2016 and 2017 and discussing Syked hiring decisions. (*Id.*, at 48-49, 110, 160, 200). Cannata even executed a non-disclosure agreement with Syked in March 2016, which he never disclosed to his HPT co-members at any time, including – unbelievably – while negotiating the Purchase Agreement between March 2016 and October 20, 2016. (*Id.*, at 111-115, 120-121). He also still continued to possess an HPT MPVI subsequent to execution of the Purchase Agreement under which Plaintiff HPT purchased his interest for $6.8 million, which he now concedes was HPT property. (*Id.*, at 49-50, 58).

In connection with his discovery responses, Cannata similarly denied possessing or providing Sykes-Bonnett with HPT's source code files (including the VCM Suite software). *See* Ex. A, Responses Nos. 22-24; Ex. C, Responses Nos. 2-4; Ex. B, Responses Nos. 2-3; Ex. D, Responses Nos. 1-3, 8, 11, 16, 39. But, in his deposition, he ***admitted*** that he sent HPT's confidential and proprietary information to Sykes-Bonnett, both on the flash drive and emails, including the time period while he was still a member of HPT and also after executing his buyout on October 20, 2016. (Cannata Tr., at 87-88). He also left no doubt as to both possessing HPT source code and repeatedly giving this information to HPT's competitor, Syked and its principals Sykes-Bonnett and Martinson, without authorization from or advising Mr. Prociuk or Mr. Piastri. Cannata admitted that he had no role in developing any HPT source code, that HPT took measures to protect its source code(s), and that it was confidential and proprietary. (*Id.*, at 60-61, 74-78, 126, 128, 130-32, 134-36, 157-59, 162-63, 167, 170, 174-77, 188-94, 198, 202-04, 206). Sykes-Bonnett was selling software that did the same thing as the VCM Suite and was competitive with HPT's software. (*Id.*, at 119). Cannata was brazen in admitting that he saw no

problem with sharing HPT's valuable intellectual property with its competitors (*Id.*, at 134-136), despite explicitly acknowledging that HPT's Operating Agreement required him to protect company property. (*Id.*, at 136-137).

In sum, this situation was entirely avoidable and required no more than Cannata's good faith compliance with federal rules and statutes, and to refrain from blatant dishonesty and deception.  But he did not.  These rules, including disclosure obligations, are in place and designed for transparency, not deceit.  Instead, Cannata opted to substitute his own alternate subjective standards of conduct in place of the rules meant to apply equally to all litigants.  His conduct should thus be sanctioned to the full extent available under the law.

## **CONCLUSION**

In consideration of the foregoing, this Court should GRANT HP Tuners' Motion for Sanctions.

WHEREFORE, Plaintiff HP TUNERS LLC respectfully prays for the imposition of sanctions against Defendant, KENNETH CANNATA, as follows:

(a)     Entry of default judgment against Defendant, Kenneth Cannata.

(b)     An order directing payment to Plaintiff of part or all of the reasonable attorney's fees and other expenses directly resulting from Defendant's violation, pursuant to Federal Rule of Civil Procedure 11(c), based on Defendant's false pleadings;

(c)     An order to satisfy the excess costs, expenses, and attorneys' fees reasonably incurred by Plaintiff because of Defendant's conduct, pursuant to 28 U.S.C. §1927;

(d)     An order pursuant to Federal Rule of Civil Procedure 37(c)(1) requiring Defendant's payment of Plaintiff's reasonable expenses, including attorney's fees and other appropriate sanctions, including any of the orders listed in Federal Rule of Civil Procedure 37(b)(2)(A)(i)-(vi), caused by Defendant's failure to make or supplement required disclosures of information;

(e)     An order pursuant to Federal Rule of Civil Procedure 37(c)(2) requiring Defendant's payment of Plaintiff's reasonable expenses, including attorney's fees, incurred in making the proof of truth for what Defendant previously denied or failed to admit in response to Plaintiff's request for admission; and,

(f)      Such other and further relief as this Court deems necessary and appropriate.

Dated this 1st day of June, 2021.          Respectfully submitted,

_s/ Andrew P. Bleiman_
Attorneys for HP Tuners, LLC

MARKS & KLEIN
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail:  andrew@marksklein.com

LEE HIGH, LTD.
Cecilia Lee, Esq.
Nevada Bar No. 3344
Elizabeth High, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone:  775.499.5712
Email: c.lee@lee-high.com
Email:  e.high@lee-high.com

Attorneys for Plaintiff HP Tuners, LLC

1

**CERTIFICATE OF SERVICE**

2

Pursuant to FRCP 5(b), I certify under penalty of perjury that I am an employee of LEE HIGH,

3

LTD., 448 Ridge Street, Reno, Nevada 89501, and that on June 1, 2021, I served the foregoing

4

**PLAINTIFF'S MOTION FOR SANCTIONS** via the Court's Notice of Electronic Filing to all those

5

persons registered with the United States District Court to receive service electronically for the above-

6

captioned matter.

7

DATED this 1st day of June, 2021.

8

/s/ Elizabeth Dendary, CP
ELIZABETH DENDARY, CP

9

Certified Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

| Exhibit | Description | No. of Pages |
|---------|-------------|--------------|
| A | Defendant's Responses to Plaintiff HP Tuners, LLC's First Set of Requests for Admission | 15 |
| B | Defendant Cannata's Answers and Objections to Plaintiff HP Tuner (*sic*), LLC's First Set of Interrogatories | 10 |
| C | Defendant Cannata's Second Supplemental Answers and Objections to Plaintiff HP Tuner (*sic*), LLC's First Set of Interrogatories | 18 |
| D | Defendant's Response to Plaintiff HP Tuners, LLC's First Set of Requests for Production | 41 |