Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Email: blarsen@shea.law
      kwyant@shea.law

*Attorneys for Defendant*
*Kenneth Cannata*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

HP TUNERS, LLC, a Nevada limited liability company;

          Plaintiff,

    vs.

KENNETH CANNATA,

          Defendants.

CASE NO. 3:18-CV-00527-LRH-WGC

**DEFENDANT KENNETH CANNATA'S MOTION IN LIMINE TO DISQUALIFY AND EXCLUDE TESTIMONY FROM PLAINTIFF'S PROPOSED EXPERT JOHN BONE**

      Defendant Kenneth Cannata ("Cannata") hereby files this *Motion in Limine to Disqualify and Exclude Testimony from Plaintiff's Proposed Expert John Bone* (the "Motion"). This Motion is supported by the papers and pleadings on file herein, the following Memorandum of Points and Authorities, any exhibits attached hereto, and any oral argument this Court may entertain on the Motion.

      DATED this 30th day of December 2022.

                **SHEA LARSEN**

                */s/ Bart K. Larsen, Esq.*
                Bart K. Larsen, Esq.
                Nevada Bar No. 8538
                Kyle M. Wyant, Esq.
                Nevada Bar No. 14652
                1731 Village Center Circle, Suite 150
                Las Vegas, Nevada 89134

                *Attorneys for Kenneth Cannata*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

- 1 -

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

        The purpose of this Motion in limine is to disqualify and preclude HP Tuners, LLC's ("<u>HPT</u>") proposed expert John Bone ("<u>Mr. Bone</u>") from testifying at trial.  As this Court is aware, a witness may only testify as an expert if the expert is properly qualified and all of the following elements are met: (a) the expert's scientific, technical, or other specialized knowledge will help a trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on nonspeculative and sufficient facts and data; (c) the testimony is the product of reliable principles and methods; and, (d) the expert has reliably applied the principles and methods to the facts of the case. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Put bluntly, Mr. Bone and his corresponding report (the "<u>Bone Report</u>") cannot be allowed to prejudice the court with their entirely speculative and unreliable methodology.

        Indeed, neither Mr. Bone nor the Bone Report rely on nonspeculative facts or data.  Rather, the entire opinion formulated by Mr. Bone is based purely on speculative and self-serving estimates from HPT itself.  For instance, the Bone Report relies entirely on an estimation of hours worked on the alleged trade secrets at issue from nearly a decade ago.  The estimation fails to reference HPT's actual payroll and other business records and was prepared in part by an employee who was not even a part of HPT at that time.  Further, the Bone Report utilizes hourly rates from HPT and does not canvass any other jurisdictions for applicable rates to perform its calculations.  When the Court examines the number of hours that Mr. Bone relies upon, it is clear based on simple mathematics that the estimation of hours cannot be correct.  Mr. Bone and the Bone Report regurgitate HPT's unsupported claims and allegations without any independent verification of the same in an attempt to present damages in the form of how much it cost HPT to develop the alleged trade secrets, which this Court has already stated is improper.

        Moreover, Mr. Bone's methodology is not reliable and he fails to take into account circumstances and facts presented in this case.  For example, Mr. Bone fails to independently exam which parts of the alleged trade secrets at issue actually belong to HPT.  It cannot be disputed that

the technology at issue includes source code from third parties, including automobile manufacturers. However, Mr. Bone does not analyze what code is not protected and what code is protected. Nor does Mr. Bone rely on any other expert's analysis of the code. Further, Mr. Bone does not take into account the fact that the allegedly competing product had already been substantially completed prior to receiving any alleged trade secrets of HPT. Nor does Mr. Bone use current data to perform extrapolations—instead, his report ignores HPT's mitigation efforts and relies entirely on data from 2019 and earlier to compute lost profits in 2020, which he could have simply referred to the actual records of HPT instead of speculative extrapolation.

HPT should not be allowed to present Mr. Bone's speculative and incomplete analysis. This Motion should be granted, and Mr. Bone should be precluded from testifying at trial.

## II.   BRIEF FACTUAL BACKGROUND[1]

1.      HPT is a Nevada limited liability company founded by Prociuk, Piastri, and Cannata on or about December 21, 2003.

