MARKS & KLEIN LLC
Andrew P. Bleiman, Esq.
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
E-mail: andrew@marksklein.com

FLETCHER & LEE
Elizabeth Fletcher, Esq.
Nevada Bar No. 10082
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.324.1011
Email: efletcher@fletcherlawgroup.com

Attorneys for Plaintiff HP Tuners, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HP TUNERS, LLC, a Nevada limited liability company,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>KENNETH CANNATA,<br><br>　　　　　Defendant. | Case No. 3:18-cv-00527-LRH-WGC<br><br>**REDACTED**<br>**PLAINTIFF HP TUNERS, LLC'S**<br>**TRIAL BRIEF** |

Plaintiff HP TUNERS, LLC, a Nevada limited liability company ("HPT" or "Plaintiff"), by and through its attorneys, hereby submits its Trial Brief and states as follows:

## I.    INTRODUCTION

Plaintiff HPT's claims in this matter stem from the brazen acts of Defendant Kenneth Cannata ("Cannata"), its former member. After 13 years with HPT, Cannata spent much of 2016 negotiating a multimillion-dollar buyout of his interest with co-members Keith Prociuk ("Prociuk") and Chris Piastri ("Piastri"). During that time, however, Cannata engaged in specific and deliberate acts intended to harm HPT and willfully and maliciously concealed that he had

already misappropriated and shared Plaintiff's confidential and proprietary information (including trade secrets of HPT) with Syked ECU Tuning, Inc.,[1] a direct competitor of HPT that Cannata's "wife" would become an owner of shortly after he finalized the sale of his membership interest in HPT and a company that he was actively supporting and assisting while he was still an owner of HPT.

On October 20, 2016, the HPT members finalized the buyout arrangement. In connection with the Membership Interest Purchase Agreement of said date ("Purchase Agreement"),[2] Plaintiff paid $6.8 million to Cannata for: (1) his membership interest and (2) certain covenants, including but not limited to Cannata maintaining the confidentiality of HPT's information, returning HPT's intellectual property and not competing against HPT. However, unbeknownst to HPT, Cannata had already violated those covenants (and been consistently engaging in this misconduct for several months prior to signing the Purchase Agreement) and continued to secretly do so for several years after execution of the Purchase Agreement. Simply put, Cannata took $6.8 million from HPT while deliberately suppressing and concealing that he was already violating his promises on which the payout was premised and conditioned.

Plaintiff brought this action after learning of Defendant Cannata's misconduct in or around August 2018. Had Plaintiff learned of Cannata's deception back in 2016 when negotiating the Purchase Agreement, it is undisputed that HPT would have terminated him immediately for cause pursuant to the 2008 Buy Sell Agreement ("Buy Sell Agreement").[3] *See* ECF No. 157, at 4 *citing* ECF No. 120[4], at 5,¶19. Under the termination provisions of the Buy Sell Agreement, Cannata would have received only a one-third interest of HPT's book value at that time. As a result of his deception, HPT overpaid Cannata in the amount of $6,000,000.00 for his interest. *See* ECF No. 157, at 4.

---

[1]   Syked ECU's principal is Kevin Sykes-Bonnett ("Sykes-Bonnett").
[2]   ECF No. 1-2.
[3]   ECF No. 1-3.
[4]   Declaration of Keith Prociuk in Support of Plaintiff's Motion for Summary Judgment. ECF No. 120.

Cannata's egregious misconduct and misappropriation of HPT's confidential and proprietary information, including HPT trade secrets, while negotiating his multimillion-dollar buyout specifically included his admitted dissemination of HPT's key generation tool to a third party. Cannata's unauthorized disclosure of HPT's key generator allowed this third party to generate application keys that provide licensing credits for third parties without having to purchase those credits from HPT.  HPT's key generator: (i) is the single most valuable piece of intellectual property that HPT possesses; (ii) is the tool that generates the overwhelming majority of user licenses; and (iii) is the security control for substantially all of HPT's revenues.

What's more, after entering into the Purchase Agreement to receive $6.8 million, Cannata shared specific, highly confidential and proprietary trade secret information belonging to HPT concerning certain intricacies of HPT's software with the same competitor, which allowed that competitor to create and release a "cracked" version of HPT's software. This "cracked" version of HPT's software allows users to bypass HPT's licensing mechanism and tune vehicles without having to purchase credits from HPT. Cannata believed that if a public version of software was released that customers would not have to purchase credits from HPT and it would significantly harm HPT. Because of this, the "cracked" version of HPT's software has been extensively downloaded and used to HPT's detriment, is continuing to be used extensively to this day and will continue to be extensively used in the future as there is nothing that HPT can do to prevent users who have the "cracked" software from continuing to download and use it.

As if sharing HPT's key generator, source code files and confidential and proprietary trade secret information was not enough, Cannata wrongfully kept, maintained, accessed and used HPT source code files in connection with his development of a hardware device for the competitive company Syked ECU – once again, in direct violation of his various contractual obligations under the Purchase Agreement and applicable statutory law.  Cannata's acts and misconduct as detailed herein were willful, malicious and fraudulent.

The Court, and Cannata by his own admission(s), have eliminated all doubt as to Cannata's deception.  The Court granted summary judgment in favor of Plaintiff as to Cannata's breach of

the Purchase Agreement, finding no genuine issue of material fact that: (1) Cannata retained HPT's confidential and proprietary information after executing the Purchase Agreement; and (2) Cannata gave Syked ECU a flash drive with HPT's source code and other files and concealed this fact from Plaintiff HPT both before and after executing the Purchase Agreement. *See* ECF No. 157, at 20. Here, Plaintiff's claims arise from the aforementioned underlying facts – namely, Cannata's unauthorized dissemination, use and possession of HPT's confidential and proprietary information, including HPT's trade secrets, while he was a member of HPT and after he was paid $6.8 million for his membership interest. In light of Cannata's admissions and this Court's findings in connection with the Motions for Summary Judgment, discrete, isolated issues of fact exist on only certain causes of action and determinations as to damages remain for trial.

Cannata's penchant for deception has been continuous and emblematic of his conduct during this litigation, resulting in sanctions by the Court. *See generally* ECF No. 141. He scoffed at this Court and the litigation process by the same *modus operandi* of concealment and lies during the discovery process, knowingly possessing yet concealing that he had Plaintiff's intellectual property and "highly relevant documents." *Id.*, at 12-13. In order to obtain $6.8 million from Plaintiff, and *even after receiving* this enormous sum of money, Defendant Cannata kept pressing on with his malice and deceit.

In addition to contract claims, this is a suit for misappropriation of confidential proprietary information, including trade secrets, and related causes of action for violations of federal and state law, breach of fiduciary duty, fraud, unfair competition, conversion, and tortious interference with prospective contractual or economic relations.

This brief sets forth the facts of the case, the law with respect to liability, the law with respect to damages, the law with respect to costs, the law with respect to fees, and Plaintiff's contentions with respect to each such item.

The case is scheduled for a bench trial on January 30, 2023.

1    **II.**    **ADMITTED MISCONDUCT AND REMAINING ISSUES IN DISPUTE[5]**

2         The facts in this case are generally uncontested and formed the basis for summary judgment

3    in Plaintiff's favor and against Defendant Cannata on Plaintiff's breach of contract claim (Tenth

4    Claim for Relief). It was during his deposition[6] and later in his First Amended Answer to

5    Complaint (ECF No. 140), after being sanctioned by this Court, that Cannata made several factual

6    admissions.

7         First, Cannata conceded that he did in fact share and disseminate Plaintiff HPT's source

8    code, key generator, and other confidential and proprietary trade secret information with Syked

9    ECU and Sykes-Bonnett both prior to and subsequent to execution of the Purchase Agreement

10   dated October 20, 2016, when Plaintiff purchased his interest for $6,800,000.00. *See* Cannata Tr.,

11   ECF No. 112, at 29-31, 87-88, 108, 137-38, 170, 174, 177-79, 181, 201-03, 226, 246-47, 249-50,

12   251-58, 308-10, 370.  Also, during the time period prior to execution of the Purchase Agreement

13   and while Cannata was negotiating same, he was admittedly working with, assisting, providing

14   services for, and consulting for HPT competitor Syked ECU (and its principals), and at all times

15   concealed this activity from Prociuk and Piastri during the Purchase Agreement negotiations

16   throughout 2016.  *Id.*, at 29-31, 87-88, 108, 113-14, 121, 130-31, 134-35, 137-38, 149, 159-60,

17   166-68, 170, 174, 177-79, 181, 191-92, 201-03, 212-13, 226, 235-36, 246-47, 249-50, 251-58,

18   308-10, 370.   More specifically, Cannata admitted having concealed from his HPT co-Members

19   at this time that he shared with and disseminated to Syked ECU, and its principals, HPT's source

20   code, key generator, and other confidential and proprietary trade secret information.  *Id.*, at 29-31,

21   87, 108, 113-14, 121, 130-31, 134-35, 149, 159-60, 166-68, 174, 191-92, 212-13, 235-36, 249-50,

22   252).  It is further uncontested that these admitted activities by Cannata expressly violated the

23   restrictive covenants of the Purchase Agreement.  *Id.*, at 167, 219, 226-30, 232-38, 240-243, 245-

24

25   _____

     [5]    Plaintiff anticipates that it will be voluntarily dismissing the Eighth and Ninth Claims for

26   Relief for Unfair Competition under Nevada and Illinois statutes (*see* NRS Ch. 598, 815 ILCS
     505/1 *et seq.*), respectively.