2.      HPT is in the business of developing and selling software and hardware that allows car enthusiasts and automotive shops to alter or tune vehicle performance parameters.

3.      Starting in or around 2004, Cannata, Prociuk, and Piastri worked together to develop the initial version HPT's software and a hardware device that allowed a user to connect a computer to a vehicle and to access and change the manufacturer's factory settings for the vehicle. Cannata was primarily responsible for the development of the hardware device, which was initially known as the Version 1 interface. Prociuk and Piastri were primarily responsible for the development of HPT's software, which was known as the VCM Suite version 1.0

4.      Cannata subsequently designed and developed a newer hardware interface that became known as the MPVI. The MPVI was released to market in 2006 or 2007 along with VCM Suite version 2.0, which was developed by Prociuk and Piastri using, in many instances, code from third-party sources, including proprietary automobile manufacturer encryption keys HPT purchased from third parties and used to gain access to and reprogram vehicle computer systems as well as

---

[1] A full recitation of the relevant facts involved in this proceeding can be found at Cannata's Motion for Partial Summary Judgment [ECF No. 124].

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1 information HPT obtained by reverse engineering or hacking products offered for sale by its

2 competitors.

3     5.    As newer versions of the software (VCM Suite) were released to the public, HPT

4 would cease development on the older versions of the software. VCM Suite 2.24 was released in

5 early 2013 and, as such, all development of VCM Suite 2.23 ceased as of May 2013.

6     6.    By 2015, disagreements had arisen between Cannata and the other members of HPT.

7 Ultimately, HPT purchased Cannata's stake in the company on October 20, 2016 through a

8 Membership Interest Purchase Agreement (the "Purchase Agreement").  However, prior to his

9 interest being purchased, Cannata began discussing a potential business relationship with Kevin

10 Sykes-Bonnett ("Sykes-Bonnett") and Syked Tuning Software, LLC ("Syked Tuning") in the event

11 that Cannata was forced out of HPT.

12     7.    Prior to executing the Purchase Agreement, Cannata sent certain source code files of

13 older, outdated technology (some of which that was publicly available on HPT's website) to Sykes-

14 Bonnett.  Cannata believed that he was authorized to do so based on his one-third ownership interest

15 of HPT, his management position, the publicly available nature of the information, as well as

16 repayment for Sykes-Bonnett's provision of code from Chrysler, Jeep, and Dodge based on a prior

17 agreement between HPT and Sykes-Bonnett.

18     8.    Subsequently, HPT initiated the above-captioned lawsuit asserting, among other

19 things, that Cannata provided HPT's trade secrets to Sykes-Bonnett in violation of HPT's Operating

20 Agreement.

21     9.    During discovery in this matter, HPT retained a proffered expert—Elizabeth Groves,

22 Ph.D.—who engaged in analyzing computer code used in the MPVI and developed by Cannata and

23 comparing the same to a competing hardware tuning cable developed by Syked Tuning.  In total,

24 Ms. Groves compared 42 files utilized by the Syked Tuning hardware cable to 142 files utilized by

25 the MPVI.

26     10.   No other code comparison was performed by any expert in this matter and no other

27 code comparison was disclosed pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(ii) before

28

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

discovery closed in this matter.  Indeed, HPT admits that it has not performed any such analysis regarding HPT's software code and the allegedly infringing and misappropriated code.[2]

11.     On or about November 20, 2020, Plaintiff proffered a report from its supposed Expert Mr. Bone in which Mr. Bone states that he based his damage calculations entirely on "the full value of the misappropriated information and trade secrets" and used "HPT's cost to develop" as a measure of damages.[3]

12.     For example, Mr. Bone calculates that the "cost to develop the VCM Editor source code version 2.23 amounted to approximately $3.9 million," "the cost to develop and maintain the MPVI Firmware amounted to approximately $190,000," and that "cost to develop and maintain the MPVI Hardware and Hardware Schematics was approximately $59,000."[4]  Mr. Bone then simply adds these development costs and re-labels them as "avoided costs."[5]

13.     The calculations of HPT's development costs were not based on any personal knowledge of Mr. Bone, but rather came from estimates of hours that HPT believes its employees spent on development back in 2004-2013, which were formulated by an employee who did not even work with HPT at the time the estimates supposedly reflect.[6]