27   [6]    *See generally* Transcript of the Deposition of Kenneth Cannata, ECF No. 112 (filed under
     seal) ("Cannata Tr.").

47, 249, 251-59, 261-62, 264, 267-69, 284, 295-97, 308-10.  It is uncontested that even subsequent to his execution of the Purchase Agreement and receipt of the $6.8 million buyout, Cannata retained Plaintiff's confidential and proprietary intellectual property - including source code files, the key generator, an MPVI administrative interface – which he was knowingly obligated to return to Plaintiff. *Id.*, at 86-88, 245-58, 308-10, 386, 437.

As noted, the Court has already found that with respect to the issue of breach of the Purchase Agreement (Tenth Claim for Relief), there is no genuine issue of material of fact that Cannata breached his obligations to Plaintiff and he has been found liable for breach of contract. *See* ECF No. 157, at 20.  Only issues pertaining to damages remain for trial on this count.

Although the Court was unable to find an absence of genuine issue of material fact on every cause of action at the time of the summary judgment motion(s), however, the same admissions of misconduct and operative facts give rise to liability under each of the counts asserted in Plaintiff's Complaint for Injunctive Relief and Damages ("Complaint").  *See* ECF No. 1.[7]

As to the Plaintiff's claim for breach of fiduciary duty (First Claim for Relief), there is no remaining issue as to whether Cannata owed Plaintiff a fiduciary duty as the Court disposed of this issue in the affirmative.  *See* ECF No. 157, at 14.  Defendant Cannata unequivocally did have a fiduciary duty to Plaintiff, Prociuk, and Piastri as it related to HPT's intellectual property and to disclose material facts related to his negotiations and dealings with Syked ECU and Sykes-Bonnett.  *Id*.

As the Court previously held, the sole disputed issue for trial on this claim is whether the information Cannata admittedly shared with Syked ECU/Sykes-Bonnett breached that duty by

---

[7]      Other causes of action which have either been disposed of prior to trial or as to which remain fully in dispute for trial are as follows and not addressed further in this subsection:  Third Claim for Relief for Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 (the Court granted summary judgment in favor of Defendant) (*see* ECF No. 157, at 21-23); Fifth Claim for Relief for Violation of the Copyright Act, 17 U.S.C. §1201(A) (1) (A); and Eleventh Claim for Relief for Tortious Interference with Prospective Contractual or Economic Relations.  The law and contentions regarding liability and damages on each of these claims are addressed further hereinbelow.

constituting improvements, enhancements, and derivative works to the "Technology" as defined by the Operating Agreement. *See* ECF No. 172, *at 5 citing* ECF No. 1-1, §4.2. At the summary judgment stage, the Court found that Plaintiff had not produced "definitive evidence" establishing that the information and software were improvements, enhancements, and derivative works of the original "Technology" under the Operating Agreement. However, Plaintiff did produce substantial evidence to support this position – namely, that the "Technology" originally contributed by Prociuk and Piastri to Plaintiff HPT included the VCM Suite Software, hardware device and firmware with various features, as well as certain algorithms, routines, and verifications methods. *See* ECF No. 172, *at 6 citing* ECF No. 1-1, Attachment A. This is accurate and will be further bolstered by evidence at trial. In addition to the issue of whether the information shared was protectable intellectual property of HPT (which it was), the issue of damages remains for trial.

As to Plaintiff's claim for fraud (Second Claim for Relief), there is no issue for trial as to the element that Cannata did in fact conceal material fact(s) under circumstances which created a duty to disclose. *See* ECF No. 157, at 14. The Court found a fiduciary duty, and Cannata has admitted his concealment throughout the 2016 negotiations. Per the Court's Order in connection with the Motions for Summary Judgment, the only remaining triable issues of fact on the Second Claim for Relief are: (1) whether Cannata had the requisite intent to fraudulently conceal his negotiations and dealings with Syked ECU; and (2) whether Plaintiff justifiably relied on Cannata's silence as a representation that he was not sharing information with competitors of HPT. *Id.*, at 14-15. Evidence exists in support of both elements, such as the execution of an NDA in March 2016 with a competitor, Cannata's use of a secret email account – instead of his regular HPT email account – to avoid detection and conceal his dealings with Syked ECU from Plaintiff (the "Yahoo Email Account"), Cannata's repeated representations and warranties in connection with the various drafts of the Purchase Agreement over the course of several months, the lack of any notice to HPT or its lawyers to modify, change or augment any such representations in connection with the various drafts of the agreement that were sent back and forth, his failure to ever notify or advise his partners of his actions in any respect whatsoever despite his alleged belief

that he was fully within his rights to do what he was doing and that it was "no big deal," causing his "wife" – rather than himself – to become an owner of Skyed ECU to conceal any connection to him and his admissions of concealment from his co-members at all times both prior to and after the Purchase Agreement.

The fact that Cannata continued to conceal matters after receiving $6.8 million and after this litigation was commenced, in pleadings and discovery with deceptive and misleading responses and non-production of documents, further evidences his intent to induce and perpetuate a false belief in Plaintiff, Plaintiff's justifiable reliance on his continued silence, and Plaintiff's acts, which would be otherwise different if not for his pattern of concealment. Not only did the Court call Cannata to task and sanction him for this behavior, but it fortifies the elements of Plaintiff's fraud claim. *See* ECF No. 141. In addition to the two factual issues noted above, the issue of damages remains for trial.

Plaintiff has several causes of action that revolve around Defendant's misappropriation of trade secrets, including its Fourth, Sixth, and Seventh Claims for Relief. Per the Court's Order in connection with the Motions for Summary Judgment, the remaining issue in dispute for trial for these three claims involves Plaintiff's identification of each misappropriated trade secret and demonstration of the trade secret's independent value. *See* ECF No. 157, at 17. Here, while Plaintiff respectfully submits that such identification of trade secrets[8] has been plead since the inception of this matter, Plaintiff will provide evidence as to why the intellectual property, software and information that Cannata shared with third parties and wrongfully possessed, used and disseminated after the buyout constituted trade secrets under applicable law. Plaintiff will

---

[8] As detailed in the Complaint, prior pleadings filed in this matter and party depositions, such trade secrets misappropriated by Cannata include (1) various HPT source code files (including source code for HPT's hardware device that Cannata used after the buyout in connection with his development of a hardware device for a competitor); (2) HPT's key generator; (3) internal documents concerning communications protocols; and (4) other confidential internal HPT documents such as the admin version of HPT's VCM Suite Software and proprietary information concerning certain intricacies of HPT's VCM Suite software. Any claim by Defendant concerning HPT's alleged failure to identify its trade secrets in this matter is misleading, unfounded and without merit.

1  additionally prove the independent economic value that HPT derives from such trade secrets.

2      Lastly, Plaintiff's Twelfth Claim for Relief is for conversion.  Cannata admitted to having

3  knowingly taken and retained confidential and proprietary intellectual property of Plaintiff, which

4  he has refused to return and knew he was obligated to return, including source code files, the key

5  generator, and an MPVI administrative interface.  *Compare* Cannata Tr., ECF No. 112 (filed under

6  seal), at 86-88, 245-58, 308-10, 386, 437 with ECF No. 1, at ¶¶192-195.    Therefore, the only

7  triable issue that remains as to this claim is damages.  *But see* ECF No. 157, at 21.

8  **III.    FACTS**

9      Please refer to the parties' Joint Statement of Stipulated Facts for Trial.

10  **IV.    LAW AND CONTENTIONS REGARDING LIABILITY**

11      Plaintiff has the burden of proving each of its claims by a preponderance of the evidence.

12  2 MCCORMICK ON EVIDENCE, The Burdens of Proof and Presumptions § 337 (7th ed.).