14.     Indeed, Mr. Bone relied entirely on a document entitled "HPT Development Time Estimates.xlsx" that was a self-serving document developed by HPT as to events that occurred approximately fifteen years prior to Mr. Bone's report.[7]

15.     Mr. Bone's report does not take into account any technological advances in coding software, nor does it take into account the software already developed by Sykes-Bonnett as no

---

[2] *See* HPT's Supplemental Responses to Cannata's Second Set of Interrogatories, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124] as <u>Exhibit S</u> ("Moreover, a full comparison of Syked ECU's code against HPT's code has not been performed…consequently, the nature and extent of the similarities between the software developed by HPT and the Syked ECU software…***is not known***.").

[3] *See* Bone Report, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124], ¶¶ 45-45, as <u>Exhibit N</u>.

[4] *Id.* at ¶¶ 49-51.

[5] *Id.* at ¶ 52.

[6] *Id.* at ¶ 48 ("As such, there are no records I can review to determine the amount of time that was spent developing the information that is alleged to have been misappropriated by Cannata.").

[7] *Id.*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  comparison has even been performed.  It does not engage or rely on any code comparison between

2  the Sykes-Bonnett software and firmware and hardware and HPT's competing products.

3      16.    HPT does not dispute that it never lost access to its software, firmware, or hardware,

4  nor was it prevented from utilizing the same.

5      17.    On or about February 24, 2022, the Court ruled in the parties competing Motions for

6  Partial Summary Judgment (the "MPSJ Order").[8]

7      18.    In the MPSJ Order, this Court, based on briefing provided to it by the parties, ruled

8  that "HPT can only seek to recover development costs that Cannata saved by misappropriating

9  HPT's trade secrets—not how much the trade secrets actually cost to develop."[9]

10     19.    Mr. Bone never supplemented his report following this ruling.

11     20.    Based on the speculative nature of estimations that underly Mr. Bone's report, his

12  violation of pertinent law precluding damages being based on HPT's development costs of its alleged

13  trade secrets, his failure to take into account all relevant facts, as well as his untested and unreliable

14  methodologies in calculating damages, Mr. Bone should be precluded from testifying.

15  **III.    LEGAL ARGUMENT**

16      **A.  Legal Standard for Motions in Limine**

17      A motion in limine is a procedural device to request that certain inadmissible evidence not

18  be referred to or offered at trial.  *Gonzales v. Shotgun Nev. Invs., LLC*, No. 2:13-cv-00931, 2017

19  U.S. Dist. LEXIS 23052, *8 (D. Nev. Feb. 17, 2017); *see also United States v.* Heller, 551 F.3d

20  1108, 1111-12 (9th Cir. 2009).  "Although the Federal Rules of Evidence do not explicitly authorize

21  *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to

22  manage the course of trials."  *Luce v. United States*, 569 U.S. 38, 41 n.4 (1980).  Despite judges

23  having broad discretion when ruling on motions in limine, such motions should be granted when

24  potential evidence to be offered will be prejudicial or inadmissible. *See Gonzales*, 2017 U.S. Dist.

25  LEXIS at * 8.

26

27  [8] *See* [ECF No. 157].

28  [9] *Id.* at 18:17-19.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**B.  Legal Standard for Expert Testimony.**

FRE 702 governs the admissibility of expert testimony and only permits the presentation of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." For expert testimony to be considered remotely admissible, the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education, it must be useful to the trier of fact, and "(1) the testimony [must be] based upon sufficient facts or data, (2) the testimony [must be] the product of reliable principles and methods, and (3) the witness [must have] applied the principles and methods reliable to the facts of this case." FRE 702.  The Supreme Court has described judges as "gatekeepers of evidence." *Daubert v. Merrell Dow Pharms*, 509 U.S. 579, 597 (1993).  If an expert's testimony fails to be either based upon sufficient facts or data, fails to be the product of reliable principles, or fails to be relevant to the facts at hand, the testimony should be excluded. *See, e.g.*, *United States v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999).