13  Plaintiff is not required, however, to present direct evidence as to each of those claims. *Id*. at §

14  338. The trier of fact may draw inferences based on the evidence presented. *Id*. at § 342. The

15  "burden of showing something by a 'preponderance of the evidence' . . . 'simply requires the trier

16  of fact "to believe that the existence of a fact is more probable than its nonexistence'." *Concrete*

17  *Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S.

18  602, 622 (1993) (citation omitted) (alteration in original).

19      **A.    Claim for Breach of Fiduciary Duty (First Claim for Relief)**

20      Under Nevada law, a member or manager of a limited liability company will be liable for

21  breach of fiduciary duty when: (1) a fiduciary duty exists; (2) the duty is breached; and (3) the

22  breach proximately caused the damages alleged.  *See Klein v. Freedom Strategic Partners, LLC*,

23  595 F. Supp.2d 1152, 1162 (D. Nev. 2009).  Although Nevada does not otherwise impose statutory

24  fiduciary duties, the Court has already determined in prior rulings that the Operating Agreement

25  did impose a fiduciary duty upon Cannata and amongst the HPT members to – at a minimum –

26  protect Plaintiff's intellectual property.  *See* ECF No. 44, at 8 *citing* ECF No. 1-1, at 5.  *See also*

27  ECF No. 157, at 11, *citing* Operating Agreement, §4.1.  Cannata's fiduciary duty to Plaintiff

1  plainly existed.

2       Cannata breached this duty by admittedly sharing software and technology with Syked

3  ECU/Sykes-Bonnett that Plaintiff's co-Members – alone – created and then contributed to

4  Plaintiff.  *See* ECF No. 1-1, Attachment A.  Section 4.2 of the Operating Agreement applies not

5  only to derivative works, but "Additional Technology" which includes "improvements,

6  enhancements, [and] derivative works to the Technology."  *Id.*, at §§4.1, 4.2

7       As a member of HPT, Cannata's duties and obligations extended beyond the "Technology"

8  to all "improvements, enhancements, [and] derivative works to the Technology."  Here, the

9  "Technology" contributed by Prociuk and Piastri in connection with the Operating Agreement is

10  detailed in the Operating Agreement and included the VCM Suite Software, and additionally, in

11  algorithms, routines and verification methods.  *Id.*  The Court has already posited that "a reasonable

12  fact-finder could find that [this] information Cannata shared with Sykes-Bonnett – source code

13  files related to HPT's VCM Suite and a copy of HPT's key generator – constituted improvements,

14  enhancements, and derivative works of the original 'Technology' under the Operating

15  Agreement."  ECF No. 172, at 6.

16       It is undisputed that prior to October 20, 2016, Cannata had already shared certain HPT

17  source code files, HPT's "key generator, communication protocol documents," and an

18  administrative version of HPT's VCM Suite 2.23 with Sykes-Bonnett.  For example, on April 8,

19  2016, Cannata sent Sykes-Bonnett via his Yahoo Email Account the HPT source code file(s)

20  named ███████ and ████████, and document(s) containing the HPT MPVI Protocol.  On May

21  10, 2016, Cannata sent the HPT source code file named ██████ to Sykes-Bonnett using the

22  Yahoo Email Account.  On May 20, 2016, Cannata sent a file named ██████ to Sykes-Bonnett

23  using the Yahoo Email Account, which file is a beta admin version of the HPT VCM Suite

24  software.  On October 16, 2016, a mere four days before the execution of the Purchase Agreement,

25  Cannata sent the HPT source code file(s) named ████████ and ████████ to Sykes-Bonnett

26  using the Yahoo Email Account.

27       The source code files, key generator, admin software, documents and information detailed

above, which was wrongfully disseminated by Cannata while he was still a member of HPT, constitute protectable intellectual property of HPT under the Operating Agreement and, further, constituted improvements, enhancements, and derivative works of the original 'Technology' under the Operating Agreement. In wrongfully sharing, disseminating and failing to protect HPT's intellectual property while he was a member of HPT before the purchase of his membership interest, Cannata breached his fiduciary duty and HPT is entitled to substantial damages. Consequently, Plaintiff HPT will be entitled to a verdict in its favor and against Cannata on its First Claim for Relief for Breach of Fiduciary Duty and is entitled to an award of monetary damages and permanent injunctive relief.

### B.    Claim for Fraudulent Concealment (Second Claim for Relief)

Applying Illinois law, the Court has stated that a claim of fraudulent concealment requires Plaintiff to demonstrate: (1) the defendant concealed a material fact under circumstances that created a duty to disclose; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it, and (5) the plaintiff's reliance resulted in damages. *See* ECF No. 157, at 14 *citing Abazari v. Rosalind Franklin University of Medicine and Science*, 40 N.E.3d 264, 274 (Ill. App. 2015).

A party has a duty to disclose material facts to another when a fiduciary relationship exists between them, and the Court has already held that Cannata had such a duty to Plaintiff.  *See* ECF No. 157, at 14 *citing Linkepic Inc. v. Vyasil, LLC*, 370 F.Supp.3d 906, 917 (N.D. Ill. 2019) and ECF No. 44, at 8.   The Court has similarly held that the fourth element (that HPT would have acted differently had it known of the concealed information) is satisfied.  *Id.*, at 15.

Per the Court's Order on the Motions for Summary Judgment, under this cause of action, all that remains for determination at trial are the following issues: (1) whether Cannata had the requisite intent to fraudulently conceal his dealings with Syked ECU and Sykes-Bonnett; (2)

1   whether Plaintiff justifiably relied on Cannata's silence as a representation that he was not sharing
2   information with competitors; and (3) the resultant damages.  *See* ECF No. 157, at 14-15.

3        As alluded to hereinabove in Section II of this Trial Brief, evidence that Cannata engaged
4   in deception and concealment continuously both before and after execution of the Purchase
5   Agreement is strongly indicative of both his intent to fraudulently conceal his dealings, and also
6   of Plaintiff's justifiable reliance. To the extent Cannata would still conceal his activities even after
7   receiving $6.8 million and as this litigation progressed, supports the requisite elements of
8   fraudulent concealment.

9        Accordingly, Plaintiff HPT will be entitled to a verdict and an award of monetary damages
10  in its favor and against Cannata on its Second Claim for Relief for Fraudulent Concealment.

11  **C.   Claim for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C.**
12  **§1836 *et seq*. (Fourth Claim for Relief)**

13       On May 11, 2016, Congress enacted the Defend Trade Secret Act ("DTSA"), 18 U.S.C. §
14  1832 *et seq*.. *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020). The DTSA creates a private
15  right of action for misappropriation where such "misappropriation of the trade secret is related to
16  a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §
17  1836 (b) (1); *see also Attia v. Google LLC*, 983 F.3d at 424 ("DTSA creates a private right of
18  action for 'any misappropriation of a trade secret . . . for which any act occurs on or after the date
19  of the enactment of [the] Act.'") (citation omitted).

20       The DTSA is a federal statute which prohibits the theft of trade secrets. 18 U.S.C.A. §
21  1832. Its purpose is to "give American companies the opportunity to protect against and remedy
22  misappropriation of important proprietary information." B. Cohen, M. Renaud & N. Armington,
23  *Explaining the Defend Trade Secrets Act,* BUSINESS LAW TODAY (Sept. 2016).

24       DTSA defines a "trade secret" as information that "the owner thereof has taken reasonable
25  measures to keep…secret" and that "derives independent economic value, actual or potential, from
26  not being generally known to…another person who can obtain economic value from the disclosure
27  or use of the information." *Attia* at 424 (*citing* 18 U.S.C. § 1839(3)). "The statute provides the

following three definitions of 'misappropriation': (1) the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;' (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent. *Id.* (*citing* 18 U.S.C. §§ 1839(5) (A), (5) (B)).

A trade secret consists of information as to which the owner has taken reasonable measures to keep secret and derives actual or potential value from not being generally known to or readily ascertainable by the general public. 18 U.S.C. § 1839(3). A "trade secret" under DTSA is defined broadly as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *Inteliclear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (*quoting* 18 U.S.C. § 1839(3)). Protectable trade secrets must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." *Id.* Therefore, as recognized by the *Inteliclear* court, "the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Id.* (*citing* 18 U.S.C. §§ 1839(3), (5)).

The "owner" of a trade secret is the person or entity in whom or in which rightful legal or equitable ownership resides. 18 U.S.C. § 1839(4).