The relevance test under FRE 702 is higher than the standard for bare relevance.  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 n. 17 (9th Cir. 1995) ("*Daubert II*").  Indeed, district courts must exclude proffered testimony "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Id.* The test for reliability requires that the expert's methods be adequately explained and that methods are grounded in science and the Ninth Circuit has "held that [o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Clausen v. M/V New Carissa*, 399 F.3d 1049, 1056 (9th Cir. 2003).  "If the testimony is not based on independent research then what is required is proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication."  *Id.* (citing *Daubert II*, 43 F.3d at 1317). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 1467-47 (1997).

The party proffering an expert bears the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *Joinder*, 522 U.S. at 144; *Domingo v. T.K.M.D.* 289 F.3d 600, 607 (9th Cir. 2002). No separate evidentiary hearing is required. *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2002). Here, Mr. Bone did not rely on sufficient facts or data, his methodology in computing damages in this matter is not the product of reliable principals and methods, and Mr. Bone did not reliably apply the methods to the facts of this case. Rather, Mr. Bone's entire opinion is based upon purely speculative information. As such, the Motion should be granted in full, and Mr. Bone should be excluded from testifying.

**C. HPT Cannot Meet Its Burden of Establishing that Mr. Bone Satisfies the *Daubert* Requirements.**

As stated by the Ninth Circuit and FRE 702, all proffered experts such as Mr. Bone must have relied upon sufficient facts or data and the proposed testimony to be offered must be the product of reliable principles and methods. Here, Mr. Bone did not rely upon sufficient data or facts in forming his opinion and his methods are not reliable nor are they reliably applied to the facts of this case. As such, the Court must exclude Mr. Bone from testifying pursuant to FRE 702 and binding case law.

       *i.*    <u>Mr. Bone's Report and his Methodology Used Therein Are Unreliable</u>

FRE 702 requires that Mr. Bone's report and proposed opinions, which were developed solely for purposes of this litigation, be reliable. Here, Mr. Bone's analysis of damages in this matter are not reliable.

As an initial matter, Mr. Bone's report relies heavily on what this Court already stated could not serve as the basis for damages—development costs incurred by HPT in developing the alleged trade secrets at issue. Indeed, in its Order [ECF No. 157], this Court expressly stated that "HPT can only seek to recover development costs that Cannata saved by misappropriating HPT's trade secrets—not how much the trade secret actually cost to develop." However, this is exactly what Mr.

Bone's report does, which this Court acknowledges is impermissible.  For example, Mr. Bone states numerous times in his report that he based his damage calculations entirely on "the full value of the misappropriated information and trade secrets" and used "HPT's cost to develop" as a measure of damages.[10]  In his report, Mr. Bone calculates that the "cost to develop the VCM Editor source code version 2.23 amounted to approximately $3.9 million," "the cost to develop and maintain the MPVI Firmware amounted to approximately $190,000," and that "cost to develop and maintain the MPVI Hardware and Hardware Schematics was approximately $59,000."[11]   Mr. Bone then simply adds these development costs and re-labels them as "avoided costs."[12]  Mr. Bone does this throughout his report, simply taking the development costs and re-labeling them as saved or avoided costs by Cannata.[13]

More importantly, this method is unreliable because it fails to take into account several relevant facts. First and foremost, Mr. Bone does nothing to determine whether the source code at issue, the MPVI firmware, or the MPVI hardware actually constitutes property of HPT, instead, he simply took HPT's word for it based on his communications with HPT's principals and HPT's operative complaint in this matter.[14]  Mr. Bone admits that he does not have any idea as to whether the information at issue actually constitutes HPT's intellectual property or trade secrets.[15]  Further, Mr. Bone did not discuss the development of this information with Cannata, who Mr. Bone acknowledges was one of the members who help developed the same.[16]  Mr. Bone cannot establish how long it would have taken Cannata to develop this material (with or without Sykes-Bonnett).[17]

---

[10] *See* Bone Report, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124], ¶¶ 45-45, as <u>Exhibit N</u>.

[11] *Id.* at ¶¶ 49-51.

[12] *Id.* at ¶ 52.

[13] *Id.* at ¶¶ 53 – 57.

[14] *Id.* at ¶ 20.

[15] *Id.* at ¶ 22, n. 29; *see also* Order [ECF No. 157], p. 17, on file herein (stating that HPT has not identified its trade secrets in this matter).