The term "misappropriation" means: (1) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret by a person who used improper means to acquire knowledge of the trade secret; or (3) disclosure or use of a trade secret by a person who knew or had reason to know at the time of disclosure or use that the trade secret was derived through a person who had used improper means to acquire the trade secret; or (4) disclosure or use of a trade secret by a

person who acquired the trade secret under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (5) disclosure or use of a trade secret by a person who derived the trade secret through a person who owed a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (6) disclosure or use of a trade secret by a person who before a material change of his or her position knew or had reason to know that it was a trade secret, and that knowledge of it had been acquired by accident or mistake. 18 U.S.C. § 1839(5).

A trade secret is unlawfully acquired if the defendant "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5) (A). "Improper means" include, "theft, bribery, misrepresentation, [or] breach or inducement of a breach of a duty to maintain secrecy . . ." 18 U.S.C. § 1839(6) (A).

To prevail on a claim for violation of the DTSA, Plaintiff must prove: (1) the existence of a trade secret that is related to a product or service used in, or intended for use in, interstate commerce; (2) ownership of the trade secret by Plaintiff; and (3) an actual or threatened misappropriation of the trade secret. 18 U.S.C. §1836.

Here, the evidence will show that: (1) Defendant Cannata had access to HPT's trade secrets, specifically HPT source code files (including source code for HPT's hardware device), HPT's key generator, internal documents concerning communications protocols and other confidential internal HPT documents, the admin version of HPT's VCM Suite Software and proprietary information concerning certain intricacies of HPT's VCM Suite software; (2) HPT's trade secrets are not generally known to, or readily ascertainable by, the general public or its competitors; (3) HPT's trade secrets have independent value, both actual and potential, because they are not generally known – and not readily ascertainable by proper means – by other persons who can obtain economic value from their disclosure and use; (4) HPT undertook significant efforts to maintain the confidential nature of its trade secrets; (5) Defendant Cannata misappropriated HPT's trade secrets without HPT's knowledge or consent; (6) Defendant's misappropriation of HPT's trade secrets was willful and malicious; (7) Defendant Cannata used, and may be continuing to

use, HPT's trade secrets to benefit himself to the detriment of HPT; and (8) as a result of Defendant Cannata's misappropriation of trade secrets, HPT has suffered and will continue to suffer damages.

Thus, HPT will be entitled to a verdict in its favor and against Cannata on its Fourth Claim for Relief for violation of the DTSA for monetary damages and permanent injunctive relief.[9]

**D.** **Claim for Violation of the Copyright Act, 17 U.S.C. §1201(a) (1) (A) (Fifth Claim for Relief)**

In enacting what is known as the Digital Millennium Copyright Act ("DMCA"), Congress sought to mitigate the problems presented by copyright enforcement in the digital age. The first provision of the Act) () ( is a general prohibition against "circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]." *See, e.g. MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010) *citing* 17 U.S.C. §1201(a) (1) (A). This prohibits the circumvention of any technological measure that effectively controls access to a protected work and grants copyright owners the right to enforce that prohibition. As used in § 1201(a), to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a) (3) (A). The prohibition in 1201(a) (1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful.

The evidence in this matter shows that Plaintiff was the owner of its intellectual property. Plaintiff will demonstrate that Cannata used and copied HPT's source code in connection with the development of a hardware device without authority to do so. Furthermore, Cannata did so willfully and for his own private commercial gain, causing damages to Plaintiff.

---

[9]     The specific nature and extent of HPT's trade secret misappropriation damages is detailed in Section 5.E below. Significantly, the DTSA, NTSA and ITSA at issue in this case expressly permit avoided costs as a proper measure of unjust enrichment damages. *See* 18 U.S.C. §1836(b) (3) (B). *See also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 U.S. Dist. LEXIS 75875, at *23 (S.D.N.Y. Apr. 20, 2021) (avoided costs are recoverable as damages for unjust enrichment under the DTSA and its state law counterparts derived from the Uniform Trade Secrets Act ("UTSA")).

As such, HPT will be entitled to a verdict in its favor and against Cannata on its Fifth Claim for Relief for violation of the DMCA in the form of monetary damages and permanent injunctive relief.

**E.**      **Claim for violation of the Nevada Uniform Trade Secrets Act, NRS Chapter 600A (Sixth Claim for Relief)**

Similar to the DTSA discussed above, the Nevada Uniform Trade Secret Act ("NTSA") has "substantially similar elements" in common with DTSA and is subject to the same analysis. *See Switch Ltd. v. Fairfax*, No. 2:17- cv-02651-GMN-VCF, 2018 U.S. Dist. LEXIS 148818, *10 (D. Nev. Aug. 30, 2018); *see also Physician's Surrogacy, Inc. v. German,* No. 17-cv-718-MMA, 2018 U.S. Dist. LEXIS 16261, *4 (S.D. Cal. Jan. 31, 2018). Under the NTSA, Plaintiff HPT must prove that: (1) it possessed a valuable trade secret; (2) Cannata misappropriated the trade secret(s) through use, disclosure, or nondisclosure of use of the trade secret; and (3) that his misappropriation was made in breach of an express or implied contract or by a party with a duty not to disclose.  *See, e.g. Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 351, 358 (Nev. 2000).  *See also Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 958 (D. Nev. 2018). "Misappropriation" under the NTSA is likewise substantially similar to DTSA's standards. *See Chemeon Surface Tech*, 312 F. Supp. 3d at 957 (*citing* NRS 600A.030(2)).

There is no dispute – because  he has admitted as much – that Cannata misappropriated Plaintiff's intellectual property.  Further, Cannata did so in breach of an express contract and a fiduciary duty not to disclose such intellectual property.  Here, the only remaining issue at trial under HPT's claims for violation of the NTSA, DTSA, and the similar Illinois statute (discussed below) is HPT's identification of the specific trade secrets at issue and their economic value.  *See* ECF No. 157, at 17.  As discussed above, HPT will present at trial evidence of its trade secrets, specifically HPT source code files (including source code for HPT's hardware device), HPT's key generator, internal documents concerning communications protocols and other confidential internal HPT documents, the admin version of HPT's VCM Suite Software and proprietary information concerning certain intricacies of HPT's VCM Suite software.  HPT will additionally

16

present the economic value of HPT's trade secrets at trial.

Thus, HPT will be entitled to a verdict in its favor and against Cannata on its Sixth Claim for Relief for violation of the NTSA for monetary damages and permanent injunctive relief.

### F.  Claim for Violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (Seventh Claim for Relief)

Likewise, the Illinois Trade Secret Act ("ITSA") treats trade secrets, and their protection, similarly to DTSA.  Under ITSA, a plaintiff must prove that "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation."  *Property Rights Law Group, P.C. v. Lynch*, No. 13-00273 SOM/RLP, U.S. Dist. LEXIS 127330, *7 (D. Haw. Sept. 6, 2013) (*quoting Parus Holdings, Inc. v. Banner & Witcoff, Lt*d., 585 F. Supp. 2d 995, 1005 (N.D. Ill. 2008)).  ITSA's definition of "trade secret" is also substantially similar to DTSA's.  *See* 765 ILCS 1065/2(d).

Consequently, there is little discernable difference between the ITSA and the previously discussed Nevada statute and also the federal DTSA.  The ITSA likewise prohibits "misappropriation" of trade secrets and provides certain remedies.  765 ILCS 1065/2 defines the key statutory terms.  "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.  Reverse engineering or independent development shall not be considered improper means."  *See* 765 ILCS 1065/2(a).  "Misappropriation" is defined as:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
> > (A) used improper means to acquire knowledge of the trade secret; or
> >
> > (B) at the time of disclosure or use, knew or had reason to

know that knowledge of the trade secret was:

> (I) derived from or through a person who utilized improper means to acquire it;

> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

> (C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See* 765 ILCS 1065/2(b).   Further, the ITSA defines "Person" to mean "a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other for-profit or not-for-profit legal entity." *See* 765 ILCS 1065/2(c).  Finally, a "Trade secret" means:

> …[i]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d).

As discussed above, Defendant Cannata had access to HPT's trade secrets, specifically, HPT source code files (including source code for HPT's hardware device), HPT's key generator, internal documents concerning communications protocols and other confidential internal HPT documents, the admin version of HPT's VCM Suite Software and proprietary information concerning certain intricacies of HPT's VCM Suite software.  These trade secrets were not and are not generally known to, or readily ascertainable by, the general public or Plaintiff's competitors.