[16] *See* Bone Report, ¶ 23, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124], as <u>Exhibit N</u>.

[17] *See id. generally*.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  Mr. Bone also does not take into account the fact that the source code, firmware, and hardware
2  contains source code from third parties.[18] Nor does Mr. Bone take into account the fact that it was
3  not Cannata who utilized the information; rather, the information was provided to Sykes-Bonnett
4  who already had versions of the allegedly competing products in development or fully developed
5  prior to the receipt of any alleged trade secret from Mr. Cannata. Indeed, Mr. Bone's report does not
6  include any analysis or comparison performed between the allegedly infringing Syked ECU software
7  and hardware to the alleged property of HPT.[19] Mr. Bone further does not take into account what the
8  salary would have been for Cannata or Sykes-Bonnett to hire an individual to engage in
9  development.[20]

10  Mr. Bone's methodology regarding the breach of contract damages associated with the Buy-
11  Sell Agreement are also unreliable. Mr. Bone basis his flawed calculations in this regard on a March
12  31, 2016 balance sheet and the Buy Sell Agreement.[21]  He states that under the Buy Sell Agreement,
13  Cannata services could have been terminated for cause and then would have been paid "book value"
14  for his membership interest; however, book value is not defined in the Buy Sell Agreement and Mr.
15  Bone relies on assumptions regarding termination for cause. Importantly, Mr. Bone ignores the fact
16  that Cannata's services for HPT were unequivocally terminated without cause in January 2016 as a
17  result of Prociuk and Piastri's actions is adopting the Written Consent through which they removed
18  Cannata from his roles with the company and made it impossible for Cannata to participate in the
19  operation of HPT by terminating his access to HPT's offices, computer systems, and books and
20  records.  HPT does not allege that Cannata engaged in any improper conduct prior to February 2016
21  – a month after his services were terminated without cause.  HPT could not have terminated
22  Cannata's services for cause in or after February 2016 due to Cannata's alleged actions because

25  [18] *See id. generally.*
26  [19] *See id. generally.*
27  [20] *See id. generally.*
28  [21] *See* Bone Report, p. 21-23, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124] as Exhibit N.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1   those services had already been terminated without cause in January 2016 through the unilateral

2   actions of Prociuk and Piastri.

3        Furthermore, Mr. Bone's reliance on a March 31, 2016 balance sheet as the method for his

4   calculations flaws his entire analysis.  HPT admits that it did not become aware of Cannata's alleged

5   improprieties until 2017 or 2018.[22]  Thus, how could HPT terminate Cannata for cause in 2016 when

6   it did not become aware of the same for over a year or two later?  The simple answer is that HPT

7   could not.  Thus, any method by which Bone relies on outdated balance sheets cannot serve as a

8   valid basis for damages in this matter.

9        Moreover, Bone's calculations relating to "book value"[23] are not consistent with HPT's

10  understanding of the same.  HPT's members admitted that their understanding of "book value" (and

11  undefined term in the Buy Sell Agreement) includes not only tangible assets, but also intangible

12  assets such as intellectual property.[24]  However, the balance sheet upon which Bone relies does not

13  take into account what HPT claims are its most valuable assets – its intellectual property.[25]

14  Moreover, it is concerning that Bone's calculations for book value of a company represents a value

15  much lower than the amounts sought in damages by HPT in this action.  Bone's calculations are

16  based on false premises and cannot support any award of damages.

17       Further, Mr. Bone's report's discussion regarding lost profits in the amount of $4,360,000 is

18  based on an entirely unreliable method.  Courts typically refuse to aware future lost profits as they

19  are routinely found to be overly speculative and "[a]ctual damages do not ordinarily include future

20  losses."  *Little Genie Prods. LLC v. PHSI, Inc.*, No. 2:12-cv-00357, 2014 U.S. Dist. LEXIS 91089,

21  *18 (W.D. Wash. July 2, 2014) (collecting cases and refusing to award a party lost profits for the

22

---

23  [22] *See* Deposition of Keith Prociuk, March 17, 2021, pp. 88 - 89, submitted with Cannata's Motion for Partial Summary
    Judgment [ECF No. 124], as Exhibit B.