These trade secrets have independent value, both actual and potential, because they are not generally known – and not readily ascertainable by proper means – by other persons who can obtain economic value from their disclosure and use.  Plaintiff HPT undertook significant efforts to maintain the confidential nature of its trade secrets.  Defendant Cannata misappropriated Plaintiff's trade secrets did so willfully and maliciously, and admittedly did so without Plaintiff's knowledge or consent.  Cannata used, and may be continuing to use, Plaintiff's trade secrets to benefit himself to the detriment of Plaintiff, resulting in damage to HPT.

Thus, HPT will be entitled to a verdict in its favor and against Cannata on its Seventh Claim for Relief for violation of the ITSA for monetary damages and permanent injunctive relief.[10]

### G. Claim for Breach of Contract (Tenth Claim for Relief)

The Court granted summary judgment in favor of Plaintiff HPT and against Defendant Cannata on Plaintiff's Tenth Claim for Relief for breach of contract, leaving only the issue of damages for trial.  *See* ECF No. 157, at 19-21, 24.

### H. Claim for Tortious Interference with Prospective Contractual or Economic Relations (Eleventh Claim for Relief)

The elements for tortious interference with prospective economic advantage are: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.  *See, e.g. In re Amerco Derivative Litig.*, 127 Nev. 196, 252 P.3d 681, 702 (Nev. 2011) (*citing Wichinsky v. Mosa*, 109 Nev. 84, 847 P.2d 727, 729- 30 (1993)). Tortious interference occurs when someone improperly induces or otherwise purposely causes a third person not to enter into or continue a business relation with another. Restatement (Second) of Torts § 766B.

---

[10] Plaintiff anticipates that it will be voluntarily dismissing the Eighth and Ninth Claims for Relief for Unfair Competition under Nevada and Illinois statutes.  *Infra,* at fn. 5. Thus, no discussion of those claims is included below.

Here, the evidence will show that Plaintiff had valid business and/or contractual relationships and/or expectancies with its customers and that Defendant Cannata had knowledge of the same. Defendant Cannata had intent to harm Plaintiff by preventing its prospective business relationships and did so without any privilege or justification.  By improperly disseminating Plaintiff's: (i) key generator (that allowed a third party to generate and sell fraudulent, unauthorized credits) and (ii) confidential and proprietary trade secret information concerning certain intricacies of HPT's software, which precipitated the creation and release of a "cracked" version of HPT's software that allows users to bypass HPT's licensing mechanism and tune vehicles without having to purchase credits from HPT, Cannata interfered with HPT's relationships with customers and prospective customers.  Cannata acted with an intent to harm HPT because he believed that if a public version of software was released that customers would not have to purchase credits from HPT.  As a result of Defendant's conduct, HPT has suffered substantial damages, which are continuing to accrue.

Consequently, Plaintiff HPT is entitled to a verdict in its favor and against Cannata on its Eleventh Claim for Relief for tortious interference with prospective contractual economic relations for monetary damages and permanent injunctive relief.

## I.    Claim for Conversion (Twelfth Claim for Relief)

To prevail on a conversion claim under Nevada law, a plaintiff must show that: (1) the defendant committed a distinct act of dominion wrongfully exerted over the plaintiff's personal property; (2) the act was in denial of or inconsistent with the plaintiff's title or rights to the property; and, (3) the act was in derogation, exclusion, or defiance of the plaintiff's title or rights in the personal property. *See Amatrone v. State Farm Fire and Casualty Co.*, 2018 U.S. Dist. LEXIS 19817, 2018 WL 772078, at *5 (D. Nev. Feb. 7, 2018) (*citing Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 5 P.3d 1043, 1049 (Nev. 2000)). Conversion is an act of general intent, meaning that no wrongful intent is required, and liability is not excused by care, good faith, or lack of knowledge. *See M.C. Multi-Family Development, LLC v. Crestdale Associates, Ltd.*, 124 Nev. 901, 193 P.3d 536, 543 (Nev. 2008). Although money cannot typically be the subject of

a conversion claim, it can be where the money is identifiable, such as being set aside in a separate account or separately earmarked.

There is no dispute in this case that Defendant Cannata has admitted to receiving his $6.8 million buyout but still retained (unbeknownst to Plaintiff) HPT's confidential and proprietary intellectual property – including source code files, the key generator, an MPVI administrative interface – which he was knowingly obligated to return to Plaintiff. *See* Cannata Tr. (ECF No. 112 (fined under seal), at 86-88, 245-58, 308-10, 386, 437. There is no dispute that, under the Purchase Agreement, this retention was inconsistent with Plaintiff's rights to that property and that Cannata's acts were in clear derogation and defiance of HPT's rights in its property. *See* ECF No. 157, at 17, 20.

Plaintiff HPT is therefore entitled to a verdict in its favor and against Defendant Cannata on the Twelfth Claim for Relief for Conversion for monetary damages and permanent injunctive relief to compel the return any and all of HPT's intellectual property in his possession, custody or control.

## V.   LAW AND CONTENTIONS REGARDING DAMAGES

### A.   Overview

A District Court has "wide discretion in calculating an award of damages, and this award will not be disturbed on appeal absent an abuse of discretion." *See Frantz v. Johnson*, 116 Nev. 455, 469 (Nev. 2000) *citing Diamond Enters., Inc. v. Lau*, 113 Nev. 1376, 1379, (Nev. 1997). With respect to proof of damages, a party seeking damages has the burden of providing the court with an evidentiary basis upon which it may properly determine the amount of damages. Damages need not be proven with mathematical exactitude, and that the mere fact that some uncertainty exists as to the actual amount of damages sustained will not preclude recovery. *See Mort Wallin v. Commercial Cabinet*, 105 Nev. 855, 857 (Nev. 1989).

A party seeking damages meets its burden of proof by utilizing an expert to assist in the calculation of the total damages sustained, and this expert testimony need only be non-speculative and based on facts known to the expert at the time. *See Frantz v. Johnson*, 116 Nev. at 469-70.

*See also Lee v. Enterprise Leasing Company-West, LLC*, 30 F.Supp. 3d 1002, 1019, *Bader v. Cerri*, 96 Nev. 352, 357 (Nev. 1980) *citing Brown v. Lindsay*, 68 Nev. 196, 228 (Nev. 1951) (where "a reasonable method for ascertaining the extent of damage is offered through testimony, the fact that some uncertainty exists as to the actual amount of damage sustained, does not preclude recovery").

The damages available in this case vary somewhat between the different asserted claims. However, the same operative facts give rise to Plaintiff's claims for damages under multiple counts. For example, Defendant's misconduct in connection with his wrongful dissemination, disclosure and misappropriation of the HPT's confidential and proprietary information, including HPT's trade secrets, **prior to** the October 20, 2016 Purchase Agreement, gives rise to an award of damages in favor of Plaintiff HPT and against Defendant Cannata under the following counts:

- Breach of Fiduciary Duty (First Claim for Relief)

- Fraudulent Concealment (Second Claim for Relief)

- Statutory Trade Secret Misappropriation Claims under the DTSA, NTSA and ITSA (Fourth Claim for Relief, Sixth Claim for Relief and Seventh Claim for Relief)

- Tortious Interference with Prospective Economic Relations (Eleventh Claim for Relief)

Similarly, Defendant's misconduct in connection with his wrongful possession, use, dissemination, disclosure and misappropriation of HPT's confidential and proprietary information, including HPT's trade secrets, **after** the execution of the October 20, 2016 Purchase Agreement, gives rise to an award of damages in favor of Plaintiff HPT and against Defendant Cannata under the following counts:

- Statutory Trade Secret Misappropriation Claims under the DTSA, NTSA and ITSA (Fourth Claim for Relief, Sixth Claim for Relief and Seventh Claim for Relief)

- Violation of the DMCA arising under 17 U.S.C. § 1201(a) (1) (A) (Fifth Claim for Relief)

- Breach of Contract (Tenth Claim for Relief)

- Tortious Interference with Prospective Economic Relations (Eleventh Claim for

Relief)

- Conversion (Twelfth Claim for Relief)

Likewise, the categories of damages outlined hereinbelow are common amongst various claims.  For example, the damages incurred by Defendant Cannata's dissemination of Plaintiff's trade secrets gives rise to multiple statutory and common law claims.

In the Order dated February 24, 2022, this Court stated:

> Cannata admitted that he retained in his possession confidential and proprietary information of HPT after the execution of the Purchase Agreement in violation of §6.1. (citations omitted).  Cannata also admitted that he provided a flash drive and source code files, containing confidential and proprietary information to Syked without notifying HPT prior to, and after, the effective date of the Purchase Agreement in violation of §§6.3 and 6.4 (citations omitted).  Accordingly, because there exists no genuine issue of material fact that Cannata breached §§6.1, 6.3 and 6.4 of the Purchase Agreement, the Court will grant HPT's motion for partial summary judgment as it pertains to liability under its breach of contract claim.