24
25  [23] "Book value" can lend itself to many definitions and has been deemed to include intangible assets. *Elec. Modules
    Corp. v. United States*, No. 179-77, 1981 U.S. Ct. Cl. LEXIS 1463, at *2, 48 A.F.T.R.2d (RIA) 5691 (Ct. Cl. July 29,
    1981).

26  [24] *Id.* at p. 88.

27  [25] *See* Report of John R. Bone, CPA, CFF dated November 20, 2020, Exhibit 3.1, attached hereto as **Exhibit N.**
    Although the balance sheet lists intangible assets as $90,754, this cannot include the intellectual property at issue
28  which HPT has alleged is worth millions of dollars.

next ten years as they were entirely speculative and unsupported by clear evidence of lost customers). "Damages based on lost profits are inherently speculative, particularly when they derive from…potential customers with whom the plaintiff has no existing relationship. Courts are generally hesitant to award such damages unless they can be calculated with reasonable certainty." *Urica, Inc. v. Pharmaplast, S.A.E.*, No. CV 11-02476, 2013 U.S. Dist. LEXIS 203303, *25 – 27 (C.D. Cal. May 6, 2013) (collecting cases and finding lost profit calculations to be too speculative). Additionally, when expert testimony is proffered that relies on speculation or assumption, lost profits cannot be awarded. *See, e.g.*, *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361-64 (Fed. Cir. 2001) (vacating a jury award of future lost profits for patent infringement where it was based on an expert opinion which used speculative assumptions).

Here, Mr. Bone solely relies on averages and median rates of downloads between June 7, 2018 and April 16, 2019, despite producing his report in November 2020.[26] HPT had the ability to provide current numbers to Mr. Bone but declined to do so; instead, HPT simply regurgitated its data used in the Washington Action and Mr. Bone relied upon the same.[27] In other words, Mr. Bone's report relies on outdated data to extrapolate lost profits into the future rather than relying on data that was readily available to HPT. Nothing could be more unreliable than relying on estimates rather than actual existing data.

Moreover, when one reviews Mr. Bone's calculations in detail, it is clear to see that his analysis is flawed, unsupported, and speculative. For example, Mr. Bone assumes that the twenty-three individuals he relies upon out of the thirty-eight identified individuals that have downloaded the cracked software but have not used credits associated with HPT's software since 2015, 2017, or 2018 will suddenly begin using credits again.[28] Additionally, the remaining 272 downloads (or 90% of total downloads) are in the hands of people who have never used the software and may not have

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

---

[26] *Id.*

[27] *See* Deposition of Keith Prociuk, March 17, 2021, pp. 246 - 248, attached to Cannata's Motion for Partial Summary Judgment [ECF No. 124], as <u>Exhibit B</u>.

[28] *See* Bone Report, ¶ 45, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124], as <u>Exhibit N</u>.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    downloaded the same except for the fact it was freely available rather than available for purchase.[29]

2    Mr. Bone further then extrapolates his errors and assumptions by assuming that these unknown 272

3    individuals will use it to tune an average of **52 cars per year** despite not knowing what vehicles are

4    owned by these individuals or whether their vehicles are supported by the software version at issue.[30]

5    Additionally, Mr. Bone fails to acknowledge that the cracked software at issue only is usable with

6    certain vehicles, and fails to take into account that those vehicles (which are typically older models)

7    will be less frequently driven by individuals over time based on wear and tear and breakdowns. The

8    Bone Report simply fails to provide any reasonable basis in fact that the extrapolated lost profit

9    calculations over the next five years are in fact accurate and does not subject his calculations or

10   provide any peer reviewed methodology to support his speculative findings.

11          As such, his methods which are not based on independent research but rather taken solely

12   from the mouth of HPT are unreliable. *Clausen v. M/V New Carissa*, 399 F.3d 1049, 1056 (9th Cir.

13   2003) ("If the testimony is not based on independent research then what is required is proof that the

14   research and analysis supporting the proffered conclusions have been subjected to normal scientific

15   scrutiny through peer review and publication.").

16                    *ii.*    <u>*Mr. Bone's Report Relies on Unsupported Estimates and Speculative Data*</u>

17          Further, Mr. Bone should be excluded from testifying based on his testimony being based

18   purely on speculative facts and self-serving estimations provided to him by HPT.  FRE 702 and the

19   Ninth Circuit requires that an expert such as Mr. Bone utilize non-speculative and non-assumptive

20   facts that are based on the expert's own personal knowledge for expert testimony to be admissible.