ECF No. 157, at 20.

The Court has acknowledged that Defendant Cannata's possession and dissemination of HPT's confidential and proprietary intellectual property *after* the Purchase Agreement as well as his conduct in violation of the restrictive covenants therein constituted a breach of the Purchase Agreement.  Although the Court did not grant summary judgment on Plaintiff's other claims, this evidence, along with the other evidence discussed hereinabove, will establish Defendant's liability as to such other claims and the resultant damages.

Notably, in a 2021 case in the United States District Court for the Eastern District of Texas a plaintiff software company obtained a $152 million verdict after one of its clients was found liable for misappropriation of trade secrets to develop a rival product.  *See ResMan, LLC v. Karya Prop. Mgmt., LLC,*  No 4:19-cv-00402, 2021 U.S. Dist. LEXIS 146422 (E.D. Tex. Aug. 5, 2021).  The Court subsequently entered final judgment in favor of the plaintiff and against defendants in the amount of $62 million.  *Id*.  Cannata's conduct herein is far more egregious than the defendants

in that matter and supports a substantial award of monetary damages in favor of HPT and against Cannata as well as exemplary and/or punitive damages (as applicable) and attorneys' fees and costs.

**B.**     <u>**Pre-judgment and Post-judgment Interest**</u>

Post-judgment interest for any judgment obtained in a federal district court is governed by 28 USC 1961(a), which provides for daily interest as follows:

> (a)  Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

28 U.S.C. §1961(a).  *See also* 28 U.S.C. §1961(b).

Absent a federal statute for prejudgment interest, Nevada law provides:

> 1. In all judgments and decrees, rendered by any court of justice, for any debt, damages or costs, and in all executions issued thereon, the amount must be computed, as near as may be, in dollars and cents, rejecting smaller fractions, and no judgment, or other proceedings, may be considered erroneous for that omission.

> 2. When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages, which draws interest only from the time of the entry of the judgment until satisfied, at a rate equal to the prime rate at the largest bank in Nevada as ascertained by the commissioner of financial institutions on January 1 or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent. The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied.

NRS 17.130.

In the Ninth Circuit, prejudgment interest in a case with federal question jurisdiction is in the broad discretion of the Court based on the equities of each particular case. *See, e.g. Warfield*

1   *v. Alaniz*, No. CV 03-2390-PHX-JAT, 2007 U.S. Dist. LEXIS 51527, at *8 (D. Ariz. July 16,

2   2007).  *See also Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th

3   Cir. 1984) (holding that the rate specified in 28 U.S.C. § 1961(a) applies to prejudgment interest

4   claims, subject to the equities of each particular case); *Wessel v. Buhler*, 437 F.2d 279, 284 (9th

5   Cir. 1971) (holding that the determination of prejudgment interest is a "question of fairness, lying

6   within the Court's sound discretion to be answered by balancing the equities").   Generally, the

7   Ninth Circuit utilizes the interest rate prescribed in §1961(a) for fixing the rate of prejudgment

8   interest in cases brought under the court's federal question jurisdiction. *See, e.g. Asdale v. Int'l

9   Game Tech.*, 763 F.3d 1089, 1093 (9th Cir. 2014); *Oak Harbor Freight Lines, Inc. v. Sears

10  Roebuck & Co.*, 513 F.3d 949, 961 (9th Cir. 2008); *Traf Intercontinental Elektronik-Handels

11  GmbH v. Sonocine, Inc.*, No. 3:17-cv-00672-LRH-WGC, 2019 U.S. Dist. LEXIS 29375, at *13

12  (D. Nev. Feb. 25, 2019)

13      **C.      Damages for Breach of Fiduciary Duty**

14          In Nevada, a breach of fiduciary duty claim seeks damages for injuries that result from the

15  tortious conduct of one who owes a duty to another by virtue of the fiduciary relationship.  *See,

16  e.g., Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).

17          The Court has already determined that Defendant Cannata did, in fact, owe fiduciary duties

18  to Plaintiff.  Upon finding a breach by his conduct, Plaintiff's damages for Defendant's breach of

19  his fiduciary duty are $14,760,000.00. This amount is comprised of the following elements: (1)

20  overpayment of Cannata's membership interest in HPT ($6,000,000.00); (2) the value of Plaintiff's

21  intellectual property misappropriated by Cannata ($4,200,000.00); (3) the lost profits relating to

22  fraudulent credits ($200,000.00); and (4) the lost profits (5 years) relating to cracked software

23  ($4,360,000.00).    Plaintiff is also entitled to prejudgment and post judgment interest. *See* 28

24  U.S.C. §1961; *see also* NRS 17.130.

25      **D.      Damages for Fraudulent Concealment**

26          "Fraud" means an intentional misrepresentation, deception or concealment of a material

27  fact known to the person with the intent to deprive another person of his or her rights or property

or to otherwise injure another person.  *See* NRS 42.001(2).  Where it is proven by clear and convincing evidence that a defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to compensatory damages, may recover an award of exemplary or punitive damages.  *See* NRS 42.005 (1).

Exemplary damages may not exceed three (3) times the amount of compensatory damages awarded to the Plaintiff if the amount of compensatory damages is $100,000 or more; or $300,000 if the amount of compensatory damages awarded is less than $100,000.  *See* NRS, §42.005(1)(a)-(b).  Here, HPT seeks an award of damages as well as exemplary damages and, therefore, the trier of fact shall make a finding of whether such damages shall be assessed and the amount, in a subsequent proceeding.  *See* NRS, §42.005(3).

Thus, on Plaintiff's fraudulent concealment claim Plaintiff's compensatory damages are the $6,000,000.00 – the amount of the overpayment for Defendant Cannata's membership interest which would not have been paid to him but for his fraudulent concealment and misconduct.  In addition, Plaintiff shall be entitled to up to an additional $18,000,000.00 in punitive damages if more than $100,000 in compensatory damages is awarded, or an additional $300,000 in punitive damages if the Court awards less than $100,000 in compensatory damages.  Plaintiff is also entitled to prejudgment and post judgment interest.  *See* 28 U.S.C. §1961; *see also* NRS 17.130.

### E.   Damages for Misappropriation of Trade Secrets

Upon a finding of misappropriation of trade secrets, there is little deviation between the measure of damages for Plaintiff's DTSA, NTSA, and ITSA claims pled in its Fourth, Sixth, and Seventh Claims for Relief.

The DTSA states that:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may…award damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of a liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade

secret.

> … if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded [above].

*See* 18 U.S.C. §1836(b)(3).

Similarly, upon the finding of misappropriation of trade secrets, the ITSA provides for damages in the form of actual loss or unjust enrichment, stating that:

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

> … If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made [above].

*See* 765 ILCS 1065/4.

The NTSA is nearly identical, providing in relevant part that:

> … a complainant is entitled to recover damages for misappropriation. Damages include both loss caused by misappropriation and unjust enrichment caused by misappropriation that is not taken into account in computing the loss. In lieu of damages measured by any other methods, damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

> If willful, wanton or reckless misappropriation or disregard of the rights of the owner of the trade secret exists, the court may award exemplary damages in an amount not exceeding twice the award made [above].

*See* NRS 600A.050.

This provision of the NTSA does not in any way affect any contractual remedies, whether or not based upon misappropriation of a trade secret. *See* NRS 600A.090(2)(a). Nor does it affect any other civil remedies that are not based upon misappropriation of a trade secret. *See* NRS 600A.090(2)(b).

Consequently, damages for misappropriation of trade secrets may include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing the actual loss.   The Court may also award exemplary damages for willful, wanton, reckless, or malicious conduct in an amount up to two times the amount of actual damages under all three statutes. *See* 18 U.S.C § 1836(3)(B); *see also* NRS 600A.050(2); *see also* 765 ILCS 1065/4.   Willful and malicious means that a defendant has acted voluntarily and intentionally with knowledge that his or her actions would injure the plaintiff or with reckless indifference as to whether his or her actions would injure the plaintiff. O'MALLEY & J. GRENIG, §§ 127:14-127:15, at 435-437.