21   *See, e.g.*, *McGlinchy v. Shell Chemical co.*, 845 F.2d 802 (9th Cir. 1988) (affirming the exclusion of

22   a proffered expert because his opinion was not based in facts on the record); *Ollier v. Sweetwater*

23   *Union High Sch. Dist.*, 768 F.3d 843, 860-61 (9th Cir. 2014) ( affirming exclusion of an expert

24   because their opinion was based on speculation); *see also Morford v. Wal-Mart Stores*, 2011 U.S.

25

26   _____

27   [29] *See* Arrowfish rebuttal expert report, p. 17, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124] as <u>Exhibit Q</u>.

28   [30] *Id.*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  Dist. LEXIS 61650, *19 (D. Nev. June 9, 2011) (collecting cases nationwide to state that an expert

2  should be excluded when the opinion expressed is based on speculative facts or speculation).

3       Here, Mr. Bone bases his calculations regarding damages associated with unjust enrichment

4  of HPT's alleged trade secrets on entirely speculative data and, as such, his opinions cannot be

5  deemed reliable and will be substantively more prejudicial than beneficial.  As discussed above, Mr.

6  Bone relies upon the already impermissible form of damages recognized by this Court by putting

7  forth the cost incurred by HPT to develop the alleged trade secrets at issue.[31]

8       However, even if development costs rebranded as saved costs could be a measure of damages

9  (which it cannot), an expert's calculation of damages relating to saved costs or development cannot

10  be based on a client's calculations without any personal knowledge of the same.  *See, e.g.*, *Brightview*

11  *Grp., LP v. Teeters*, No. SAG-19-2774, 2021 U.S. Dist. LEXIS 28015, *20-22 (D. Md. Feb. 8, 2021).

12  In *Brightview*, a plaintiff hired an expert to opine as to damages relating to the saved development

13  costs.  *Id.* at *19 – 20.  The expert's report on saved costs stated that "[t]he saved cost of development

14  for Defendants can generally be measured by the hours spent developing the confidential materials

15  multiplied by the hourly cost of compensation of the Brightview employees who developed those

16  materials."   *Id.*   The *Brightview* court immediately recognized that this method was entirely

17  unreliable, stating:

18       This method assumes Monarch would need the same number of employees to
         expend the same number of hours developing these documents and would pay them
19       a comparable wage. The remainder of her report on saved costs of development
         recites the estimates generated by Brightview of how much it cost Brightview to
20       develop documents alleged to be trade secrets. ECF 173-3 ¶¶ 16-20 (explaining
         "Brightview has undertaken an exercise to determine the cost of development" in
21       her report); ECF 159-7 at 244 (testifying that Brightview determined the hours
         worked and compensation of employees who developed the documents then
22       reported the costs to Robinson). Robinson attempted to verify the accuracy of some
         of the inputs to Brightview's estimations by examining payroll records. ECF 173-
23       1 at 230-32. However, even assuming Brightview's calculation of the costs it
         expended to develop the documents is accurate, Robinson admitted at deposition
24       that she did not have the knowledge or experience to know whether the hours and
         costs expended were reasonable. *Id.* at 227-29. In sum, she applied no "scientific,
25       technical, or other specialized knowledge" in evaluating the costs of development,
         but simply offers Brightview's calculations of the costs as her own without any
26       basis for knowing whether Brightview's estimation of the costs saved to Monarch
         is realistic or reasonable. "When an expert's proffered opinion merely parrots

27  _____

28  [31] *See* [ECF No. 157] at 18:17-19.

- 14 -

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

information provided to [her] by a party, that opinion is generally excluded." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.,* No. 1:07-cv-00341-SEB-DML, 2009 U.S. Dist. LEXIS 96131,2009 WL 31876855 at *2 (S.D. Ind. Sept. 29, 2009) (excluding damages expert's testimony where expert merely reported his client's calculations of development costs). Because Robinson's saved costs of development testimony "goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis," it is inadmissible. *See Ask Chems., LP v. Comput. Packages, Inc.,* 593 F. App'x 506, 510 (6th Cir. 2014) (upholding exclusion of expert's damages opinion that "lack[ed] independent verification or analysis").