Defendant Cannata has repeatedly advanced the same erroneous claim that his avoided costs cannot serve as the basis for Plaintiff's unjust enrichment damages.   This claim is false and unfounded.   As the Court previously observed, "the Ninth Circuit and district courts have recognized that unjust enrichment, in the context of trade secrets damages, may be appropriate where the infringer receives a benefit as a result of their wrongdoing … [s]pecifically, a plaintiff may seek recovery of 'development costs' saved by misappropriating, rather than developing, the trade secrets at issue."   ECF No. 157., at 18 *citing Bourns, Inc v. Raychem Corp.*, 331 F.3d 704, 709-10 (9th Cir. 2003), *Oracle Corp. v. SAP AG*, 734 F.Supp.2d 956, 970 (N.D. Cal. 2010), and *Ajaxo, Inc. v. E\*Trade Group, Inc.*, 135 Cal. App. 4th 21, 37 Cal. Rptr. 3d 221 (2005)).

The relevant statutes at issue here also expressly permit avoided costs as a proper measure of unjust enrichment damages. *See* 18 U.S.C. §1836(b)(3)(B); *see also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 U.S. Dist. LEXIS 75875, at \*23 (S.D.N.Y. Apr. 20, 2021) (avoided costs are recoverable as damages for unjust enrichment under the DTSA and its state law counterparts derived from the Uniform Trade Secrets Act ("UTSA")).[11]

---

[11]     Further discussion on this topic and case law may be found in Plaintiff HP Tuners, LLC's Response in Opposition to Defendant Kenneth Cannata's Motion in Limine to Preclude and Reference to Development Costs Incurred by HP Tuners, LLC for Alleged Trade Secrets. *See* ECF No. 190.

Furthermore, avoided costs damages under the theory of unjust enrichment represent "the wrongful gain to the party that misappropriated the trade secret." *Id.* at 24. This "wrongful gain" may be quantified as the research and development funds saved by the defendant, which the plaintiff may recover in full. *Id.* at *23-24. A plaintiff may use its own research and development costs as a proxy for what the defendant "saved" by virtue of the misappropriation, which is a "common way to determine a wrongdoer's avoided costs." *Id.* at 25 *citing GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016).

Under the NTSA, a complainant is entitled to recover damages for misappropriation. *See* N.R.S. §600A.050. Damages include both a plaintiff's loss caused by the misappropriation and a defendant's unjust enrichment gained by the misappropriation that is not taken into account in computing the loss. In lieu of damages measured by any other methods, a reasonable royalty may be imposed for a misappropriator's unauthorized disclosure or use of a trade secret. If willful, wanton or reckless misappropriation or disregard of the rights of the owner of the trade secret exists, the court may award exemplary damages of up to twice the foregoing award. *Id.*

Defendant has also repeatedly advanced the contentions that HPT's damages asserted herein are speculative. However, as this Court articulated in its Order on the Motions for Summary Judgment in eschewing Defendant's claims in this regard, the damages alleged by HPT are not speculative but rather:

> … HPT has submitted a precise estimate of its damages as calculated in Bone's expert report, and the concrete numbers provided prevent a jury from "speculation or guesswork" in determining the amount of damages to award. Cannata ultimately contests the reliability of the method of calculation, but such determinations are left best to the finder of fact …

ECF No. 157, at 13.

Accordingly, under Plaintiff's statutory claims for misappropriation of trade secrets, Plaintiff's damages for the actual loss caused by Defendant's misappropriation are $8,760,000.00. This amount is comprised of the following elements: (1) the value of Plaintiff's trade secrets misappropriated by Cannata ($4,200,000); (2) the lost profits relating to fraudulent credits

($200,000); and (3) the lost profits (5 years) relating to cracked software ($4,360,000).

Exemplary damages of up to $17,520,000 may also be awarded, in addition to injunctive relief, based on Defendant Cannata's willful, wanton or reckless misappropriation or disregard of the rights of Plaintiff HPT as the owner of the trade secrets at issue herein.  Plaintiff HPT is also entitled to recover its reasonable attorneys' fees and costs based on Defendant Cannata's willful and malicious misappropriation.  *See* NRS 600A.060, 765 ILCS 1065/5, 18 U.S.C. §1836(b)(3)(D).

In addition, Plaintiff is entitled to permanent injunctive relief preventing any continued use, possession or misappropriation of HPT's trade secrets and for an order compelling the turnover of any and all trade secrets of HPT in Cannata's possession, custody and/or control. Plaintiff is also entitled to prejudgment and post judgment interest. *See* 28 U.S.C. §1961; *see also* NRS 17.130.

### F.    Damages pursuant to the DMCA

17 U.S.C. §1203 prescribes the damages available under the DMCA (Fifth Claim for Relief), as follows:

> § 1203. Civil remedies
>
> (a)    Civil actions. Any person injured by a violation of section 1201 or 1202 [17 USCS § 1201 or 1202] may bring a civil action in an appropriate United States district court for such violation.
>
> (b)    Powers of the court. In an action brought under subsection (a), the court—
>
> (1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation, but in no event shall impose a prior restraint on free speech or the press protected under the 1st amendment to the Constitution;
>
> (2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;
>
> (3) may award damages under subsection (c);

(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

(c) Award of damages.

(1) In general. Except as otherwise provided in this title, a person committing a violation of section 1201 or 1202 [17 USCS § 1201 or 1202] is liable for either—

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2), or

(B) statutory damages, as provided in paragraph (3).

(2) Actual damages. The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(3) Statutory damages.

(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 [17 USCS § 1201] in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 [17 USCS § 1202] in the sum of not less than $2,500 or more than $25,000.

(4) Repeated violations. In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 [17 USCS § 1201 or 1202] within 3 years after a final judgment was entered against the person for another such violation, the court may increase the award of damages up to triple the amount that would otherwise be awarded, as the court considers just.

1    *See* 17 U.S.C. §1203.

2      For its DMCA claim, Plaintiff is entitled to damages in the amount of $250,000.00 based

3    on Cannata's use and copying of HPT's source code in connection with the development of a

4    hardware device for Syked ECU.  Statutorily, Plaintiff may recover not less than $200 or more

5    than $2,500 per act of circumvention, device, product, component, offer, or performance of

6    service, as the court considers just.  And, upon a showing of Cannata's repeated violations in which

7    the Court finds that he has violated section 1201 within 3 years after a final judgment was entered

8    against the person for another such violation, the court may increase the award of damages up to

9    triple the amount that would otherwise be awarded, as the court considers just.  HPT is also entitled

10   to an award of its attorneys' fees and costs as well as injunctive relief herein on its Fifth Claim for

11   Relief.   Plaintiff is also entitled to prejudgment and post judgment interest.  *See* 28 U.S.C. §1961.

12   *See also* NRS 17.130.

13     **G.**  **Damages for Breach of Contract**

14     Plaintiff has already been granted summary judgment in its favor and against Defendant

15   Cannata on the breach of contract claim set forth in the Tenth Claim for Relief.  *See* ECF No. 157.

16   In determining the amount of damages recoverable by reason of breach of contract, the law

17   attempts to place the non-defaulting party in the position it would have occupied had the contract

18   been performed. *See, e.g. LaGrange Construction, Inc. v. Kent Corp.*, 88 Nev. 271, 496 P.2d 766,

19   768 (1972); *see also Kelly Services, Inc. v. A2Z Global Staffing, Inc.*, No. 2:15-cv-01443-JAD-

20   PAL, 2017 U.S. Dist. LEXIS 2741, **13-14 (D. Nev. Jan. 6, 2017).

21     As detailed above, by virtue of Defendant's breaches of contract in sharing HPT's

22   confidential intellectual property  and disseminating confidential and proprietary trade secret

23   information by informing Syked ECU of certain intricacies of the VCM Suite Software that

24   enabled him to release a "cracked" version of software, Plaintiff has suffered damages in an

25   amount far in excess of the amount it paid Cannata ($6.8 million) for his membership interest,

26   which includes the value of the confidential and proprietary intellectual property of HPT that

27   Cannata misappropriated.

As such, Plaintiff HPT is entitled to an award of $8,760,000.00 on its Tenth Claim for Relief for Breach of Contract. This amount is comprised of the following elements: (1) the value of Plaintiff's trade secrets misappropriated by Cannata ($4,200,000); (2) the lost profits relating to fraudulent credits ($200,000); and (3) the lost profits (5 years) relating to cracked software ($4,360,000).[12]  Plaintiff is also entitled to prejudgment and post judgment interest.  *See* 28 U.S.C. §1961; *see also* NRS 17.130.