Here, this is exactly what the Bone Report does but in a much less reliable fashion. Like the expert in *Brightview*, Bone admits that he relied on estimates and admitted that "there are no records I can review to determine the amount of time that was spent developing the information that is alleged to have been misappropriated by Mr. Cannata."[32] Rather than conduct any analysis, Bone simply took what HPT alleges it spent on various pieces of intellectual property based on "time estimates."[33] This is much worse than the expert in *Brightview* who actually reviewed payroll records herself, and like the expert's testimony in *Brightview* that was found to be entirely unsupported and speculative, Bone's testimony should be similarly found unsupported and speculative, especially when one looks at his underlying calculations based on these "estimates."

Bone states that his discussions with HPT's agents and review of these estimates led him to understand that, from 2004 to 2013 when the VCM Suite version 2.23 was rendered obsolete, HPT spent "more than 74,000 hours."[34] To be clear, 74,000 hours is equivalent to a single person working 24 hours a day, 7 days a week, 365 days a year for roughly eight and a half years – virtually the entire time in question – working on the development of the VCM Suite software. Incredibly, HPT claims that, through 2013, substantially all of the proprietary code written for the VCM Suite was written by Prociuk with Piastri writing 1% or less of the code during that time.[35] Prociuk admitted that he did not spend 24 hours a day, 7 days a week, 365 days a year for nine years developing this

[32] *See* Bone Report, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124], ¶¶ 48-49, as Exhibit N. The Bone Report is rife with words such as "estimate" or "assume" or variations thereof, further evidencing the entirely speculative nature upon which it is based.

[33] *Id.* at ¶¶ 49 – 58.

[34] *Id.* at ¶ 49.

[35] *See* Deposition of Keith Prociuk, March 17, 2021, pp. 64 - 65, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124] as Exhibit B.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

code in part because he had another full-time job during part of this time period.[36]  Further, the individual who Bone states he used to obtain the numbers to estimate the cost of development, Ion Solton, was admittedly not even hired until 2014 or 2015, after VCM Suite 2.23 was rendered obsolete.[37]  Thus, any information Mr. Solton provided could not have been based on his personal knowledge.  In sum, the Bone Report simply parrots and relies on speculation from individuals who are guessing at the time spent on developing HPT's alleged intellectual property that were not present when the alleged trade secrets were being developed approximately a decade ago. This is entirely speculative, not based on Mr. Bone's personal knowledge, and not based on any existing documentation other than estimates generated solely for litigation purposes.  As such, HPT cannot satisfy the *Daubert* requirements of establishing that Mr. Bone's testimony is based on nonspeculative factual foundation.

## III.    CONCLUSION

Based on the foregoing and this Court's prior rulings, Mr. Bone should be precluded from testifying as a result of his entirely speculative and unreliable findings and methodology.

DATED this 30th day of December 2022.

SHEA LARSEN

/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for Kenneth Cannata*

---

[36] *Id.* at pp. 29, 63.

[37] *Compare id.* at pp. 62 – 63 *with* Report of John R. Bone, CPA, CFF dated November 20, 2020, ¶ 48, submitted with Cannata's Motion for Partial Summary Judgment [ECF No. 124] as <u>Exhibit N.</u>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## **CERTIFICATE OF MEET & CONFER CONFERENCE**

Pursuant to LR 16-3(a), the undersigned counsel certifies that counsel for the parties met and conferred on December 29, 2022 in an effort to resolve the subject matter of Defendant's motions in limine without court action. The parties were unable to resolve the issues contained herein in a mutually agreeable manner.

DATED this 30th day of December 2022.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for Kenneth Cannata*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2022, I electronically transmitted the foregoing **DEFENDANT KENNETH CANNATA'S MOTION IN LIMINE TO DISQUALIFY AND EXCLUDE TESTIMONY FROM PLAINTIFF'S PROPOSED EXPERT JOHN BONE** to the Office of the Clerk of the United States District Court, District of Nevada, using the CM/ECF System, for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants listed for this matter.

By: /s/ *Bart K. Larsen, Esq.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432