### H.   Damages for Tortious Interference

Pursuant to the Restatement (Second) of Torts § 774(A), "one who is liable to another for interference with a . . . prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the . . . prospective relation; (b) the consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation if they are reasonably to be expected to result from the interference."  Restatement (Second) of Torts § 774(A) comment b ("Whether the interference is with an existing contract or with a prospective contractual relation, one who becomes liable for it is liable for damages for the pecuniary loss of the benefits of the contract or the relation . . . And when the defendant's interference is with prospective contractual relations, the plaintiff may recover for the loss of profits to be made out of the expected contracts.").

This is the approach in Nevada.  A plaintiff who proves a claim of intentional interference

---

[12]     In addition, in the alternative, where fraud claims are involved, out-of-pocket-losses and a benefit-of-the-bargain metric may also be used and may be the most appropriate measure in such circumstances. *See Kelly Services,* 2017 U.S. Dist. LEXIS at *15.  The out-of-pocket measure is comprised of the difference between what the defrauded party gave and what it actually received. Under the benefit-of-the bargain measure, a plaintiff is awarded "the value of what [it] would have if the representations were true, less what [it] had actually received." *Id.* Here, in connection with the Purchase Agreement, Plaintiff HPT paid $6.8 million for: (1) Cannata's membership interest and (2) certain covenants from Cannata (e.g. that he would maintain the confidentiality of HPT's information, that he would return HPT's intellectual property and that he would not compete against HPT).  However, HPT never received the benefit of the bargain it paid for as Cannata was already in breach of those covenants on the day executed the Purchase Agreement and thereafter. Consequently, HPT did not get the benefit of its bargain in connection with the Purchase Agreement and, at a minimum, is entitled to damages in the amount of $6,000,000, *i.e.*, the amount it overpaid for Cannata's interest.

with contractual relations is entitled to recover damages for the pecuniary loss of the benefits of the contract; damages for actual harm to reputation, if they are reasonably to be expected to result from the interference; and consequential losses for which the interference is a legal cause." *See, e.g., National Right To Life Political Action Committee v. Friends of Bryan*, 741 F.Supp. 807, 812 (D.Nev. 1990) (*citing* Restatement (Second) of Torts § 774A (1979)). Damages need not be proven "to a mathematical certainty," but Plaintiff must introduce sufficient facts to enable the Court to arrive at an intelligent estimate of damage without speculation or conjecture." *Id.* (*citing Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456-57 (9th Cir. 1983)) and *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir. 1982)). This evidence may be presented in the form of a damages expert who could assist in the calculation of the total damages sustained by the tortious interference at issue. *See Frantz v. Johnson*, 999 P.2d 351 (Nev. 2000).

Plaintiff's damages on its Eleventh Claim for Relief for tortious interference total $4,560,000.00 which includes the: (1) lost profits relating to fraudulent credits ($200,000); and (2) lost profits (5 years) relating to cracked software ($4,360,000). Plaintiff is also entitled to prejudgment and post judgment interest. *See* 28 U.S.C. §1961; *see also* NRS 17.130.

## I.   Damages for Conversion

The full value of the property at the time of conversion is an appropriate measure of damages when the defendant is unable or unwilling to return the property. *See, e.g., Winchell v. Schiff*, 193 P.3d 946, 950 (Nev. 2008). When the conversion causes a "serious interference to a party's rights in his property," the injured party should receive full compensation for his actual losses but the property value is not the sole measure of damages. *Id.*, at 950-51.

Under NRS 42.005, however, punitive damages may also be awarded where the plaintiff proves fraud, malice, or oppression by clear and convincing evidence. *See* NRS 42.005. NRS 42.001(4) provides that "oppression" means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person. NRS 42.001(1) provides that "conscious disregard" means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences. Where it is proven by

clear and convincing evidence that a defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to compensatory damages, may recover an award of exemplary or punitive damages.

The value of Plaintiff's property which Defendant Cannata converted is $4,200,000. However, the Court is not limited to this number and may in its discretion award punitive damages pursuant to NRS 42.005 for Defendant Cannata's oppression and conscious disregard. See NRS 42.001 42.005. This would entitle Plaintiff up to an additional $12,600,000 in punitive damages if more than $100,000 in compensatory damages is awarded, or an additional $300,000 in punitive damages if the Court awards less than $100,000 in compensatory damages. Plaintiff is also entitled to prejudgment and post judgment interest. *See* 28 U.S.C. §1961. *See also* NRS 17.130.

In addition, Plaintiff is entitled to permanent injunctive relief preventing any continued use or possession of the intellectual property and for an order compelling the turnover of any and all intellectual property owned by HPT in Cannata's possession, custody and/or control.

## VI.    COSTS AND ATTORNEYS' FEES

Litigation expenses fall into two general categories: (1) those that are taxable as "costs" pursuant to 28 U.S.C. § 1920; and (2) those that are "non-taxable," but are "related to" attorney fees. Fed. R. Civ. P. 54(d). Pursuant to Fed. R. Civ. P 54(d)(1) and 28 U.S.C. § 1920, the prevailing party is entitled to costs, consisting of (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. § 1923; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under 28 U.S.C. § 1828.

The Ninth Circuit has found "out of pocket" expenses that would normally be charged to a fee-paying client are compensable. *See Grove v. Wells Fargo Fin. California, Inc.*, 606 F.3d 577, 580-81 (9th Cir. 2010). Reasonable out-of-pocket litigation expenses include the costs of postage,

photocopying, travel, lodging, filing fees, deposition expenses, legal research charges, copying, meals and messenger service. *See id.*; *see also Harris v. Marhoefer*, 24 F.3d 16, 19-20 (9th Cir. 1994). They also include such expenses as fees paid to jury and trial consultants. *See Carter v. Chicago Police Officers,* 1996 WL 446756, at *4 (N.D. Ill. Aug. 1, 1996).

Subject to "review" by the court, the "clerk may tax costs on 14 days' notice." Fed. R. Civ. P. 54(d) (1). A bill of costs "must be filed with the Clerk within twenty-one (21) days from entry of judgment." LCR 54(d). Once Plaintiff prevails on its claims at trial, Plaintiff will file an appropriate bill of costs pursuant to Rule 54(d) (1) and LCR 54.

Finally, attorneys' fees are available with respect to Plaintiff's statutory claims as noted hereinabove as follows:

    a.  For Plaintiff's Fourth Claim for Relief (Defend Trade Secrets Act) pursuant to 18 U.S.C. §1836(b)(3)(D);

    b.  For Plaintiff's Fifth Claim for Relief (Digital Millennium Copyright Act) pursuant to 17 U.S.C. §1203(b)(5);

    c.  For Plaintiff's Sixth Claim for Relief (Nevada Uniform Trade Secrets Act) pursuant to NRS 600A.060RCW 19.108.040; and

    d.  For Plaintiff's Seventh Claim for Relief (Illinois Trade Secrets Act) pursuant to 765 ILCS 1065/5.

Consequently, Plaintiff's reasonable attorneys' fees incurred in connection with this matter are recoverable herein.

"A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2). "Unless a statute or court rule provides otherwise," any such motion "must be filed no later than 14 days after entry of judgment." Fed. R. Civ. P. 54(d)(2)(B)(i). Here, the appropriate procedure for awarding fees under these statutory claims is for the prevailing party to file a post-trial motion pursuant to Rule 54(d).

Local Rule 54-1 provides further that unless the court orders otherwise, the prevailing party

is entitled to reasonable costs. A prevailing party who claims costs must file and serve a bill of costs and disbursements on the form provided by the clerk no later than 14 days after the date of entry of the judgment or decree. *See* 28 U.S.C. §§ 1920, 1921, and 1923; Fed. R. Civ. P. 54(d)(1).

Consequently, if the jury finds in favor of Plaintiff on the statutory claims as set forth herein, Plaintiff will file a motion for attorneys' fees and costs pursuant to applicable Rules.

Dated this 25th day of January, 2023.

MARKS & KLEIN LLC

/s/ Andrew P. Bleiman, Esq.
ANDREW P. BLEIMAN, ESQ.

FLETCHER & LEE

/s/ Elizabeth Fletcher, Esq.
ELIZABETH FLETCHER, ESQ.
Attorneys for Plaintiff HP Tuners, LLC

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b) and Local Rule IC 4-1, I certify under penalty of perjury that I am an employee of Fletcher & Lee, 448 Ridge Street, Reno, Nevada 89501, and that on January 25, 2023, I served <u>Plaintiff HP Tuners, LLC's Trial Brief</u> via the Court's Notice of Electronic Filing to all those persons registered with the United States District Court to receive service electronically for the above-captioned matter.

DATED this 25th day of January, 2023.

<u>/s/ Elizabeth Dendary, CP</u>
ELIZABETH DENDARY, CP
Certified Paralegal